Aaron P. Hisel, OSB #161265
*aaron@capitol.legal*
Rebeca A. Plaza, OSB #053504
*rebeca@capitol.legal*
William W. Manlove, OSB #891607
*bill@capitol.legal*
Capitol Legal Services
901 Capitol St. NE
Salem, OR 97301
   Telephone: (503) 480-7252
   Fax: (503) 779-2716
   Attorneys for Defendant Steven Teets

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| ESTATE OF JAMES MARSHALL, and SARA MARSHALL, in her personal capacity and as personal representative of the Estate of James Marshall, | Case No. 3:22-cv-01470-YY |
| Plaintiffs, | **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| CITY OF FOREST GROVE, STEVEN TEETS, KOLE McGANN, and MATTHEW DORICK, | |
| Defendants. | |

**LR 7-1 CERTIFICATION**

Counsel for defendant Steven Teets, William W. Manlove, conferred with one of Plaintiff's counsel, Jonny Russell, by a telephone conference call on October 7, 2025, having previously exchanged detailed position statements on the issues over email. The parties are unable to resolve their differences with respect to claims and issues that are the subject of defendant Steven Teets'

Page 1 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Motion for Summary Judgment ("Teets' Motion"), and therefore, defendant Steven Teets requires the Court's assistance.

## <u>MOTION</u>

Defendant Steven Teets ("Teets") moves the Court under Fed. R. Civ. P. 56(c) for Summary Judgment against the First Amended Complaint ("FAC") on the following grounds:

(1)    Defendant Teets is entitled to summary judgment on Plaintiff's First Cause of Action that Teets violated Plaintiff's Fourth Amendment rights by "tackling" James Marshall and taking him to the ground. *Graham v. Connor,* 490 U.S. 386, 396 (1989); *A.B. v. County of San Diego,* No. 20-56140, 2022 WL 1055558, at *1, (9th Cir., April 8, 2022); *Carmona-Perez v. City of Salem*, No. 6:20-cv-00186-IM, 2023 WL 6216167, at *6-8, (D. Or. September 25, 2023);

(2)    Defendant Teets is entitled to summary judgment on Plaintiff's First Cause of Action that Teets violated Plaintiff's Fourth Amendment rights by "discharg[ing] his taser striking Mr. Marshall, prior to tackling Mr. Marshall." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Torres v. Madrid*, 592 U.S. 306, 317 (2021); *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596-97 (1989);

(3)    Defendant Teets is entitled to summary judgment on Plaintiff's First Cause of Action that Teets violated Plaintiff's Fourth Amendment rights by "tas[ing] Mr. Marshall a second time" with a drive stun application of the Taser. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Isayeva v. Sacramento Sheriff's Department*, 872 F.3d 938, 948-950 (9th Cir. 2017); *Holloway v. Orange County*, No. 8:19-CV-01514-DOC-DFMx, 2024 WL 1816943, *5-6 (C.D. Calif. March 18, 2024); *Bynum v. City of North Las Vegas*, No.: 2:17-cv-02112-APG-VCF, 2020 WL 8483837, at *7 (D. Nevada August 31, 2020);

Page 2 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

(4)     Defendant Teets is entitled to summary judgment on Plaintiff's First Cause of Action that Teets violated Plaintiff's Fourth Amendment rights by using his knees on Mr. Marshall's shoulder blades, neck and buttocks during the custody of Mr. Marshall.  *Graham v. Connor*, 490 U.S. 386, 396 (1989); *A.B. v. County of San Diego,* No. 20-56140, at *1-2, (9th Cir., April 8, 2022); *Gregory v. County of Maui*, 523 F.3d 1103, 1106-07 (9th Cir. 2008);

(5)     Defendant Teets is not liable for any use of force or control by defendants McGann or Dorick;  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

(6)     Defendant Teets is entitled to qualified immunity for each of his uses of force that comprise Plaintiff's First Cause of Action as described above in paragraphs (1)-(5);

(7)     Defendant Teets is entitled to summary judgment on Plaintiff's Fifth Cause of Action that Teets committed the state law tort of Assault on Mr. Marshall.  *Price v. City of Sutherlin,* 945 F.Supp.2d 1147, 1157-58 (D. Or. 2013); *Giger v. Klamath Falls*, 21 Or App 753, 763 (1975); *Rich v. Cooper*, 234 Or. 300, 309 (1963); and

(8)     Defendant Teets is entitled to summary judgment on Plaintiff's Sixth Cause of Action that Teets committed the state law tort of Battery on Mr. Marshall. *Price v. City of Sutherlin*, 945 F. Supp. 2d 1147, 1157-58 (D. Or. 2013); *Giger v. Klamath Falls*, 21 Or. App. 753, 763 (1975); *Rich v. Cooper*, 234 Or. 300, 309 (1963).

In support of this Motion, Defendant Teets relies upon:

(a)     The Declaration of William W. Manlove ("Manlove Decl.") and the exhibits attached thereto;

(b)     The Declaration of Steven Teets ("Teets Decl.") and the exhibits attached thereto;

(c)     The pleadings, declarations and attached exhibits filed with the Court by defendants Kole McGann, Matthew Dorick and the City of Forest Grove ("City Defendants"),

Page 3 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

including the City Defendants' Motion and Memorandum of Law in support of Summary Judgment;

(d)     The complete Court file; and

(e)     The Memorandum of Law below.

## TABLE OF CONTENTS

LR 7-1 CERTIFICATION ............................................................................................. 1

MOTION ..................................................................................................................... 2

MEMORANDUM OF LAW ........................................................................................ 11

I.      Factual Background ............................................................................................. 11

      A.      Officer Teets and the other officers locate and attempt to communicate with Mr. Marshall. ................................................................................. 11

      B.      Mr. Marshall's fist strike and Officer Teets counter punch. ................................ 15

      C.      Officer Teets pushes Mr. Marshall to the ground; Mr. Marshall and the police fight to control Officer Teet's Taser; the unintentional Taser discharge. ....................................................................................... 16

      D.      The officers' efforts to get Mr. Marshall handcuffed and to control Mr. Marshall's physical resistance; Officer Teets' single application of the Taser drive stun mode. ............................................................... 18

      E.      Mr. Marshall continues to kick his legs; Officer McGann retrieves the zip ties. .................................................................................................... 21

      F.      Mr. Marshall stops moving. ......................................................... 23

II.     Summary Judgment Standard ......................................................................... 23

III.    Argument ......................................................................................................... 25

      A.      Officer Teets did not violate Mr. Marshall's 4th Amendment rights. .................. 25

      B.      Officer Teets' takedown of Mr. Marshall was an objectively reasonable use of force. .......................................................................................... 28

      C.      Officer Teets' inadvertent Taser discharge was not a seizure under the Fourth Amendment. ...................................................................... 32

      D.      Officer Teets' single Taser drive stun on Mr. Marshall's back was an objectively reasonable use of force. ................................................ 34

      E.      Officer Teets and the other officers' intermittent use of their knees and hands to control Mr. Marshall was an objectively reasonable use of force. ......... 40

      F.      Officer Teets is not liable for any use of force or control by either defendant McGann or defendant Dorick. ..................................................... 50

      G.      Officer Teets is entitled to Qualified Immunity. ............................... 51

H.    Plaintiff has no state law claims for assault or battery against Officer Teets. ................................................................................................. 53

CONCLUSION .............................................................................................................. 54

Page 6 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

## Cases

*A.B. v. County of San Diego,*
  2020 WL 5847551, *17 (S.D. Calif.), 18cv1541-MMA-LL, October 1, 2020 ........... 45, 46, 47

*A.B. v. County of San Diego,*
  No. 20-56140, at *1, (9th Cir., April 8, 2022) ................................................. 2, 3, 47

*Anderson   v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986).................................................................................... 21, 22

*Arpin v. Santa Clara Transp. Agency,*
  261 F.3d 912   (9th Cir. 2001) .......................................................................... 23

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009)....................................................................................... 3, 48

*Barba v. City of Shafer,*
  No. 1:12-CV-00195 AWI JLT, 2015 WL 848495, at *7 (E.D. Cal. Feb. 26, 2015) ................ 25

*Blankenhorn v. City of Orange,*
  485 F.3d 463 (9th Cir. 2007) ............................................................................ 28

*Brooks v. City of Seattle,*
  599 F.3d 1018 (9th Cir. 2010) ...................................................................... 34, 37

*Brooks v. Clark Cnty.,*
  828 F.3d 910 (9th Cir. 2016) ............................................................................. 25

*Brosseau v. Haugen,*
  543 U.S. 194 (2004) (per curiam)....................................................................... 50

*Brower v. Cnty. of Inyo,*
  489 U.S. 593 (1989)....................................................................................... 2, 31

*Bryan v. MacPherson,*
  630 F.3d 805 (9th Cr. 2010)............................................................................... 25

*Bynum v. City of North Las Vegas,*
  No.: 2:17-cv-02112-APG-VCF, 2020 WL 8483837, at *7 (D. Nevada August 31, 2020) .. 2, 35

*Calonge v. City of San Jose,*
  104 F.4th 39 (9th Cir. 2024) ............................................................................. 49

*Carmona-Perez v. City of Salem,*
  No. 6:20-cv-00186-IM, 2023 WL 6216167, at *6-8, (D. Or. September 25, 2023).................. 2

*Celotex Corp., v. Catrett,*
  477 U.S. 317 (1986)......................................................................................... 22

*Chew v. Gates,*
  27 F.3d 1432 (9th Cir. 1994) ............................................................................. 25

*Ciampi v. City of City of Palo Alto*,
   790 F.Supp. 2d 1077 (N.D. Cal.) (2011) ................................................................ 35

*City of Escondido v. Emmons*,
   586 U.S. 38 (2019) ................................................................................................. 49

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ............................................................................................... 31

*Deorle v. Rutherford*,
   272 F.3d 1272 (9th Cir. 2001) ............................................................................... 25

*District of Columbia v. Wesby*,
   583 U.S. 48 (2018) ............................................................................................ 49, 50

*Drummond v. City of Anaheim*,
   343 F.3d 1052 (9th Cir. 2003) ............................................................................... 44

*Est. Of Hernandez by & through Hernandez v. City of Los Angeles*,
   96 F.4th 1209 (9th Cir. 2024) ................................................................................ 50

*Forrester v. City of San Diego*,
   25 F.3d 804 (9th Cir. 1994) ................................................................................... 26

*Franklin v. Foxworth*,
   31 F.3d 873 (9th Cir. 1994) ................................................................................... 25

*Giger v. Klamath Falls*,
   21 Or App 753 (1975) ......................................................................................... 3, 52

*Gonzalez v. City of Anaheim*,
   747 F.3d 789 (9th Cir. 2014) ................................................................................. 24

*Graham v. Connor*,
   490 U.S. 386 (1989) ................................................................................. 2, 3, 24, 31

*Gregory v. County of Maui*,
   523 F.3d 1103  (9th Cir. 2008) ............................................................... 3, 43, 44, 45

*Holloway v. Orange County*,
   No. 8:19-CV-01514-DOC-DFMx, 2024 WL 1816943, *5-6 (C.D. Calif. March 18, 2024) ..... 2

*Isayeva v. Sacramento Sheriff's Department*,
   872 F.3d 938 (9th Cir. 2017) ...................................................................... 2, 36, 37

*Keenan v. Allan*, 9
   1 F.3d 1275 (9th Cir. 1996) ................................................................................... 22

*Kisela v. Hughes*,
   584 U.S. 100 (2018) .................................................................................... 47, 49, 50

*Krause v. Vancouver Police Dept.*,
   2023 WL 7286999, *5, 3:22-cv-05204-BHS-GJL (October 4, 2023) (W.D. Wash.) .............. 29

*Lowry v. City of San Diego*,
  858 F.3d 1248 (9th Cir. 2017) ....................................................................... 23, 25

*Malley v. Briggs*,
  475 U.S. 335 (1986)................................................................................................ 50

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)................................................................................................ 22

*Mattos v. Agarano,*
  661 F.3d 433 (9th Cir. 2011) ....................................................................... 34, 37

*Monell v. Dep't of Soc. Servs.*,
  436 U.S. 658 (1978)................................................................................................ 48

*Morales v. Fry*,
  873 F.3d 817 (9th Cir. 2017) ................................................................................ 50

*Napouk v. Las Vegas Metropolitan Police Department*,
  123 F.4th 906 (9th Cir. 2024) .............................................................................. 24

*Nelson v. City of Davis*,
  685 F.3d 867 (9th Cir. 2012) ................................................................................ 25

*Oracle Corp. Sec. Litig.*,
  627 F.3d 376 (9th Cir. 2010) ................................................................................ 22

*Price v. City of Sutherlin,*
  945 F.Supp.2d 1147 (D. Or. 2013) ................................................................ 3, 52

*Rice v. Morehouse*,
  989 F.3d 1112 (9th Cir. 2021) ............................................................. 24, 28, 49

*Rich v. Cooper*,
  234 Or 300 (1963)...................................................................................................... 3

*Rivas –Villegas v. Cortesluna,*
  595 U.S. 1 (2021)..................................................................................................... 49

*Saberi v. City of Portland,*
  No. 04-1396-M), 2006 WL 2707995, at *4 (D. Or. Sept. 18, 2006); ...................... 52

*Scott v. Harris,*
  550 U.S. 372 (2007)................................................................................................ 23

*Shafer v. Cnty. of Santa Barbara,*
  868 F.3d 110 (9th Cir. 2017) ................................................................................ 50

*Sheridan v. Trickey,*
  2010 WL 5812678, * 8, Civ. No. 10-06034-AC, (December 16, 2010) (D. Or.) ............ 28

*Smith v. Agdeppa,*
  81 F.4th 994 (9th Cir. 2023) ................................................................................. 49

*Soremekun v. Thrifty Payless, Inc.,*
   509 F.3d 978 (9th Cir. 2007) .................................................................................. 22

*Tatum v. City and County of San Francisco,*
   441 F.3d 1090, 1092-93 (9th Cir. 2006) ................................................................ 28

*Torres v. Madrid,*
   592 U.S. 306 (2021) ........................................................................................... 2, 31

*Union Bank of California v. Copeland Lumber Yards, Inc.,*
   213 Or App 208 (2007) ........................................................................................... 52

*Vos v. City of Newport Beach,*
   892 F.3d 1024 (9th Cir. 2018) .............................................................................. 23

*Wilkins v. City of Oakland,*
   350 F.3d 949 (9th Cir. 2003) ................................................................................ 24

*Wilkinson v. Torres,*
   610 F.3d 546 (9th Cir. 2010) ................................................................................ 26

*Williamson v. City of National City,*
   23 F.4th 1146  (9th Cir. 2022) .............................................................................. 25

**Statutes**

42 U.S.C. § 1983 ...................................................................................................... 48
ORS 161.233 ............................................................................................................. 52
ORS 161.235 ............................................................................................................. 52
ORS 164.345 ............................................................................................................. 29
ORS 166.025(1)(a) .................................................................................................... 29
ORS 166.025(1)(b) .................................................................................................... 29
ORS 30.020 et seq. .................................................................................................... 52

**Rules**

Fed. R. Civ. P. 56(a) .......................................................................................... 21, 23
Fed. R. Civ. P. 56(c) ................................................................................................... 2
Fed. R. Civ. P. 56(c)(1)(A) ...................................................................................... 22

**MEMORANDUM OF LAW**

I.    **Factual Background**

Defendant Steven Teets hereby incorporates certain factual background and undisputed material facts presented by the City Defendants' Motion for Summary Judgment and Memorandum in Law in Support, including the declarations of defendants Kole McGann and Matthew Dorcik, to the extent those facts are necessary to resolve any claim asserted against defendant Steven Teets ("Teets")

A.    **Officer Teets and the other officers locate and attempt to communicate with Mr. Marshall.**

On October 7, 2020, during the late-night hours, Mr. Marshall left his home in Forest Grove, Oregon, wearing pajama bottoms, shirtless, carrying a flagpole, and walked to St. Anthony of Padua Catholic Church. (FAC, ECF 56, ¶ 13). At approximately 11:50 p.m. Forest Grove Police arrived at St. Anthony's in response to a community 911 call of a half-naked man, waving an 8–10-foot flagpole, yelling, running through the streets, and acting erratically. (Declaration of William W. Manlove ("Manlove Decl."), ¶ 3, Ex. 1, Excerpts of Certified Deposition Transcript of Steven Teets, ("Teets Depo"), Tr. pp. 26:16-27:5; 29:3-30:1; Manlove Decl., ¶ 4, Ex. 2, Excerpts of Certified Deposition Transcript of Kole McGann, ("McGann Depo."), Tr. pp. 28:9-29:1; 29:7-13; Manlove Decl., ¶ 5, Ex. 3, Excerpts of Certified Deposition Transcript of Matthew Dorick, ("Dorick Depo."), Tr. p. 38:11-19.) Officer McGann arrived on scene first, followed by Officer Dorick.  (Manlove Decl., Ex. 2, McGann Depo., Tr. p. 29: 5-6; Ex. 3, Dorick Depo., Tr. p. 40:13-17.) Both officers McGann and Dorick tried to ascertain Mr. Marshall's mental condition by speaking to him, asking him what was going on, asking for his name, and repeatedly asking him to put down the flagpole.  (Manlove Decl., Ex. 2, McGann Depo., Tr. p. 35: 3-9.) (See Declaration

of Kole McGann ("McGann Decl."), Ex. 1, Body Worn Camera ("BWC") video at 0:07-2:10.)[1] (See Declaration of Matthew Dorick ("Dorick Decl."), ¶ 8, Ex. 1, BWC video at 0:33-0:34.) Officer Dorick believed Mr. Marshall's mental state was "poor" and that he was "not really cognizant, not really making sense." Officer Dorick believed Mr. Marshall was "maybe having a mental health crisis or drug-induced mental health crisis." (Manlove Decl., Ex. 3, Dorick Depo., Tr. pp.41:11-42: 13.)

Officer Teets then arrived on scene and tried speaking with Mr. Marshall. In an effort to develop a rapport with Mr. Marshall, Officer Teets attempted to engage in small talk and asked Mr. Marshall, in part, the following: what Mr. Marshall was doing, his name, where he lived, if the flag was his, if Mr. Marshall had been in the military, and whether he had taken any narcotics or was on any medication. (Teets Decl., ¶ 7, Ex. 5, BWC Video at 01:46- 03:49.) (See also McGann Decl., Ex. 1, BWC video at 03:13-05:37.) Mr. Marshall gave rambling, incoherent statements in response to Officer Teets. (ECF 56, ¶ 16; Manlove Decl., Ex. 1, Teets Depo., Tr. pp. 31:25-32: 3.) (Teets Decl., Ex. 5, BWC Video at 00:30- 05:56).

Ignoring the officers' attempts to engage and speak to them, Mr. Marshall had reached for the church door handle, apparently trying to open the door. (Teets Decl., Ex. 5, BWC video at 04:21). When Mr. Marshall said: "Is it unlocked?", Officer Teets admonished Mr. Marshall: "Don't go in there." (Teets Decl., Ex. 5, BWC video at 04:21-04:24.) (McGann Decl., Ex. 1, BWC video at 06:09-06:10.)

As Officer Teets attempted to communicate with Mr. Marshall, Mr. Marshall became more agitated, at one point "jousting" and charging at the officers with the flagpole as a spear. (Manlove Decl., Ex. 1, Teets Depo., Tr. p. 32:8-10; Ex. 2, McGann Depo., Tr. pp. 49:25-50:7; Ex. 3, Dorick

---

[1] The time references for all the BWC video refers to the time stamp noted on the exhibit, in the lower, left-hand part of the video.

Page 12 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Depo., Tr. pp. 53:16-54:10.) (Teets Decl., Ex. 5, BWC video at 04:35-04:40.) (Dorick Decl., ¶ 13.) Officer Teets told Mr. Marshall twice to calm down or he would be tased. (Teets Decl., ¶ 8, Ex. 5 BWC video at 04:39-04:43.) (McGann Decl., Ex. 1, BWC video at 06:26-06:31.) At this time Officer Teets was still assessing Mr. Marshall's mental condition and was suspicious that Mr. Marshall was under the influence of narcotics. (Manlove Decl., Ex. 1, Teets Depo., Tr. p. 30:22-25.) (Teets Decl., ¶ 9.)

As Mr. Marshall waved the flagpole at Officer Teets, Teets asked him: "Okay. What's going on?" (Teets Decl., Ex. 5, BWC video at 04:49-04:58.) At this point, Officer Teets confirmed with Officer McGann to request medical personnel to respond and to stand by because Teets thought detaining Mr. Marshall might involve some use of force. (Teets Decl., ¶ 13, Ex. 5, BWC video at 04:59.) (McGann Decl., Ex. 1, BWC video at 06:45-06:47.) Mr. Marshall began pressing the key pad to the church door and tugging on the church door handle. (Teets Decl., Ex. 5, BWC video at 5:03-5:05.) (See also Declaration of Lauren Nweze ("Nweze Decl.")_ Ex. 1, NVR_ch13_main_20201008000239_20201008003738 (FG0940) ("Church video"), at 2:11/35:04-2:22/35:04.)

Mr. Marshall then began kicking in a backward motion at one of the church glass doors. Officer Teets has described Mr. Marshall's kicking motion as a "donkey kick". (Manlove Decl., Ex. 1, Teets Depo., Tr. p. 35:17-23.) (Teets Decl., Ex. 5, BWC video at 05:06-05:24.). (See also McGann Decl., Ex. 1, BWC video at 06:52-07:04; Dorick Decl., Ex. 1, BWC video at 05:17-05:28.) Mr. Marshall kicked the glass door in rapid succession eight times with his right leg. Then, immediately, Mr. Marshall did one "donkey kick" with his right leg to a glass window, next to the glass door. (*Id.*) (See also Nweze Decl., Ex. 1, Church video, at 2:22/35:04-2:39/35:04.) In response to Mr. Marshall's kicking, Officer Teets gave Mr. Marshall commands, which Mr. Marshall ignored, telling Mr. Marshall to "stop" "knock it off" and "get on the ground now" "get

on the ground" "get on the ground." (Teets Decl., ¶ 11, Ex. 5, BWC video at 05:08-05:16.) Officer Dorick also gave Mr. Marshall commands, telling Mr. Marshall: "Stop that. Stop it." (Dorick Decl., Ex. 1, BWC video 05:21.) Officer Teets asked dispatch to send an additional officer to the scene. (Teets Decl., Ex. 5, BWC video at 05:17.) At the same time, Officer Teets also continued talking to Mr. Marshall to try to de-escalate the situation, telling Mr. Marshall to "Calm down guy. Okay? Relax. Take it down a notch. Take it down a notch. Calm down." (Teets Decl., ¶ 11, Ex. 5, BWC video at 05:34 to 05:38). (McGann Decl., Ex. 1, BWC video at 07:21-07:22.)

Abruptly, Mr. Marshall stabbed the flagpole in the direction of Officer Teets, causing Teets to step back about three feet. (Teets Decl., ¶ 12, Ex. 5, BWC video at 05:50-05:55.) (McGann Decl., Ex. 1, BWC video at 07:38-07:40.) (Dorick Decl., Ex. 1, BWC video at 06:01-06:02.) Officer Teets responded saying "Don't" and ordering Mr. Marshall to drop the flagpole, saying: "Motherfucker. Put that shit down. Put it down." (Teets Decl., ¶ 12, Ex. 5, BWC video at 05:53.) Officer Teets was concerned that Mr. Marshall would use the flagpole as a weapon to injure him in some way. (Teets Decl., ¶ 12.) (See also Dorick Decl., ¶ 14.) Then Mr. Marshall turned toward the church and began slamming the end of the flagpole into the glass door in an apparent attempt to break the church door's glass. (Teets Decl., ¶ 11.) (Manlove Decl., Ex. 2, McGann Depo., pp. 37:20-38:9.) (Moments earlier, Mr. Marshall had pressed the door's keypad and pulled on the door's handle.) (See Teets Decl., ¶ 11, Ex. 5, BWC video at 05:29.) (Nweze Decl., Ex. 1, Church video at 2:12/35:04-2:21/35:04.) (Dorick Decl., ¶ 15.) Mr. Marshall slammed the end of the flagpole two times in succession against the glass door. (Teets Decl., Ex. 5, BWC video at 05:56-05:57.) (McGann Decl., Ex. 1, BWC video at 07:42-07:43.) (Dorick Decl., Ex. 1, BWC video at 06:06.) (Nweze Decl., Ex. 1, Church video at 3:11/35:04-3:12/35:04.) Each time Mr. Marshall kicked the glass door or the glass window or slammed the end of the flagpole against the glass door, the kicking and slamming made a loud sound, and the glass would visibly vibrate and shake.

Page 14 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

(*Id.*) (Teets Decl., ¶11.) After Mr. Marshall's second "donkey kick" against the door, a rectangular object fell inside the church from the top of the glass door. (Nweze Decl., Ex. 1, Church video at 2:23/35:04-2:24/35:04.)

### B.    Mr. Marshall's fist strike and Officer Teets counter punch.

Because Mr. Marshall had thrusted the flagpole at the officers as a weapon, and because of the risk that Mr. Marshall's kicks and slamming of the end of the flagpole were going to shatter the glass door and window, Officer Teets decided to "go hands on" and detain Mr. Marshall to be evaluated and treated by paramedics. (Manlove Decl., Ex. 1, Teets Depo., Tr. p. 36:21-25.) (Teets Decl., ¶ 12.) Based on his observations of Mr. Marshall's actions, behavior and statements, Officer Teets believed he had probable cause that Mr. Marshall was attempting to commit the crimes of criminal mischief and disorderly conduct. (Teets Decl., ¶ 11.) Officer Teets was concerned that if the glass broke, Mr. Marshall might get cut and injure himself. (*Id.*) In addition, Officer Teets was concerned that if the glass broke, any attempt to bring Mr. Marshall into custody would become more dangerous for himself and the other officers. (*Id.*) (See also Dorick Decl., ¶ 17.)  (See also McGann Decl., ¶ 16.)

When Mr. Marshall was momentarily distracted and looking at the glass door as he was slamming one end of the pole into the door, Officer Teets quickly moved approximately 12 feet to Mr. Marshall to detain him. (Teets Decl., Ex. 5, BWC video at 05:56-05:58.) (McGann Decl., Ex. 1, BWC video at 07:44-07:47.) (Dorick Decl., Ex. 1, BWC video at 06:07-06:11.) Officer Teets was still holding his Taser in his right hand. However, prior to physically contacting Mr. Marshall, Mr. Marshall struck Officer Teets in the face with a closed, right fist. (Manlove Decl., Ex. 1, Teets Depo., Tr. p. 37:8-14.) (Teets Decl., ¶ 13.) (Nweze Decl. Ex. 1, Church video at 3:13/35:04-3:14/35:04.) Mr. Marshall hit Officer Teets with enough force to split Officer Teets' lip, bruise the inside of his mouth, and cause his lip to start bleeding. (*Id.*) To protect himself, and to get Mr.

Page 15 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Marshall to stop fighting him, Officer Teets punched Mr. Marshall one time in the face with a closed fist. (*Id.*)

### C.    Officer Teets pushes Mr. Marshall to the ground; Mr. Marshall and the police fight to control Officer Teet's Taser; the unintentional Taser discharge.

Despite Mr. Marshall's resistance, Officer Teets used his strength and weight to push Mr. Marshall straight down to the ground. (Teets Decl., ¶ 14.) (Dorick Decl., Ex. 1, BWC video at 06:08-06:12.) (Nweze Decl., Ex. 1, Church video at 3:15/35:04-3:17/35:04.)  Officer Teets did this by putting his arms around Mr. Marshall's torso and shoulders.  (Dorick Decl., Ex. 1, BWC video at 06:08-06:12.) Another officer may have assisted Teets by pulling Mr. Marshall to the ground. (*Id.*) (See Teets Decl., ¶ 14.) Regardless, almost all of the force to take Mr. Marshall to the ground was done only by Officer Teets, who simply pushed Mr. Marshall straight down to the ground. (Nweze Decl., Ex. 1, Church video at 3:15/35:04-3:17/35:04.) (See Dorick Decl., ¶ 23.) (See McGann Decl., ¶ 19.) During the takedown, Officer Teets had physical contact with Mr. Marshall at all times. (Teets Decl., ¶ 14.) Mr. Marshall did not suffer any injuries during the takedown, or at least any serious injuries. (See Teets Decl., ¶ 14.)

When Officer Teets took Mr. Marshall to the ground, Officer Teets' Taser fell to the ground. (Teets Decl., ¶ 13.) (Dorick Decl., Ex. 1, BWC video at 06:09- 06:10.)  (McGann Decl., Ex. 1, BWC video at 07:46-0&;47.)  (The Taser has a yellow frame.)  *Id*. When Mr. Marshall and Officer Teets were initially on the ground, Mr. Marshall had both hands under his chest. Then Mr. Marshall reached out with his left hand and grabbed the Taser, which was lying next to Marshall and Teets, and scooped the Taser under his body. (Teets Decl., ¶ 16.) (See Dorick Decl., Ex. 1, BWC video at 06:16, "He's got Taser.")  Mr. Marshall grabbed the Taser as soon as Marshall and the officers were on the ground.  (Manlove Decl., Ex. 3, Dorick, Depo., Tr. pp. 71:10-72:7.) From Officer Dorick's perspective, "it seemed almost instantaneous." (Manlove Decl., Ex. 3, Dorick Depo., Tr. p. 71:10-16.)

Page 16 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Mr. Marshall was gripping Officer Teets' Taser with his left hand and Teets was trying to pry the Taser loose from Marshall's grip. (Teets Decl., ¶ 16.) As Officer Teets was trying to pry the Taser loose from Mr. Marshall's grip, the Taser discharged, causing the probes to deploy. It is unclear why or how the Taser deployed, whether someone pulled the trigger or deactivated the Taser's safety. (*Id.*) If Officer Teets caused the Taser's probes to deploy, that action was inadvertent and unintentional because Mr. Marshall had physical control over the Taser. (*Id.*) During the ground struggle for the Taser, Officer Teets was focused on getting the Taser away from Mr. Marshall. (*Id.*) Officer Teets thought Mr. Marshall was trying to bite his arm as they struggled for control of the Taser. (*Id.*)

As the officers struggled to get the Taser free from Mr. Marshall, Mr. Marshall was lying prone but slightly angled and leaning on his right side. (Teets Decl., ¶ 17.) Mr. Marshall had his right arm under his body. Initially, Officer Teets was lying with his torso on the right side of Mr. Marshall's upper back and shoulder. (*Id.*) Another officer was momentarily leaning over the top of Officer Teets.  (*Id.*) (Nweze Decl., Ex. 1, Church video at 3:22/35:04-3:29/35:04.) (Dorick Decl., ¶ 23.) Officer Dorick was able to pry Mr. Marshall's left hand from the Taser, and Dorick tossed the Taser aside and away from the officers and Mr. Marshall to prevent Marshall from accessing it again.  (Manlove Decl., Ex. 3, Dorick Depo., Tr. pp. 70:6-71:5.) (Dorick Decl., ¶ 23, Ex. 1, BWC video at 06:26, "Taser away" "Taser away") (Nweze Decl., Ex. 1, Church video at 3:27/35:04-3:29/35:04.) It took Officer Dorick a "short period of time" "less than 30 seconds" to break Mr. Marshall's grip on Taser. (Manlove Decl., Ex. 3, Dorick Depo., Tr. p. 72:12-23.) In fact, it took about 12 seconds. (Nweze Decl., Ex., 1, Church video at 3:17/35:04-3:29/35:04.) Once Mr. Marshall lost his grip on the Taser, he brought his left arm under the torso of his body. (Teets Decl., ¶ 19.)  (McGann Decl., ¶21.)

Page 17 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Officer Teets was positioned on Mr. Marshall's right side. Officer Dorick was straddling Mr. Marshall's legs and was positioned toward the legs/buttocks area. Officer McGann was positioned on Mr. Marshall's left side. (Manlove Decl., Ex. 3, Dorick Depo., Tr. pp. 72:24-73:13.) (Teets Decl., ¶¶ 17, 18.) (Dorick Decl., ¶ 25.) (McGann Decl., ¶ 21.) Mr. Marshall's body was rigid and tense, and he kept kicking his legs. (Teets Decl., ¶ 18.) (Dorick Decl., ¶ 25.) As Officer Teets was attempting to control Mr. Marshall's body movements, Officer Teets used his hands and knees to hold Mr. Marshall down. (Teets Decl., ¶ 18.) Officer Teets' left knee was mostly on the ground, and his right knee was on Mr. Marshall's right shoulder or upper right back. (*Id*.) Officer Teets was applying only enough force with his hands and knees to control Mr. Marshall's resistance. (Teets Decl., ¶¶ 18, 27.) Despite Mr. Marshall's physical resistance with his right arm and kicking his legs, Officer Teets and Officer Dorick were able to pull Mr. Marshall's right hand behind Mr. Marshall's back to place a handcuff on Mr. Marshall's right wrist. (Teets Decl., ¶ 18.) (Dorick Decl., ¶ 23, Ex. 1, BWC video at 06:55-7:08.) From tossing the Taser away, it took approximately 32 seconds for Officers Teets and Dorick to controll Mr. Marshall's right wrist for handcuffing. (See Nweze Decl., Ex. 1, Church video at 3:28/35:04-4:00-/35:04.)

**D.    The officers' efforts to get Mr. Marshall handcuffed and to control Mr. Marshall's physical resistance; Officer Teets' single application of the Taser drive stun mode.**

Officer McGann was kneeling next to Mr. Marshall on Mr. Marshall's left side, pulling on Mr. Marshall's left arm so it could be placed behind Mr. Marshall's back to complete the handcuffing. (Teets Decl., ¶ 19.) (Dorick Decl., Ex. 1, BWC video at 07:20-07:54.) Officer McGann was unable to get Mr. Marshall's left arm out from under his body. (McGann Decl., Ex. 1, BWC video at 08:35-08:57.) Officer McGann told Mr. Marshall to "Give us your arm. Give us your left arm." (Dorick Decl., Ex. 1, BWC video at 07:40-07:41.) During this effort to get his left arm out from under his body, Mr. Marshall was not lying prone with any officers on top of him,

but rather, continued to be angled on his right side. (Teets Decl., ¶ 19.) (Dorick Decl., ¶ 25, Ex. 1, BWC video at 07:37-08:08.) (McGann Decl., ¶ 21.) Officer Teets had one hand resting on Mr. Marshall's back, but Teets' knees were on the ground with his heels against the church wall. (Dorick Decl. Ex. 1, BWC video at 07:55.) (Nweze Decl., Ex. 2, Shafer BWC video at 00:23-00:25.) And as Officer McGann pulled on Mr. Marshall's left arm, Officer McGann had both knees resting on the ground. (Dorick Decl., Ex. 1, BWC video at 07:53-08:41.) (McGann Decl., ¶ 21.) Mr. Marshall's left arm was angled with his left hand down near his waist area. (McGann Decl., ¶21.)

Mr. Marshall was still actively kicking Officer Dorick and resisting Officer McGann's efforts to dislodge his left arm from under his body. Officer Dorick told Mr. Marshall to "Stop kicking.") (See Dorick Decl., ¶ 25, Ex. 1, BWC video at 07:29.) (McGann Decl., Ex. 1, BWC video at 08:54-08:58.) (Nweze Decl., Ex., 1, Church video at 4:30/35:04-4:34/35:04.) Due to Mr. Marshall's continued resistance, Officer Teets asked Officer Shafer, who had responded to the incident, to retrieve Officer Teets' Taser, which lay nearby. (Teets Decl, ¶ 20.) Once he had his Taser, Officer Teets warned Mr. Marshall at least twice that he would be tased if he continued to struggle against Officer McGann's efforts to control Mr. Marshall's left arm. (*Id.*) (Dorick Decl., ¶ 26, Ex. 1, BWC video at 08:09-08:13.) Officer Teets then yelled "Taser" three times. (Teets Decl., ¶ 21.) (McGann Decl., Ex. 1, BWC video at 09:46-09:52.) After these warnings, and Mr. Marshall's failure to comply, Officer Teets applied one Taser drive stun to Mr. Marshall's left upper back/shoulder blade area. (Teets Decl., ¶ 21.) (Dorick Decl., ¶ 26.) (Nweze Decl., Ex. 2, Shafer BWC video at 00:30.) Officer Teets applied the Taser for one to two seconds. (Teets Decl., ¶ 21.) The Taser drive stun had no apparent, immediate effect on Mr. Marshall's continued resistance to releasing his left arm from under his body. (Teets Decl., ¶ 23.) (Dorick Decl., ¶ 26, Ex. 1, BWC video at 08:08-08:31.) (McGann Decl., ¶ 22.)

Page 19 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

When Officer Teets warned of the Taser use and applied the Taser, Mr. Marshall was still angled on his right side. (Dorick Decl., ¶ 25, Ex. 1, BWC video at 08:07-08:23.) Officer Teets's left foot was still pressing against the church wall with his left knee on the ground. (Nweze Decl., Ex. 2, Shafer BWC video at 00:23-00:34.) Officer Teets' left knee was not touching Mr. Marshall. (*Id.*) (Dorick Decl., Ex. 1, BWC video at 08:11-08:22.) Officer Teets held the Taser in his right hand when he applied the Taser. His left hand was pressing on Mr. Marshall's lower left back. (Nweze Decl., Ex. 2, Shafer BWC video at 00:24-00:34.) (Dorick Decl., Ex. 1, BWC video at 08:11-08:22.) Although Officer Teets' right knee may have been touching Mr. Marshall's body, Teets was in a squatting position, like a baseball catcher, with almost all of his weight on the balls of his feet. (Teets Decl., ¶ 20.) (Nweze Decl., Ex. 2, Shafer BWC video at 00:30-00:34.) In fact, when Officer Teets applied the Taser, Mr. Marshall reacted by angling his body to lay further on his right side. (Dorick Decl., Ex. 1, BWC video at 08:19-08:21.) From Officers Teets and Dorick handcuffing Mr. Marshall's right wrist to Officer Teets applying the Taser to Mr. Marshall's back was approximately one minute and 14 seconds. (See Dorick Decl., Ex. 1, BWC video at 07:07-08:21.)

Officer Teets then reached over Mr. Marshall's back and used both hands to pull on Mr. Marshall's left shoulder, while Officer McGann continued to pull on Mr. Marshall's left arm. (Teets Decl., ¶ 23.) (Dorick Decl., ¶ 27, Ex. 1, BWC video at 08:32-08:54.) During the first part of this effort, Officer Teets' left knee did not touch Mr. Marshall's body at all. Instead, Officer Teets was again squatting like a baseball catcher, on the balls of his feet, as he pulled on Mr. Marshall's left shoulder. (Dorick Decl., Ex. 1, BWC video at 08:32-08:36.) (Nweze Decl., Ex. 2, Shafer BWC video at 00:34-00:36.) (Nweze Decl., Ex. 1, Church video at 5:38/35:04-5:41/35:04.) During the later part of this effort to obtain Mr. Marshall's left arm, Officer Teets had his left knee resting on Mr. Marshall's buttocks and his right knee near Mr. Marshall's right shoulder blade

Page 20 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

torso. (Dorick Decl., Ex. 1, BWC video at 08:36-08:46.) Mr. Marshall remained angled, still lying on his right side. (*Id.*) With Officer Teets' assistance, Officer McGann was then able to get Mr. Marshall's left arm out from under his body, and despite Mr. Marshall's continued physical resistance, Officers Teets and McGann were able to get Mr. Marshall's left wrist behind his back and complete the handcuffing. (Teets Decl., ¶ 23.) (McGann Decl., ¶ 23.)(Nweze Decl., Ex. 1, Church video at 5:51.) From Officer Teets applying the Taser to Officers Teets and McGann handcuffing Mr. Marshall's left wrist took approximately 24 seconds. (Dorick Decl., Ex. 1, BWC video at 08:21-08:45.) From handcuffing Mr. Marshall's right wrist, it took the officers approximately one minute and 38 seconds to free Marshall's left arm and handcuff his left wrist. (See Dorick Decl., Ex. 1, BWC video at 07:07-08:45.)

### E.  Mr. Marshall continues to kick his legs; Officer McGann retrieves the zip ties.

Once Officers Teets and McGann were able to complete the handcuffing, Officer Teets stood up momentarily and was not touching Mr. Marshall at all. (Teets Decl., ¶ 24.) (Dorick Decl., Ex. 1, BWC video at 08:52-08:56.) (Nweze Decl., Ex. 1, Church video at 5:56/35:04-6:01/35:04.) But because Mr. Marshall continued to kick his legs towards Officer Dorick, Officer Teets squatted back down and initially placed his left knee near Mr. Marshall's buttocks. (Teets Decl., ¶ 24.) (Dorick Decl., Ex. 1, BWC video at 08:56-09:02.) (Nweze Decl., Ex. 1, Church video at 6:01/35:04-6:06/35:04.) A few seconds later, Officer Teets then put his right knee near Mr. Marshall's right upper back and shoulder. (Teets Decl., ¶ 24.) (Dorick Decl., Ex. 1, BWC video at 09:02-09:13.) He also placed his hands on Mr. Marshall's back. (*Id.*) Officer Teets was only pressing down with enough force to steady himself or to diminish Mr. Marshall's ability to kick. (Teets Decl., ¶ 24.) Officer McGann left to go to his police vehicle to get zip ties to control Mr. Marshall's legs. (Teets Decl., ¶ 24.) (Dorick Decl., ¶ 27, Ex. 1, BWC video at 09:22-09:24.)

When Officer McGann left, Officer Shafer then kneeled down with his right knee on Mr. Marshall's left buttock. (Dorick Decl., Ex. 1, BWC video at 09:27.) Officer Dorick was using his hands to hold down Mr. Marshall's left leg. (Dorick Decl., ¶ 27, Ex. 1, BWC video at 09:43-10:17.) During this time, one of the officers told Mr. Marshall to "Stop grabbing my leg." (Dorick Decl, Ex. 1, BWC video at 09:47-09:48.) Moreover, during this time when Officers Dorick and Shafer were holding Mr. Marshall down, Officer Teets completely stood up, with only his right hand resting on Mr. Marshall upper, right back, and asked Mr. Marshall "What's your name, man?" "What's your name?" Mr. Marshall replied, "USA" and twice said "United States of America." (Nweze Decl., Ex. 2, Shafer BWC video at 01:57-02:13.) (Teets Decl., Ex. 5, BWC video at 09:45-10:01.) (See Nweze Decl., Ex. 1, Church video at 7:01/35:04-7:17/35:04.) After standing for approximately 18 seconds, Officer Teets squatted down with only his hands resting on Mr. Marshall's back. (See Nweze Decl., Ex. 2, Shafer BWC at 01:59-02:17.) During this time, Mr. Marshall was able to raise his head off the ground and turn his head. (*Id.* at 02:15-2:31.) Also during this time, Mr. Marshall's back was rising up and down, indicating he was breathing. (*Id.* at 02:56-03:00.)

It took Officer McGann approximately 50 seconds to retrieve the zip ties. (Dorick Decl., Ex. 1, BWC video at 09:25-10:15.) When Officer Dorick was having difficulty threading the ties properly, Officer Teets leaned over Mr. Marshall's buttocks and upper legs to assist Officers Dorick and McGann in getting the restraints applied to Mr. Marshall's legs. Officer Teets hands were completely off of Mr. Marshall's back, and he was applying little if any downward pressure on Mr. Marshall with his knees. (Teets Decl., ¶ 25.) (Dorick Decl., Ex. 1, BWC video at 10:16-11:24.) (Nweze Decl., Ex. 2, Shafer BWC video at 02:45-03:22.) Officer Teets was mostly kneeling on the ground. (McGann Decl., Ex. 1, BWC video at 12:22-12:34.) From Officers Teets and McGann handcuffing Mr. Marshall's left wrist to the officers securing the zip ties around Mr.

Page 22 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Marshall's ankles took approximately two minutes and 38 seconds. (See Dorick Decl., Ex. 1, BWC video 08:45-11:23.)

### F.    Mr. Marshall stops moving.

As soon as the leg restraints were applied, one of the officers said that Mr. Marshall was not moving. (Nweze Decl., Ex. 2, Shafer BWC video at 03:23.) This was the first moment during Officer Teets' interaction with Mr. Marshall that Teets became aware that Mr. Marshall did not appear to be breathing or was having difficulty breathing. (Teets Decl., ¶ 26.) (See McGann Decl., ¶ 26.) (See Dorick Decl., ¶ 28.) Officer Teets immediately turned Mr. Marshall over on to his right side, and then positioned him on his back. (Teets Decl., ¶ 26.) (Nweze Decl., Ex. 2, Shafer BWC video at 03:24-03:33.) (McGann Decl., Ex. 1, BWC video at 12:58-13:12.) One of the officers immediately began CPR on Mr. Marshall and Officer Teets radioed for the paramedics to move in from their staging area and come into the scene. (*Id.*) CPR continued until the paramedics arrived. (Manlove Decl., Ex. 1, Teets Depo., Tr. p. 54:8-12.)

Mr. Marshall was taken by ambulance to Tuality Forest Grove Hospital, where he died approximately 36 hours later. (FAC, ¶ 35.)

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp., v.*

Page 23 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

*Catrett*, 477 U.S. 317, 323, (1986) (internal quotation marks omitted); *see also* Fed. R. Civ. P. 56(c)(1)(A). If the moving party bears the burden of proof on a particular issue at trial, it must provide affirmative evidence demonstrating that "no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007). On the other hand, when the nonmoving party bears the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id*.

Summary judgment involves burden shifting. If the moving party meets its initial burden, the nonmoving party must then establish that there are "specific facts demonstrating the existence of genuine issues for trial." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp.*, 477 U.S. at 324); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). The nonmoving party must produce evidence to support its claims and must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). To this end, the non-moving party is not permitted to rely on the mere allegations in its pleading. *Celotex Corp.*, 477 at 324. Further, the nonmoving party must show more than the mere existence of a scintilla of evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252. Instead, the nonmoving party must come forth with evidence from which a jury could reasonably render a verdict in the nonmoving party's favor. *Id*. Where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587. At summary judgment, the court draws all reasonable inferences and views the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88. However, when the factual incident underlying the legal action is recorded by video, and there is no dispute about the video's accuracy or authenticity, courts "vie[w] the facts in the light depicted by the video[s]." *Scott v. Harris,* 550

Page 24 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

U.S. 372, 378-81 (2007). The nonmoving party's blatant contradiction of a video, such that no reasonable jury could believe the contradiction, does not prevent summary judgment. *Id*. at 380.[2]

In a Section 1983 action for excessive force in violation of the Fourth Amendment, the plaintiff bears the burden of proving that the force used was unreasonable. *Arpin v. Santa Clara Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001). Notably,"[i]n the absence of material factual disputes, the objective reasonableness of a police officer's conduct is 'a pure question of law.'" *Lowry v. City of San Diego*, 858 F.3d 1248, 1254 (9th Cir. 2017) (en banc) (quoting *Scott v. Harris*, 550 U.S. 372, 381, n. 8 (2007).

For the reasons that follow, there are no genuine disputes as to any material fact, and Officer Teets is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(a).

## III.    Argument

### A.    Officer Teets did not violate Mr. Marshall's 4th Amendment rights.

Plaintiff[3] contends that Officer Teets used excessive force in violation of Plaintiff's Fourth Amendment rights by using physical force in five different ways: (1) by "charg[ing] and tackl[ing]" Mr. Marshall to the ground, (2)  by "discharg[ing] his taser striking Mr. Marshall; (3) by restricting Mr. Marshall's airways by "position[ing] his knees between Mr. Marshall's shoulder blades for almost two minutes", and by "reposition[ing] his knees on the back of Mr. Marshall's neck and buttock for almost three minutes"; (4) by "tas[ing] Mr. Marshall a second time, while Mr. Marshall was laying on the pavement, pinned by all three Defendant Officers" and (5) by

---

[2] However, the existence of a video does not prevent the nonmoving party from arguing there is a genuine dispute about the reasonable inferences to be drawn from the material facts depicted on the video.  *See Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018).

[3] There are two plaintiffs listed in the caption of this action: Sara Marshall in her "personal capacity" and "as personal representative" of the Estate of James Marshall. (See FAC, Caption, Page 1.)  However, in the body of the FAC, only one party is identified as "Plaintiff", Sara Marshall as "the estate's personal representative." (FAC, ¶ 4.) Moreover, all claims in the FAC are on behalf of the Estate of James Marshall only. Ms. Marshall has asserted no claims in her individual capacity, such as a 14th Amendment Due Process Claim for the deprivation of familial association.

"collectively... us[ing] excessive lethal force" with the other officers. (First Amended Complaint, ("FAC") ¶ 38). (ECF 56.)  Plaintiff is wrong.

To determine whether the force used by Officer Teets was excessive under the Fourth Amendment, the Court must determine whether his actions were "objectively reasonable in light of the facts and circumstances confronting [Officer Teets], without regard to [Officer Teets'] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Courts look at "whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation [that the officer] confronted." *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 915 (9th Cir. 2024) (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003). The reasonableness of force depends on the unique facts of each case confronting the officer and "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 396-97; *Gonzalez v. City of Anaheim*, 747 F.3d 789, 794 (9th Cir. 2014) (en banc) (same, quoting *Graham*). Reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham* at 396; *Gonzalez* at 794.

To determine the reasonableness of an officer's use of force, courts consider: "(1) 'the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted,' (2) 'the government's interest in the use of force,' and (3) the balance between 'the gravity of the intrusion on the individual' and 'the government's need for that intrusion.'" *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021) (quoting *Lowry v. City of San Diego*, *supra*, 858 F.3d at 1256); *see also Graham*, 490 U.S. at 396 (establishing three-factor test). "With respect to the Fourth Amendment intrusion side of the balance, courts 'evaluat[e] the type

and amount of force and amount of force inflicted.'" *Holloway v. Orange County*, No. 8:19-CV-015114-DOC-DFMx, 2024 WL 1816943, at* 3 (C.D. Calif., March 18, 2024), quoting *Chew v. Gates*, 27 F.3d 1432, 1440 (9th Cir. 1994). Courts "consider the 'specific factual circumstances' of the case in classifying the force used." *Williamson v. City of National City*, 23 F.4th 1146, 1151-52 (9th Cir. 2022), quoting *Lowry, supra* at 1256. "The nature and degree of physical contact are relevant to this analysis… as are the 'the risk of harm and the actual harm experienced.'" *Id*. quoting *Nelson v. City of Davis*, 685 F.3d 867, 879 (9th Cir. 2012) (internal citation omitted).

"For the governmental interest side of the ledger, courts must examine all relevant factors, including 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Holloway, supra* at *3, quoting *Brooks v. Clark Cnty.*, 828 F.3d 910, 920 (9th Cir. 2016). See also *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994) (courts must "look to whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.")

Whether a person is suffering from emotional disturbance is relevant to the use of force analysis under *Graham*, but it is not a dispositive factor. See *Deorle v. Rutherford*, 272 F.3d 1272, 1282-83 (9th Cir. 2001). The Ninth Circuit has "refused to create two tracks of excessive force analysis, one for the mentally ill and one for serious criminals." *Bryan v. MacPherson*, 630 F.3d 805, 829 (9th Cr. 2010). Further, the government has an important interest in detaining persons who are at risk of harming themselves. *Barba v. City of Shafer*, No. 1:12-CV-00195 AWI JLT, 2015 WL 848495, at *7 (E.D. Cal. Feb. 26, 2015) ("[T]here is an important governmental interest in attempting to get an individual medical attention who appears to be a risk to himself due to a mental disorder.")

Page 27 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Significantly, the Fourth Amendment has never "required [the police] to use the least intrusive degree of force possible." *Forrester v. City of San Diego,* 25 F.3d 804, 807 (9th Cir. 1994). A reasonable use of force can "encompass[] a range of conduct, and the availability of a less-intrusive alternative will not render [reasonable] conduct unreasonable." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010). Rather, the Constitution requires the police only to use objectively reasonable force under the totality of the circumstances. *Id*.

**B.      Officer Teets' takedown of Mr. Marshall was an objectively reasonable use of force.**

When Officer Teets and the other officers approached Mr. Marshall, Officer Teets took the lead in talking calmly and compassionately to Mr. Marshall. (Teets Decl., Ex. 5, BWC video at 01:46-04:21).  Officer Teets wanted to develop a rapport and start a dialogue with Mr. Marshall to further determine Mr. Marshall's mental status, beyond Teets' own observations of Mr. Marshall's conduct. (Teets Decl., ¶¶ 7-10.) And although Mr. Marshall had used the flagpole in a menacing manner towards Officer Dorick, Officer Teets continued to talk to Mr. Marshall to try and build rapport and calm him down. (Teets Decl., Ex. 5, BWC video at 01:46-03:49; 04:39-04:43.)

It was only when Mr. Marshall began aggressively kicking the glass door of the church that the dynamics of the encounter rapidly began to shift. With this behavior, Officer Teets had probable cause that Mr. Marshall was committing the crimes of criminal mischief and disorderly conduct. (See Teets Decl., ¶ 11.) Moreover, Officer Teets and the other officers reasonably concluded that Mr. Marshall was escalating the risk of injury to himself and the officers by kicking the door with enough force to cause the glass to vibrate and shake. (See Teets Decl., Ex. 5, BWC video at 05:06-05:24.) (See Nweze Decl., Ex. 1, Church video at 2:22/35:04-2:39/35:04.) Officer Teets reasonably concluded that the glass might break, and if the glass broke, Mr. Marshall might cut himself, or both Marshall and the officers might get cut in the process of detaining Mr. Marshall. (Teets Decl., ¶ 11.) (See also McGann Decl., ¶16.)  (See also Dorick Decl., ¶ 17.)  Mr.

Page 28 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Marshall failed to heed Officer Teets' multiple commands to stop the kicking the door. (Teets Decl., Ex. 5, BWC video at 05:06-05:24.) Furthermore, Mr. Marshall had manipulated the door keypad and pulled on the door handle *prior* to kicking and slamming the end of the flagpole into the church. (See Teets Decl., Ex. 5, BWC video at 04:21-04:24.) (See Nweze Decl., Ex. 1, Church video at 2:12/35:04-2:21/35:04.) (See also Dorick Decl., ¶ 15.) A reasonable police officer could conclude that Mr. Marshall might be trying to enter the church. Mr. Marshall's successful entry into the church could make his detention more dangerous for the police. (See Teets Decl., ¶ 11.) (See McGann Decl., ¶16.) (See Dorick Decl., ¶ 17.)

When Mr. Marshall looked away and began slamming the end of the flagpole into the glass door, Officer Teets decided to go "hands on" and initiate physical contact with Mr. Marshall. With Marshall's attention somewhat diverted to slamming on the glass door, Officer Teets quickly approached Mr. Marshall. (Teets Decl., Ex.5, BWC video at 05:56-05:58; ¶ 12.) Officer Teets had been trained by both the State of Oregon and the City of Forest Grove that getting a subject prone on the ground can be an effective and safe way to bring a person under control, especially someone resisting or fighting with the police. (Teets Decl., ¶ 15.)

When Officer Teets was within arm's reach of Mr. Marshall, Mr. Marshall punched Officer Teets in the face with a closed fist. (Teets Decl., ¶ 13.) (See Nweze Decl., Ex. 1, Church video at 3:13/35:04-3:14/35:04.) Officer Teets responded with a single punch to Mr. Marshall's face to protect himself from more punches from Mr. Marshall and to stop Mr. Marshall's resistance. (*Id*.) However, even with the physical assault by Mr. Marshall, Officer Teets did not "tackle" Mr. Marshall in a way to cause Mr. Marshall to move backward and hit his head on the glass door of the church. (Recall, Mr. Marshall was standing within a foot or two of the glass door when Officer Teets first touched him.) (See Nweze Decl., Ex. 1, Church video at 3:13/35:04-3:14/35:04.) (See Dorick Decl., Ex. 1, BWC video 06:09-06:23.) Rather, Officer Teets put his

arms around Mr. Marshall's torso and shoulders and used his body weight and strength to push Mr. Marshall down to the ground. (Teets Decl., ¶ 14.) (Dorick Decl, Ex. 1, BWC video at 06:08-06:12.) (See Nweze Decl., Ex. 1, Church video at 3:13/35:04-3:14/35:04.) Another officer may have pulled Mr. Marshall to get him down to the ground. (Teets Decl., ¶ 14.)  (See McGann Decl., ¶ 19.)   (See also Dorick Decl., ¶ 23, "I did not provide assistance or apply force in order to get Mr. Marshall to the ground.")   With this minimal and controlled use of force, Mr. Marshall did not get seriously injured during the takedown. (Teets, Decl., ¶ 14.) (See Dorick Decl., Ex. 1, BWC video at 06:09-06:23.) (See Nweze Decl., Ex. 1, Church video at 3:14/35:04-3:17/35:04.)

Taking a suspect to the ground – even "tackling" a suspect – does not automatically constitute excessive force. "Neither tackling nor [even] punching a suspect to make an arrest necessarily constitutes excessive force." *Blankenhorn v. City of Orange,* 485 F.3d 463, 477 (9th Cir. 2007). Instead, courts use the *Graham* analysis and examine the physical harm caused by the takedown, the government's interest in using the takedown, and whether the takedown was proportional to the need for the force in the particular situation confronting the police.  *See Rice v. Morehouse*, 989 F.3d 1112, 1121-1124 (9th Cir. 2021). *See also Tatum v. City and County of San Francisco,* 441 F.3d 1090, 1092-93, 1096-97 (9th Cir. 2006) (arm bar take down reasonable force where suspect was kicking door of police station, refused officer's commands to stop, probable cause existed for arrest, and suspect resisted arrest); *Carmona-Perez v. City of Salem*, No. 6:20-cv-00186-IM, 2023 WL 6216167, at *6-8, (D. Or. September 25, 2023) (using *Graham* analysis to determine that takedown was not unreasonable under the totality of the circumstances); *Sheridan v. Trickey*, Civ. No. 10-06034-AC, 2010 WL 5812678, at * 8, (D. Or. December 16, 2010). "[A] controlled takedown maneuver (i.e., a takedown executed so as to produce only minimal injury) is clearly lawful where an arrestee resists arrest or presents an immediate threat."; *Krause v. Vancouver Police Dept*., No. 3:22-cv-05204-BHS-GJL, 2023 WL 7286999, at *5, (W.D. Wash.

Page 30 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

October 4, 2023) (Officers' takedown of a domestic violence suspect was reasonable where the takedown was "calculated and controlled" that resulted in no significant injury.).

In the present case, the BWC video from Officer Teets and the other officers, along with the video from inside the church, show there was no "tackling" of Mr. Marshall. Furthermore, Officer Teets had probable cause to arrest Mr. Marshall for the crimes of criminal mischief in the third degree, and disorderly conduct in the second degree. (ORS 164.345; ORS 166.025(1)(a) and 1(b).)[4] (See Teets Decl., ¶ 11.) Officer Teets and the other defendant officers had a legitimate and immediate interest in stopping Mr. Marshall's behavior and the risk of the glass breaking. Recall, Mr. Marshall had already ignored Officer Teets' multiple commands to drop the flagpole, and to stop banging on the glass door, ordering Mr. Marshall to "stop" "knock it off" and "get on the ground now" "get on the ground" "get on the ground." (Teets Decl., ¶ 3, Ex. 5, BWC video at 05:08-05:16.) Officer Teets reasonably concluded that if Mr. Marshall broke the glass door, Mr. Marshall might injure himself, and glass on the ground would make any arrest more dangerous for both Mr. Marshall and the police officers. (Teets Decl., ¶ 11.)  (See McGann Decl., ¶ 16.)  (See Dorick Decl., ¶ 17.)  And Mr. Marshall had already used the flagpole as a weapon, stabbing it at Officer Teets, and then ignoring Teets' commands to put the flagpole down. (Teets Decl., ¶ 12, Ex. 5, BWC video at 05:53.)  Moreover, Mr. Marshall's fist strike elevated the threat of injury to Officer Teets and was another indicator to any reasonable police officer that Mr. Marshall was not

---

[4] ORS 164.345 Criminal mischief in the third degree, states in relevant part: "(1) A person commits the crime of criminal mischief in the third degree if, with intent to cause substantial inconvenience to the owner or to another person, and having no right to do so nor reasonable ground to believe that the person has such right, the person tampers or interferes with property of another."
ORS 166.025 Disorderly conduct in the second degree, (1) (a) and (b), states in relevant part: "A person commits the crime of disorderly conduct in the second degree if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, the person:
    (a)  "Engages in fighting or in violent, tumultuous or threatening behavior;
    (b)  "Makes unreasonable noise"

Page 31 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

going to comply with the officers' orders. Bringing Mr. Marshall to the ground quickly in a controlled manner effectively stopped Mr. Marshall from delivering more fist strikes.

In short, Officer Teets' controlled takedown was a reasonable use of force proportional to the active resistance, threats and risks Mr. Marshall was presenting to the officers and himself.[5]

The Court should grant Teets' Motion that his use of a takedown of Mr. Marshall was not an unreasonable use of force.

**C.      Officer Teets' inadvertent Taser discharge was not a seizure under the Fourth Amendment.**

As Officer Teets approached Mr. Marshall, Teets was holding his Taser in his right hand. (Teets Decl., ¶ 13.) At some point during Officer Teets' initial contact with Mr. Marshall, Officer Teets' Taser fell out of his hand and onto the ground. (Teets Decl., ¶ 13.) (See Dorick Decl, Ex. 1, BWC at 6:09-6:10.)  (See McGann Decl., Ex. 1, BWC video at 7:47-7:47.)  When Mr. Marshall and Officer Teets were on the ground, the Taser was also on the ground. (Teets Decl., ¶ 16.) (McGann Decl., Ex. 1, BWC video at 7:58-7:59.)

Initially, Mr. Marshall had both of his arms under his chest.  He was angled and leaning slightly on his right side. (Teets Decl., ¶ 17.) The Taser was off to Mr. Marshall's left. (Teets Decl., ¶ 16.)  Mr. Marshall reached out with his left hand and grabbed the Taser as soon as Teets and Mr. Marshall went to the ground. (Teets Decl., ¶ 16.) (Manlove Decl., Ex. 3, Dorick Depo., Tr. pp. 70:18-72:11.) Mr. Marshall then scooped the Taser under his body. (Teets Decl., ¶ 16.) As Officer Teets tried to pry the Taser loose from Mr. Marshall's grip, Mr. Marshall tried to bite Officer Teets' arm. (*Id.*) Another police officer, Officer Dorick, was leaning on top of Officer Teets and also struggling with Mr. Marshall to get the Taser out of Mr. Marshall's hand. (Teets Decl., ¶ 17.)

---

[5] While using the Taser to deploy the probes may have also been a reasonable alternative to stop Mr. Marshall's behavior, such a choice would have had its own risks.  The use of the Taser with the probes at a distance created the risk that Mr. Marshall could fall *uncontrolled* into the glass door, the church wall, or onto the ground, and thereby injuring himself.

Page 32 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

(Manlove Decl., Ex. 3, Dorick Depo., Tr. pp. 70:18-72:11.) (Dorcik Decl., ¶ 23.)  After a few seconds of struggling for control of the Taser, Officer Dorick was able to break Mr. Marshall's grip on the Taser and then tossed the Taser out of the way.  (*Id*.)

As the officers and Mr. Marshall struggled for the Taser, the Taser deployed. Either Mr. Marshall, Officer Teets, or perhaps another officer, caused the trigger to pull during the struggle. (See Manlove Decl., Ex. 1, Teets' Depo., Tr. pp. 41:4-7; 41:22-42:9; 43: 3-14.) However, Officer Teets does not remember pulling the trigger. If he did, it was unintentional and inadvertent because Mr. Marshall had physical control over the Taser. Officer Teets' focus was on getting the Taser away from Mr. Marshall. (Teets Decl., ¶ 16.)

Where an excessive force claim is brought under the Fourth Amendment, the force used takes place in the context of a seizure. *See Graham v. Connor, supra*, 490 U.S. at 394. However, an accidental use of force does not meet the Fourth Amendment's definition of a "seizure." "A seizure requires the use of force *with intent to restrain*. Accidental force will not qualify." *Torres v. Madrid*, 592 U.S. 306, 317 (2021). (Emphasis original.) A Fourth Amendment "seizure" "must be willful. This is implicit in the word "seizure," which can hardly be applied to an unknowing act." *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989). This requirement of intentionality makes sense: the purpose of the Fourth Amendment is to address "misuse[s] of power… not the accidental effects of otherwise lawful government conduct." *Id.* (internal citation omitted). A seizure under the Fourth Amendment occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Id.* at 596-597. (Emphasis original.) *See also County of Sacramento v. Lewis*, 523 U.S. 833, 836-37 (1998) (holding that there was no seizure where an officer in a police car pursued a motorcyclist and passenger, the motorcycle tipped over as the motorcyclist tried a sharp left turn, and the officer slammed on brakes and then hit the passenger; indicating that officer "accidentally stopped the suspect by crashing into him").

Page 33 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

In the present case, Officer Teets did not intend for his Taser to discharge. He was simply focused on freeing the Taser from Mr. Marshall's grip.  (Teets Decl., ¶ 16.)  There are no facts showing or suggesting that Officer Teets objectively manifested any "intent to restrain" Mr. Marshall through the use of his Taser. See *Torres v. Madrid, supra*.

The Court should grant Teets' Motion that he did not violate the Fourth Amendment when his Taser inadvertently discharged.

**D.    Officer Teets' single Taser drive stun on Mr. Marshall's back was an objectively reasonable use of force.**

After fighting with Mr. Marshall for control of the Taser, Officers Teets and Dorick were able to eventually force Mr. Marshall's right wrist behind his back against Mr. Marshall's physical resistance and get the handcuffs attached to Mr. Marshall's right wrist. (Teets Decl., ¶ 18.) (Dorick Decl., Ex. 1, BWC video at 06:48-07:03.) Officer McGann, however, was less successful with Mr. Marshall's left wrist. (Teets Decl., ¶ 19.) Despite over a minute of pulling on Mr. Marshall's left arm, which Mr. Marshall had tucked under his body, Officer McGann was unable to overcome Mr. Marshall's physical resistance to placing the handcuffs on Mr. Marshall's left wrist. (*Id*.) (See McGann Decl., Ex. 1, BWC video at 08:35-08:57.) (See Dorick Decl., Ex. 1, BWC video at 07:20-08:41.)

When it became clear to Officer Teets that Officer McGann was unable to get Mr. Marshall's left arm out from under his body, Officer Teets asked another police officer that had arrived on scene, Officer Shafer, to retrieve his Taser. (This was the same Taser that Officer Dorick had tossed aside earlier during the ground struggle with Mr. Marshall for control of the Taser. (Teets Decl., ¶ 20.) When Officer Shafer handed Officer Teets the Taser, Teets armed his Taser, and he warned Mr. Marshall at least two times that he would be tased if he did not stop resisting and release his arm to Officer McGann. (*Id*.) (See Dorick Decl., Ex. 1, BWC video at 08:09-08:13.) When Officer Teets gave his warning to Mr. Marshall, Mr. Marshall was still angled on his right

side. (See Dorick Decl., Ex. 1, BWC video at 08:07-08:23.)  Mr. Marshall's left hand was near his waist.  (McGann Decl., ¶ 23.)

When Mr. Marshall failed to give up his arm, Officer Teets yelled "Taser" three times. He then applied a single, one to two second, drive stun application to Mr. Marshall's left upper back/shoulder area. (Teets Decl., ¶ 21.) (See Nweze Decl., Ex. 2, Shafer BWC video at 00:30.) Officer Teets chose this location to apply the limited drive stun application because it was a large muscle group that was easily accessible and was not a sensitive area. (Teets Decl., ¶ 21.) Moreover, Officer Teets reasonably thought that physical pain to Mr. Marshall's upper back or shoulder area would cause him to lose his strength and ability to keep his left arm tucked under his body. (*Id.*)

Officer Teets' drive stun application had no apparent effect on Mr. Marshall's demeanor or surrendering his left arm. Officer Teets then reached over Mr. Marshall's body and used both hands to pull on Mr. Marshall's left shoulder. (Teets Decl., ¶ 23.) (See Dorick Decl., Ex. 1, BWC video at 08:32-08:34.) Once Teets did this, in conjunction with Officer McGann using both his hands to pull on Mr. Marshall's left arm, Officer McGann was finally able to get Mr. Marshall's left arm out from under his body. Officer Teets and McGann were then able to handcuff Mr. Marshall's left wrist. (Teets Decl., ¶ 23.) (See Nweze Decl., Ex. 1, Church video at 5:51/35:04.) (McGann Decl., ¶23.)

Officer Teets had been trained by the State of Oregon's Department of Public Safety Standards and Training and by the City of Forest Grove that using a Taser in a focused and limited manner, on a resistive and combative person that he is trying to handcuff after taking to the ground, can be a reasonable use of force. (Teets Decl., ¶ 22.)

Federal case law supports Officer Teets' training and justifies his limited use of the Taser on Mr. Marshall. While the Ninth Circuit has held that the use of the Taser in dart-mode

Page 35 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

"constitute[s] an intermediate, significant level of force," the use of a Taser in drive-stun mode constitutes a less-than-intermediate level of force. *Mattos v. Agarano,* 661 F.3d 433, (9th Cir. 2011), quoting *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010); *Brooks v. City of Seattle*, 599 F.3d 1018, 1027-28 (9th Cir. 2010) (*reversed on other grounds*) (the use of a Taser in drive-stun mode "causes temporary, localized pain only," and is a "less than the intermediate" intrusion found with a dart-mode application.) And while courts have found the use of Tasers in drive-stun mode on nonresistant, nonthreatening, and passive arrestees to be excessive force, the use such force on resisting and threatening arrestees is not.

For example, when a person is threatening and actively resisting a police officer's efforts for control, the measured use of a Taser in drive-stun mode is a reasonable use of force. In *Holloway v. Orange County*, No. 8:19-CV-01514-DOC-DFMx , 2024 WL 1816943, (C.D. Cal. March 18, 2024), police officers were dispatched to a call reporting a man, Mr. Holloway, hitting a woman at a campsite. *Id*. at *1. When confronted by the police, Mr. Holloway was uncooperative, agitated and hostile. *Id*. When the officers could not locate any victim of the assault, they left without arresting Mr. Holloway. However, within 15 minutes of leaving, the police returned after receiving a second call complaining of Mr. Holloway. *Id*. at *2.

When the police returned, Mr. Holloway refused to comply with the officers' orders to get on the ground. One of the officers, Officer Renegar, then punched Mr. Holloway in the face, causing him to fall to the ground. *Id*. Once on the ground, the officers struggled to get Mr. Holloway's arms out from under his body and behind his back for handcuffing. Officer Renegar punched Mr. Holloway in his torso but still could not secure Holloway's hands. *Id*. Officer Renegar then deployed his Taser in dart-mode to Mr. Holloway's buttocks to get Mr. Holloway to free his arms. However, this use of the Taser was unsuccessful. *Id*. Two other officers arrived and were able to free one of Mr. Holloway's arms. One of the officers kneed Mr. Holloway in the head

Page 36 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

several times to get Mr. Holloway to give up his remaining arm from under his body. When the knee strikes were unsuccessful, Officer Renegar again used the Taser, this time in drive-stun mode, on one of Mr. Holloway's calves. The officers were then able to free the other arm and handcuff Holloway. *Id*.

Although the court decided the use of force issue on the basis of Officer Renegar's defense of qualified immunity, the court explained that because Mr. Holloway's hands were unsecure, under his body, and near his waistband where he could access a weapon, Holloway's continued resistance was dangerous and presented an officer safety risk to Officer Renegar and the other officers. *Id*. at *6. As a result, neither tasing by Officer Renegar violated clearly established law. Moreover, the *Holloway* court noted that "[m]any circuits, including the Sixth, Eighth, Tenth, and Eleventh, ""draw[] the line" separating permissible and impermissible use of a taser at "active resistance."" *Id*. "In those circuits, active resistance includes "refusing to move your hands for the police to handcuff you." The *Holloway* court noted "[t]hat [Officer] Renegar's actions would not violate the Fourth Amendment – much less clearly established Fourth Amendment law – in many circuits *underscores their reasonableness*." *Id*. (Emphasis added.)  *See also Bynum v. City of North Las Vegas,* No.: 2:17-cv-02112-APG-VCF, 2020 WL 8483837, at *7 (D. Nevada August 31, 2020) (No reasonable jury could find that a single Taser drive stun after a warning on a suspect resisting arrest with his hands under his body was an  excessive use of force.); *Ciampi v. City of City of Palo Alto*, 790 F.Supp. 2d 1077, 1103-04 (N.D. Cal.) (2011). (The single use of a Taser in drive-stun against a resisting subject who had punched and was kicking police officers was not an excessive use of force.)

*Holloway* is instructive. There, the nature, quality and certainly the quantity of the intrusion by Officer Renegar and the other police officers was much greater than the force used by Officer Teets and the other officers in handcuffing Mr. Marshall. Other than the single counter punch

Page 37 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Officer Teets delivered in response to Mr. Marshall's punch, and Officer Teets' take down of Mr. Marshall, there were no other fist or knee strikes on Mr. Marshall. Moreover, Officer Teets provided clear, multiple warnings and used his Taser just once, on a nonsensitive part of Mr. Marshall's body. Finally, Officer Teets used the Taser only after Officer McGann had tried unsuccessfully for over a minute to pull Mr. Marshall's arm out from under Mr. Marshall's body. In other words, Officer McGann had tried a less intrusive use of force for over a minute prior to Officer Teets' use of the Taser.

Another instructive case is *Isayeva v. Sacramento Sheriff's Department*, 872 F.3d 938 (9th Cir. 2017). Like *Holloway*, the Court decided the officer's use of a single drive-stun did not violate clearly established law. And like *Holloway*, the Court concluded the subject's active resistance justified the use of force.

In *Isayeva*, deputies responded to two family disturbance calls involving a mentally ill man, Mr. Tereschenko. The deputies initially interviewed family members outside the home, then entered the home and contacted Mr. Tereschenko in a bedroom. *Id*. at 942. Mr. Tereschenko became increasingly agitated as the contact with the deputies continued. At one point, he told the deputies they would have to "shoot or kill" him. *Id*. at 943. When the deputies went to put Mr. Tereshchenko into handcuffs as part bringing him into protective custody, Mr. Tereschenko stiffened both arms and resisted. *Id*.

To overcome Mr. Tereschenko's active resistance, one of the deputies – after a warning - applied a single, five second Taser drive stun between Mr. Tereschenko's shoulder blades. *Id*. Unfortunately, this caused Mr. Tereschenko to escalate the encounter by tossing the deputies aside and then punching one of the deputies repeatedly in the face. Ultimately, as Mr. Tereschenko approached the deputy, the deputy shot Mr. Tereschenko three times, killing him. *Id*. at 944. Ms.

Page 38 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

Isayeva sued under Section 1983 for excessive force for both the use of the drive-stun and lethal use of force.  *Id*.

In deciding there was no clearly established law to put the deputy on fair notice that his use of the Taser violated the Fourth Amendment, *Isayeva* discussed preexisting Ninth Circuit cases involving Tasers: *Bryan v. MacPherson*, 630 F.3d 805 (9th Cir. 2010), *Brooks v. City of Seattle, supra,* and *Mattos v. Agarano, supra*. *Isayeva* provides a thoughtful discussion about the parameters for justified use of a Taser in drive-stun mode. *Isayeva*, 872 at 948-950. First, *Isayeva* distinguished *Bryan* by noting that a drive-stun application is less intrusive than "dart mode.  *Id*. at 948.  ("*Bryan* involved a greater degree of force.") *Id*. The court also distinguished *Bryan* by noting that there was no indication in the record that the deputy's single drive-stun application injured Mr. Tereschenko. *Id*. at 948-949. The court also noted that Mr. Tereschenko was physically resisting the deputies while the plaintiff in *Bryan* was 15 to 25 feet away and facing away from the deputy at the time of the Taser use. *Id.* at 949.

In a similar fashion, the *Isayeva* court easily distinguished *Brooks* and *Matto*s.  *Id.* at. 949-950. The court noted both Ms. Brooks and Ms. Mattos were physically smaller women, whose resistance did not match that of Mr. Tereschenko's resistance. The court noted that both female plaintiffs were apparently sober, whereas deputies knew that Mr. Tereschenko was under the influence of drugs. In summary though, the court used a *Graham* analysis to conclude that the need to overcome the escalating, threatening resistance of Mr. Tereschenko outweighed the deputy's limited use of the Taser. *Id*. at 946-947.

The same reasoning applies in the present case. Officer Teets had watched Mr. Marshall's behavior escalate from threatening the officers with the flagpole, to kicking and banging on the glass door, to punching Officer Teets in the face, to struggling with the officers over control of the Taser, to trying to bite Officer Teets in the arm, to keeping his arms under his body despite the

officers' efforts to get control of them for handcuffing. Like Mr. Tereshchenko, Mr. Marshall escalated the situation that justified Officer Teets single, drive-stun application of the Taser. And like the brief use of the drive-stun on Mr. Tereshchenko, Officer Teets' one to two second drive-stun use of the Taser on Mr. Marshall did not cause any apparent injury to Mr. Marshall.

The Court should grant Teets' Motion that he did not violate the Fourth Amendment by his single use of his Taser in drive-stun mode on Mr. Marshall.

**E.      Officer Teets and the other officers' intermittent use of their knees and hands to control Mr. Marshall was an objectively reasonable use of force.**

Officer Teets and the other defendant officers' prone restraint of Mr. Marshall occurred in a sequence to four phases of Mr. Marshall's active resistance: (1) the fight to break Mr. Marshall's grip on the Taser, (2) overcoming Mr. Marshall's resistance to having his right wrist handcuffed, (3) overcoming Mr. Marshall's resistance to having his left wrist handcuffed, including Officer Teets using the drive stun Taser to Mr. Marshall's left upper back, and (4) restraining Mr. Marshall from kicking while waiting for and applying the zip ties to Mr. Marshall's ankles.

As explained earlier, (see *supra,* at pages 15-17) when Mr. Marshall went to the ground, he immediately reached for and grabbed Officer Teets' Taser, which had fallen on the ground. (Teets Decl., ¶ 13.) Mr. Marshall was lying prone but slightly angled on his right side. (Teets Decl., ¶ 17.) Officer Teets was lying with his torso on the right side of Mr. Marshall's upper back and shoulder area. (*Id*.) From this position, Officer Teets struggled with Mr. Marshall to break Marshall's grip on the Taser. (*Id*.)

During this struggle for the Taser, Officer Dorick was leaning over the top of Teets. (See Teets Decl., ¶ 17.) (Manlove Decl., Ex. 3, Dorick Depo., Tr. Pp. 70:6-71:5.) (Dorick Decl., ¶ 23.) Officer Dorick was also trying to break Mr. Marshall's grip on the Taser. (*Id*.) During this time, Officer Dorick's body camera video depicts Mr. Marshall moving his head and torso, and shouting and grunting at the officers. (Dorick Decl., Ex. 1, BWC video at 06:23-06:26.) The officers were

Page 40 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

in this position for only about 12 seconds as they struggled for the Taser. (Nweze Decl., Ex. 1, Church video at 3:17/35:04-3:29/35:04.)

After Officer Dorick got the Taser away from Mr. Marshall, Marshall raised his head and torso up as he struggled with the three officers.  Officer Dorick then moved to straddle Mr. Marshall's hamstrings to prevent Mr. Marshall from kicking his legs.  (Teets Decl., ¶¶ 17, 18.) Officer Teets remained next to Mr. Marshall's right side. Officer McGann shifted over to Mr. Marshall's left side, towards the middle of Mr. Marshall's body. (Manlove Decl., Ex. 3, Dorick Depo., Tr. 72:24-73:13.)

Once the Taser was removed from Mr. Marshall's grip, Officers Teets and Dorick had to overcome Mr. Marshall's physical resistance to place a handcuff on Mr. Marshall's right wrist. (Teets Decl., ¶ 18.)  As Officer Teets wrestled to get Mr. Marshall's right hand behind his back, Officer Teets used his hands and knees to hold Mr. Marshall down and control Mr. Marshall's movements. (*Id*.) To accomplish this control, Officer Teets' left knee was mostly resting on the ground, and his right knee was on Mr. Marshall's right shoulder or upper right back. (*Id*.) (See Dorick Decl., Ex. 1, BWC video at 06:48-07:03.)  Officer Teets used only enough body weight pressure to control Mr. Marshall's resistance.  (Teets Decl., ¶¶ 18, 28.) Officer Teets, with assistance from Officer Dorick, was able to get Mr. Marshall's right hand behind his back and place a handcuff on it. (Teets Decl., ¶ 18.) From breaking Mr. Marshall's grip on the Taser, it took the officers approximately 32 seconds to get Mr. Marshall's right hand controlled for handcuffing. (See Dorick Decl., Ex. 1, BWC video at 06:26-07:00.)  (See also Nweze Decl., Ex. 1, Church video at 3:38/35:04-4:10/35:04.)

When the officers broke Mr. Marshall's grip on the Taser, Mr. Marshall brought his left arm under his left torso. (Teets Decl., ¶ 19.) Mr. Marshall's left arm was angled with his left hand near his waist.  (McGann Decl., ¶ 23.) Officer McGann was on Mr. Marshall's left side trying to

grab and pull Marshall's left arm out from under his body. Officer McGann and the other officers were ordering Mr. Marshall to bring his left arm and hand out from under his body. (Manlove Decl., Ex. 2, McGann Depo., Tr. p. 53: 5-10.) During this effort to get his left arm out from under his body, Mr. Marshall was not lying prone with any officers on top of him, but rather, continued to be angled on his right side. (Teets Decl., ¶ 19.) (Dorick Decl., Ex. 1, BWC video at 07:37-08:08.) Officer Teets had one hand resting on Mr. Marshall's back but Teets' knees were on the ground with his heels against the church wall. (Dorick Decl. Ex. 1, BWC video at 07:55.) (Nweze Decl., Ex. 2, Shafer BWC video at 00:23-00:25.) Also, as Officer McGann tried to get Mr. Marshall's left arm free for handcuffing, Officer McGann had none of his body weight on Mr. Marshall.  Instead, Officer McGann had both his knees resting on the ground, next to Mr. Marshall. (Teets Decl., ¶ 19.) (See Dorick Decl, Ex. 1, BWC video at 07:53-08:41.) (Manlove Decl., Ex. 2, McGann Depo., Tr. p. 52:7-12.)

Because Officer McGann could not overcome Mr. Marshall's active resistance, Officer Teets used a single drive-stun Taser application to try and free Mr. Marshall's left arm. When Officer Teets used the Taser, his knees may have been touching Mr. Marshall's lower back, but Teets was in a squatting position, like a baseball catcher, with almost all of his weight on the balls of his feet, which were resting against the wall of the church. (Teets Decl., ¶ 20.) (See Dorick Decl., Ex. 1, BWC video at 07:54-08:34.)  From when Officer Teets and Dorick had  handcuffed Mr. Marshall's right wrist, Officer McGann struggled to free Mr. Marshall's left arm from under his body for approximately one minute and 14 seconds before Officer Teets used the Taser drive-stun on Mr. Marshall. (See Dorick Decl., Ex. 1, BWC video at 07:07-08:21.)

When the Taser drive-stun had no apparent effect, Officer Teets reached over with both hands and pulled on Mr. Marshall's left shoulder to lift it slightly off the ground. (See Dorick Decl., Ex. 1, BWC video at 08:32-08:54.) During the first part of this effort, Officer Teets' left

Page 42 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

knee was not touching Mr. Marshall's body at all. Instead, Officer Teets was again squatting like a baseball catcher, on the balls of his feet, as he pulled on Mr. Marshall's left shoulder. (Dorick Decl., Ex. 1, BWC video at 08:32-08:36.) (Nweze Decl., Ex. 2, Shafer BWC video at 00:34-00:36.) (Nweze Decl., Ex. 1, Church video at 5:38/35:04-5:41/35:04.) During the later part of this effort to obtain Mr. Marshall's left arm, Officer Teets had his left knee resting on Mr. Marshall's buttocks and his right knee near Mr. Marshall's right shoulder blade. (Dorick Decl., Ex. 1, BWC video at 08:36-08:46.) Mr. Marshall remained angled, still lying on his right side. (*Id*.) With Officer Teets' pulling on Mr. Marshall's left shoulder, Officer McGann was then able to get Mr. Marshall's left arm out from under his body and both Officer Teets and McGann were then able to put the handcuffs on Mr. Marshall's left wrist and complete the handcuffing. From when Officer Teets used the Taser drive-stun, it took Officers Teets and McGann approximately 24 seconds to get Mr. Marshall's left arm out from under his body and handcuff Mr. Marshall's left wrist. (See Dorick Decl., Ex. 1, BWC video at 08:21-08:45.) The handcuffing process - from placing the handcuffs on the right wrist to placing the handcuffs on the left wrist - took the officers approximately one minute and 38 seconds. (See Dorick Decl., Ex. 1, BWC video at 07:07-08:45.)

As soon as Mr. Marshall was handcuffed, Officer Teets stood up momentarily and was not touching Mr. Marshall at all. (Teets Decl., ¶ 24.) (See Dorick Decl., Ex. 1, BWC video at 08:52-08:56.) (Nweze Decl., Ex. 1, Church video at 5:56/35:04-6:01/35:04.) However, Mr. Marshall continued to squirm, thrash and kick his legs towards Officer Dorick. (See Manlove Decl., Ex. 2, McGann Depo., Tr. pp. 55:22-56:21.) Officer Teets then knelt down again, placing his left knee near Mr. Marshall's buttocks and his right knee near Mr. Marshall's right upper back and shoulder. Officer Teets also placed his hands on Mr. Marshall's back. (Teets Decl., ¶ 24.) (See Dorick Decl., Ex. 1, BWC video at 09:02-09:13.) Officer Teets was only pressing down with enough force to steady himself or to diminish Mr. Marshall's ability to kick. (Teets Decl., ¶ 24.) Officer McGann

Page 43 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

then left to go to his police car to get zip ties to secure Mr. Marshall's legs. (Manlove Decl., Ex. 2, McGann Depo, Tr. pp. 56:22-57:3.) (See Dorick Decl., Ex. 1, BWC video at 09:22-09:23.)

During this time, Officer Teets stood up a second time, completely off of Mr. Marshall's back. (Nweze Decl., Ex. 2, Shafer BWC at 01:59.) Mr. Marshall was able to speak, responding to Officer Teets' question: "What's your name, man?" "What's your name?" Mr. Marshall told Officer Teets that Mr. Marshall's name was "USA. United States of America." (Nweze Decl., Ex. 2, Shafer BWC at 01:59-02:01) Officer Teets squatted down again, with only his hands resting on Mr. Marshall's back. (Nweze Decl., Ex. 2, Shafer BWC at 2:14.) After about 16 seconds of squatting, Officer Teets positioned his body so that both of his knees were resting on the ground. (*Id*. at 2:40.) During this entire time, Mr. Marshall was able to raise his head off the ground and turn his head. (Nweze Decl., Ex. 2, Shafer BWC at 02:15-2:31.) Also during this time, Mr. Marshall's back was rising up and down, indicating he was breathing. (*Id.* at 02:56-03:00.)

It took Officer McGann about 50 seconds to retrieve the zip ties. (See Dorick Decl., Ex. 1, BWC video at 09:25-10:15.) When Officer McGann returned with the zip ties, Officer Teets leaned over Mr. Marshall to assist Officers McGann and Dorick in securing the ties. (See Dorick Decl., Ex. 1, BWC video at 10:45-11:05.) Officer Teets's hands and knees were completely off Mr. Marshall's back. (See Teets Decl., ¶ 25.) (McGann Decl., Ex. 1, BWC video at 12:21-12:35.) (See Nweze Decl., Ex. 2, Shafer BWC video 02:45-03:23.) (See Dorick Decl., Ex. 1, BWC video at 11:00.) It took the officers approximately 45 seconds to secure the zip ties around Mr. Marshall's legs. (See Dorick Decl., Ex. 1, BWC video at 10:38-11:23.)

As soon as the zip ties were applied, one of the officers noticed Mr. Marshall was not moving, and Officer Teets immediately turned Mr. Marshall over on his back. Within six seconds of securing the zip ties, the officers were turning Mr. Marshall over. (See Dorick Decl., Ex. 1, BWC video at 11:23-11:29.)

Page 44 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

A prone restraint of a resisting subject – even restraint by applying force around the neck and head - is not necessarily excessive force. *See Gregory v. County of Maui,* 523 F.3d 1103 (9th Cir. 2008). In *Gregory*, officers responded to a call regarding a man possibly high on drugs, trespassing and refusing to leave a music studio. *Id*. at 1105. When the officers arrived on scene, the man was holding a writing pen with its tip pointed at the officers, and appeared "high strung, excitable and jumpy," speaking loudly, rapidly and stating "he was a Christian and that God was with him." *Id*.

The officers asked Mr. Gregory three times to put the pen down, but Mr. Gregory refused each time. One of the officers then grabbed Mr. Gregory's arm and attempted to move him so the pen would be facing away from the officers. When Mr. Gregory resisted, the officers took him to the ground, pinned him to the ground, and tried to control his arms. As the officers struggled with Mr. Gregory and continued to try and subdue him, Mr. Gregory repeatedly shouted he could not breathe. One of the officers told him that was impossible because he could talk. That same officer used a hold around Mr. Gregory's head and neck to restrain him. None of the officers struck Mr. Gregory or drew their firearms. *Id*.

Once the officers were able to handcuff Mr. Gregory, they sat him up and noticed that he was not breathing. The officers unsuccessfully tried to resuscitate Mr. Gregory, who was later pronounced dead from a heart attack. The medical examiner determined that Mr. Gregory suffered from severe blockage of one of his coronary arteries, and that his use of marijuana contributed to his heart attack. *Id*. The medical examiner noted that "a sensation of shortness of breath is a common symptom of a heart attack" and confirmed that "[Mr.] Gregory was breathing during the struggle since he was able to talk." *Id*.

In finding the officers' use of force objectively reasonable, the court noted that the officers were informed that Mr. Gregory was possibly under the influence of drugs, and that Mr. Gregory

acted in a "bizarre manner throughout the confrontation" with the police. *Id*. at 1106. The court further noted that the officers did not immediately engage in a physical confrontation. Instead, they first asked Mr. Gregory to drop the pen. Only after Mr. Gregory repeatedly refused to comply with the officers' requests did they physically try and disarm him. Moreover, the officers only restrained Mr. Gregory after he resisted. *Id*. at 1107.

The *Gregory* court distinguished the Ninth Circuit's earlier prone restraint decision, *Drummond v. City of Anaheim,* 343 F.3d 1052, 1056 (9th Cir. 2003). *Id*. at 1108-09. The court explained that in *Drummond,* the officers immediately used force on Mr. Drummond, who was not suspected of committing any crime. The *Gregory* court explained that, unlike Mr. Drummond, Mr. Gregory posed a threat to the officers in part because he refused to comply with their orders and "resisted the officers throughout the encounter." *Id.* at 1108-09. Significantly, in *Gregory*, unlike *Drummond*, the officers ceased their use of force once they handcuffed Mr. Gregory and neutralized the threat he posed. *Id*. at 1109.

Similar to the situation in *Gregory*, in the present case, Officer Teets and the other officers interacted with a person who was acting in a "bizarre manner" during the entire incident. Like in *Gregory,* Officer Teets had probable cause to arrest Mr. Marshall for criminal offenses. However, Officer Teets and the other officers did not immediately take Mr. Marshall into custody. Rather, all of them –especially Teets – tried to talk to Mr. Marshall to build rapport, even after Mr. Marshall had used the flagpole as a spear against Officer Dorick and had "donkey kicked" the glass door of the church.  Officer Teets warned Mr. Marshall multiple times he would be tased and ordered him to drop the flagpole.  Like the officers in *Gregory*, Officer Teets was trying to detain an irrational, resistive and combative person.  Finally, and most importantly, Officer Teets' prone restraint was intermittent, measured and ended once the zip ties were secured to prevent Mr. Marshall from kicking.

Page 46 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

In line with *Gregory*'s reasoning, district courts in the Ninth Circuit have held the use of calibrated body pressure to control a prone, resisting subject on the ground is not necessarily excessive force. "Restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest." *A.B. v. County of San Diego*, No. 18cv1541-MMA-LL, 2020 WL 5847551, at *17 (S.D. Calif. October 1, 2020). In *A.B.*, sheriff deputies responded to a call from a store owner about a man, Mr. Kristopher, who appeared disoriented, was staggering, and acting strangely at the entrance to the store. *Id.* at *1. A deputy responded with a mental health clinician to evaluate Mr. Kristopher. *Id.* at *2. The deputy attempted to speak to Mr. Kristopher, but Mr. Kristopher was unable to hold a coherent conversation. *Id.* When Mr. Kristopher resisted the deputy's efforts to handcuff him, the mental health clinician made an emergency call to summon cover deputies to respond to the scene. *Id.*

The other deputies arrived and saw the struggle between Mr. Kristopher and the first deputy. *Id.* The responding deputies deployed their Tasers in dart-mode twice at Mr. Kristopher without achieving successful compliance. Instead, as Mr. Kristopher ran across the store parking lot, the deputies tackled Mr. Kristopher to the ground. *Id.* at *3. When Mr. Kristopher got up, one of the deputies struck him in the face with a closed fist approximately three times. *Id.* Despite this force, the deputies and several civilian passersby continued to struggle to control Mr. Kristopher. In fact, when one of the deputies placed his baton on the ground while trying to restrain Mr. Kristopher, Mr. Kristopher grabbed the baton, although the deputy was able to knock it away. *Id.*

The deputies and the passersby were able to secure only one of Mr. Kristopher's wrists in handcuffs. *Id.* To obtain the other wrist, one of the deputies struck Kristopher in the hands, head and shoulders with approximately four hammer-fist strikes, and with about six close-range strikes with a sap.[6] *Id.*

---

[6] A sap is a leather impact weapon weighted with lead. *Id.*, n. 9.

Page 47 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

As still more deputies arrived, they moved the assisting passersby out of the way. One of the deputies used downward pressure to control Mr. Kristopher's movements by placing one of his knees on one of Mr. Kristopher's shoulders and by using one of his hands to increase downward pressure on Mr. Kristopher as Mr. Kristopher appeared to increase his resistance. Another deputy used his hands to control Mr. Kristopher's upper back to keep him from rising up, again varying the downward pressure in response to Mr. Kristopher's level of resistance. *Id*. As the deputies struggled to get Mr. Kristopher into handcuffs, a third deputy used his elbow and hands to control Mr. Kristopher's head. A fourth deputy held onto Mr. Kristopher's legs. When even more deputies arrived, they used their hands and knees to apply downward pressure on Mr. Kristopher's arms as another deputy applied a cord around Mr. Kristopher's ankles to prepare Kristopher for maximum leg restraint. *Id*.

When the deputies noticed that Mr. Kristopher was having trouble breathing, they placed him on his side and monitored his breathing and pulse until paramedics arrived. *Id*. at *4. The paramedics attempted life saving measures but were unsuccessful. *Id*. The medical examiner testified that Mr. Kristopher's cause of death was "[s]udden cardiac arrest while restrained and contributing acute methamphetamine intoxication." *Id*.

The *A.B.* court noted that the struggle to control Mr. Kristopher on the ground of the store parking lot was "clearly tense, uncertain, and rapidly evolving as Kristopher continued to resist and attempted to flee." *Id*. at *16. With regard to the deputies' prone restraint of Mr. Kristopher, the court also held the deputies were entitled to qualified immunity. In distinguishing other prone restraint cases, the *A.B.* court pointed out that Mr. Kristopher was "suspected of being under the influence of drugs and resist[ed] detention in an antagonistic manner for virtually the entire encounter with the deputies, including the process of securing Kristopher in both sets of maximum restraints." *Id*. at *18. The court noted that the deputies only "escalated their use of force in direct

Page 48 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

correlation to Kristopher's continued resistance." *Id*. Importantly, with respect to the issue of "compression asphyxia" the *A.B.* court noted the deputies never put their full body weight on Mr. Kristopher's neck. Rather, they used varying degrees of physical force on other parts of Mr. Kristopher's body to maintain control over Mr. Kristopher, including placing their knees, elbows, hands and closed fists on Mr. Kristopher's upper back, on a shoulder, and on one of Mr. Kristopher's hands. *Id*. at *20. The court noted that one of the deputies placed a hand on the back of Mr. Kristopher's neck and head for only approximately 19 seconds. *Id*. With these facts, the court concluded that the deputies were not on "fair notice" from "existing precedent 'squarely govern[ing]' the specific facts at issue" that their actions were unconstitutional. *Id*. at *19, quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018).[7]

In the present case involving Mr. Marshall, Officer Teets and the other officers used only that pressure from their hands or knees to counter the active resistance of Mr. Marshall. With the exception of the initial 12 seconds as the officers and Mr. Marshall struggled for control of the Taser, Officer Dorick remained straddling Mr. Marshall's hamstrings. Notably, as Officer McGann pulled on Mr. Marshall's left arm from under Mr. Marshall's torso, Officer McGann was not even resting his knees on Mr. Marshall; instead, Officer McGann's knees were on the ground, next to Mr. Marshall's left side.

And Officer Teets prone restraint was similarly limited and measured. Officer Teets had his left knee intermittently near Mr. Marshall's buttocks, whether trying to handcuff the right wrist, apply the Taser drive stun, pull on Mr. Marshall's left shoulder to free the left arm for handcuffing, or controlling Mr. Marshall's kicking while Officer McGann retrieved the zip ties. Officer Teets' right knee was located near Mr. Marshall's right shoulder blade. But after Mr. Marshall was

---

[7] The Ninth Circuit upheld the court's ruling that the deputies who restrained Mr. Kristopher were entitled to qualified immunity. *A.B. v. County of San Diego*, 2022 WL 1055558, *2 (9th Cir.), 20-56140, April 8, 2022.

handcuffed, the video evidence also clearly shows Officer Teets twice standing up, squatting next to Mr. Marshall, or kneeling on the ground—with his knees completely off Mr. Marshall. After Mr. Marshall was handcuffed, the video evidence shows Officer Teets' knees and body weight off of Mr. Marshall for at least one minute and 28 seconds. Moreover, the video evidence also shows Mr. Marshall shouting, grunting, moving his body, *answering* Officer Teets' questions, and *breathing* as Teets used his hands and knees intermittently to control Mr. Marshall.

Officer Teets calibrated and adjusted his use of force in response to the actions of Mr. Marshall. Moreover, Officer Teets applied sustained pressure only on the areas of Mr. Marshall's body and for the length of time that helped effectuate their control of Mr. Marshall. As a result, Officer Teets' use of force was objectively reasonable.

The Court should grant Teets' Motion that he did not violate the Fourth Amendment by his intermittent use of his knees and hands to control Mr. Marshall on the ground.

    **F.**     **Officer Teets is not liable for any use of force or control by either defendant McGann or defendant Dorick.**

Under 42 U.S.C. § 1983, there is no collective liability among police officers for their uses of force. Section 1983 liability requires individual, personal participation in constitutional violations by each defendant and rejects vicarious or collective liability theories. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the constitution.") (Emphasis added.) *See also Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) (recognizing the municipalities are "persons" under section 1983, and noting "a municipality cannot be held liable under § 1983 on a *respondent superior* theory.") To the extent Plaintiff brings such a claim for collective responsibility, the Court should reject that claim.

G.    **Officer Teets is entitled to Qualified Immunity.**

To determine whether a police officer is entitled to qualified immunity, courts ask two questions: (1) whether the officer's conduct violated a constitutional right, and (2) whether the right was clearly established in light of the specific context of the case. *Rice v. Morehouse*, 989 F.3d 1112, 1120 (9th Cir. 2021). The first question asks whether "the use of force is contrary to the Fourth Amendment's prohibition against unreasonable seizures." *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 914-15 (2024) (quoting *Wilkins v. City of Oakland*, 350 F.3d 949, 954 (9th Cir. 2003)). Courts look at "whether it would be objectively reasonable for the officer to believe that the amount of force employed was required by the situation he confronted." *Id*. The second question asks whether "the unlawfulness of [the officer's] conduct was 'clearly established at the time' [of the incident]." *Id*. (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 62-63 (2018).

A right is clearly established when it is "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Rivas –Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). (Emphasis added.) "[P]olice officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "The law is clearly established when precedent is 'clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Calonge v. City of San Jose*, 104 F.4th 39, 47 (9th Cir. 2024) (quoting *D.C. v. Wesby*, *supra*, 583 U.S. at 63). Although there need not be "a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate," for which "a body of relevant case law is usually necessary." *City of Escondido v. Emmons*, 586 U.S. 38, 44 (2019). "The rule must be 'settled law,' which means it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Smith v. Agdeppa*, 81 F.4th 994, 1001 (9th Cir. 2023). "This demanding

Page 51 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

standard protects 'all but the plainly incompetent or those who knowingly violate the law.'" *D. C. v. Wesby*, 583 U.S. 48, 63 (2018) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To this end, the Supreme Court "'has repeatedly told courts – and the Ninth Circuit in particular – not to define clearly established law at a high level of generality.'" *Est. Of Hernandez by & through Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1218-19 (9th Cir. 2024) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (9th Cir. 2018)). Rather, the "law at the time of the conduct" must have defined the relevant constitutional "right's contours" in a manner that is "sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating [the constitutional right]." *Kiesela v. Hughes*, 584 U.S. at 104-05. "This need for 'specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.'" *Est. of Hernandez*, 96 F.4th at 12-19 (quoting *Kisela*, 584 U.S. at 104.)

Finally, the "plaintiff ... bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 110, 1118 (9th Cir. 2017). Whether the law is clearly established for purposes of qualified immunity "is a question of law that only a judge can decide." *Morales v. Fry*, 873 F.3d 817, 821 (9th Cir. 2017).

In the present case, Officer Teets is entitled to qualified immunity for his use of force in attempting to take Mr. Marshall into custody. In the particular circumstances faced by Officer Teets, there was no "controlling authority" or "robust consensus of cases" putting Officer Teets on "fair notice" that his actions violated Mr. Marshall's Fourth Amendment rights. *See Kisela v. Hughes, supra* at 104 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). In fact, as explained earlier, see *supra* pages 24-31, 33-49, the law *authorized* Officer Teets to act in the manner he did.

Page 52 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

For example, with respect to Officer Teets' use of force to get Mr. Marshall to the ground, Mr. Marshall had used the flagpole as a weapon against two police officers, had repeated kicked the glass door and window of the church, and had ignored commands to drop the flagpole and to stop kicking. Mr. Marshall's actions presented risks of injury to the officers and to himself. Moreover, the video evidence shows without dispute that Officer Teets did not "tackle" Mr. Marshall. Instead, he placed his arms around Mr. Marshall's shoulders and pushed him to the ground. And this was after Mr. Marshall punched Officer Teets in the face.

Similarly, regarding Officer Teets' single application of the Taser to Mr. Marshall's left upper back in drive stun mode, there is no case that prohibits such limited use to expedite the handcuffing of a person who is actively resisting handcuffing, especially where that person has just punched an officer in the face, and then just fought for control of an officer's Taser.

Finally, regarding Officer Teets' prone restraint of Mr. Marshall, whether restraint done prior to the completion of the handcuffing, or restraint done after the handcuffing but before the zip ties were applied, the video evidence shows Mr. Marshall talking, grunting, his back rising up and down to indicate breathing, and Officer Teets at times completely off of Mr. Marshall's back. When Officer Teets' hands or knees were touching Mr. Marshall, Teets was doing so only with enough pressure to control Mr. Marshall's movements.

At the time of incident with Mr. Marshall, there was no clearly established law providing Officer Teets with "fair notice" that any of his actions during the particular incident with Mr. Marshall violated Mr. Marshall's Fourth Amendment rights. As a result, Officer Teets is entitled to qualified immunity.

## H.     Plaintiff has no state law claims for assault or battery against Officer Teets.

Because Officer Teets' use of force was objectively reasonable and justified under the Fourth Amendment, Plaintiff has no claims for the state law torts of assault or battery. *Price v.*

Page 53 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

*City of Sutherlin*, 945 F. Supp. 2d 1147, 1157-58 (D. Or. 2013); *Saberi v. City of Portland,* No. 04-1396-M), 2006 WL 2707995, at *4 (D. Or. Sept. 18, 2006); *Giger v. Klamath Falls*, 21 Or App 753, 763 (1975).[8]

At the time of the incident with Mr. Marshall, ORS 161.235[9] allowed peace officers to use reasonable force to make arrests. Such arrests are justified and do not constitute either an assault or battery under state law. *See Price, supra.* As such, Plaintiff has no state law claims for assault or battery.

## CONCLUSION

For all of the above reasons, Defendant Steven Teets respectively requests an Order issue granting Summary Judgment in his favor and dismissing Plaintiff's claims with prejudice.

DATED this 9th day of October, 2025.

> s/William W. Manlove
> Aaron P. Hisel, OSB #161265
> Rebeca A. Plaza, OSB #053504
> William W. Manlove, OSB #891607
> Attorneys for Defendant Steven Teets

---

[8] Moreover, the sole cause of action under Oregon law for harm resulting in death is Oregon's Wrongful Death statute, ORS 30.020 et seq. *Union Bank of California v. Copeland Lumber Yards, Inc.*, 213 Or App 208, 313 (2007) ("In Oregon, an action for wrongful death is regarded as exclusively statutory in nature.") Plaintiff's First Amended Complaint is unclear if Sara Marshall is bringing such an action. (See FAC, ¶¶ 47-55.) The FAC has no cause of action identified as such. (Id.) The Estate makes a reference to ORS 30.020 when it alleges damages, however. (See FAC, ¶¶ 56, 57.)

[9] The Oregon legislature repealed ORS 161.235 in 2020 and replaced it with ORS 161.233, which became effective January 1, 2021.

Page 54 – **DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT**

**CERTIFICATE OF SERVICE**

I hereby certify that I served the foregoing DEFENDANT TEETS' MOTION FOR SUMMARY JUDGMENT on:


Jonny Russell
Jina Clark
Clark Law and Associates, LLC
6501 SW Macadam Ave., Suite E
Portland, OR 97239
      Attorneys for Plaintiffs

Lauren Nweze
Wood Smith Henning & Berman LLP
12755 SW 69th Avenue, Suite 100
Portland, OR 97223
      Attorney for City of Forest Grove, Kole McGann, and Matthew Dorick

by the following indicated method or methods:

☒         by **electronic means through the Court's Case Management/Electronic Case File system** on the date set forth below;

by **emailing** a copy thereof to each attorney at each attorney's last-known email address on the date set forth below;

by **mailing** a full, true, and correct copy thereof in a sealed, first-class postage-prepaid envelope, addressed to plaintiff's last-known address listed above and depositing it in the U.S. mail at Salem, Oregon on the date set forth below.

DATED this 9th day of October, 2025.


s/William W. Manlove
Aaron P. Hisel, OSB #161265
Rebeca A. Plaza, OSB #053504
William W. Manlove, OSB #891607
Of Attorneys for Defendant Steven Teets


CERTIFICATE OF SERVICE