**Jina L. Clark,** OSB No. 000319
E-mail: jina@clarklawportland.com
**Jonathan Russell**, OSB No. 220641
E-mail: jonny@clarklawportland.com
CLARK LAW AND ASSOCIATES, LLC
6501 SW Macadam Ave. Suite E
Portland, OR   97239
(503) 238-1010
(503) 238-1212 (facsimile)
  *Of Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| SARA MARSHALL, in her personal capacity and as personal representative of the Estate of James Marshall, ESTATE OF JAMES MARSHALL<br><br>Plaintiffs,<br><br>  v.<br>CITY OF FOREST GROVE, STEVEN TEETS, KOLE MCGANN, and MATTHEW DORICK.<br><br>Defendants. | ) Case No. 3:22-cv-01470-YY<br>)<br>) **PLAINTIFFS' RESPONSE TO**<br>) **DEFENDANT STEPHEN TEETS'**<br>) **MOTION FOR SUMMARY JUDGMENT**<br>)<br>)<br>) *(\*Filed Concurrently with Declarations of*<br>) *Jonathan Russell, Crispin Rosenkranz, and*<br>) *Sara Marshall; Plaintiffs' Compendium of*<br>) *Exhibits)* |

TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ............................................. 12

**ARGUMENT** ............................................................................................................ 12

I.    SUMMARY JUDGMENT STANDARD IN EXCESSIVE FORCE CASE .. 12

II.   EXCESSIVE FORCE CLAIM: DRIVE-STUN TO MARSHALL'S
      UPPER BACK WHILE FOUR OFFICERS RESTRAINED HIM
      FACE DOWN IN THE PRONE POSITION .................................................. 12
      A. Graham Factors ....................................................................................... 12
         1. Type and Amount of Force .................................................................. 12
         2. Severity of Alleged Crimes were Minor ............................................ 15
         3. No Immediate Safety Threat ............................................................... 16
            a. Level of Marshall's Threat Before the Takedown ....................... 16
            b. Level of Marshall's Threat at Time of Drive-Stun Deployment ... 19
         4. Level of Resistance ............................................................................. 23
            a. Upon Officers' Arrival ................................................................ 23
            b. Marshall Defensively Jabbed his Flagpole in Officer Dorick's
               Direction as the Officers Encroached ......................................... 24
            c. Kicking and Banging the Church Glass Door was Reactive,
               Not Resistive ............................................................................... 25
            d. Marshall's Punch was Instinctive, Not Resistive ......................... 26
            e. Marshall was Not Capable of Actively Resisting or Attempting
               to Evade when he was Drive-Stunned ......................................... 26
      B. Additional Factors ................................................................................... 29
         1. Emotionally Distraught/Mental Health Crisis (Deorle v. Rutherford) 29
         2. Availability of Less Intrusive Alternatives ........................................ 30
         3. OIC Teets Created the Dangerous Situation ....................................... 31
            a. Failure to Promptly Summon EMT Personnel ............................. 31
            b. Officers' Provocative Encroachment Triggers Marshall's
               Defensive Jab ............................................................................... 33
            c. Foreseeable Chain of Events: Bullrush Leads to Marshall's
               Protective Punch; Leads to Dogpile; Leads to Marshall's
               Squirming Under Heavy Weight; Leads to Deadly Drive Stun .... 34
         4. Teets' Drive Stun Contributed to Marshall's Death ........................... 34

III.  EXCESSIVE FORCE: PRONE RESTRAINT BODY COMPRESSION ...... 37
      A. Graham Factors ....................................................................................... 37
         1. Type and Amount of Force was Deadly .............................................. 37
         2. Severity of Marshall's Crimes was Minimal ...................................... 39
         3. Marshall was Incapable of Presenting an Immediate Threat While
            Handcuffed .......................................................................................... 39

4. Marshall's Lack of Resistance ........................................... 40
5. Marshall was in the Midst of a Mental Health Crisis......................... 41
6. A Less Intrusive Alternative was to Put Marshall in the Recovery Position Immediately After he was Handcuffed............................... 41

IV. NO QUALIFIED IMMUNITY BECAUSE THE LAW WAS CLEARLY ESTABLISHED IN OCTOBER 2020 REGARDING DRIVE-STUN ON RESTRAINED PERSON SUFFERING EXCITED DELIRIUM ...................................................................... 42
A. Intersectionality ................................................................ 43
1. Drive-Stun Clearly Established Precedent: Mattos / Bonivert ........... 43
2. Mental Health Clearly Established Precedent: Deorle v. Rutherford / Bryan v. MacPherson ......................................................... 44

V. NO QUALIFIED IMMUNITY BECAUSE THE LAW WAS CLEARLY ESTABLISHED IN OCTOBER 2020 THAT CONTINUOUS FORCEFUL PRONE RSTRAINT OF A CANDCUFFED PERSON SUFFERING EXCITED DELIRIUM CONSTITUTES EXCESSIVE FORCE .................. 45
A. This Court's Qualified Immunity Analysis in Payne v. City of Eugene... 45
B. Drummond v. City of Anaheim, 343 F.3d 1052 (9th Cir. 2003)............... 47
C. Gregory and A.B. are Distinguishable Because Teets Used Prone Restraint After Marshall was Handcuffed............................... 49
1. Teets' Cited Ninth Circuit Cases are Distinguishable......................... 49
2. Payne's Ninth Circuit Cases are Analogous..................................... 49

VI. PLAINTIFFS' STATE LAW CLAIMS: ASSAULT & BATTERY ............. 51

**CONCLUSION** ........................................................................ **51**

## TABLE OF AUTHORITIES

**CASES**

*Abston v. City of Merced*
506 F. App'x 650 (9th Cir. 2013) ................................................................. 50

*A.B. v. Cnty. of San Diego*
2022 U.S. App. LEXIS 9534 (9th Cir. 2022) ............................................... 49

*Alves v. Riverside Cnty.*
2021 U.S. Dist. LEXIS 169354 (C.D. Cal. Aug. 5, 2021) ........................... 46

*Alves v. Riverside Cnty.*
2023 U.S. Dist. LEXIS 109189 (C.D. Cal. May 19, 2023) .......................... 42

*Andrews v. City of Henderson*
35 F.4th 710 (9th Cir. 2022) ........................................................................ 21

*Arce v. Blackwell*
294 Fed.App'x 259 (9th Cir. 2008) .............................................................. 49

*Armstrong v. Vill. Of Pinehurst*
810 F.3d 892 (4th Cir. 2016) ................................................................. 13, 19

*Ashcroft v. al-Kidd*
563 U.S. 731 (2011) ..................................................................................... 43

*Ballard v. City of Albany*
221 Or.App. 630 (2008) ............................................................................... 51

*Ballentine v. Tucker*
28 F.4th 54 (9th Cir. 2022) ..................................................................... 42, 43

*Ballou v. McElvain*
29 F.4th 413 (9th Cir. 2022) ........................................................................ 43

*Barnard v. Theobald*
721 F.3d 1069 (9th Cir. 2013) ..................................................................... 27

*Berger v. Spokane Cnty.*
2017 U.S. Dist. LEXIS 20227, *20 (E.D. Wash. Feb. 13, 2017) ....................17, 20, 24

*Blanchard v. Cnty. of Los Angeles*
2022 U.S. Dist. LEXIS 181640 (C.D. Cal. Aug. 25, 2022) ................................ 40, 42

*Bonivert v. City of Clarkston,*
    883 F.3d 865, 880 (9th Cir. 2018) .................................................... 33, 36, 43, 44, 45

*Briseno v. City of Tuscon*
    2025 U.S. Dist. LEXIS 38678 (D. Az. Mar. 3, 2025) ........................................... 39, 46

*Brown v. Diaz*
    2020 U.S. Dist. LEXIS 148067 (E.D. Cal. Aug. 14, 2020) .................................. 24, 26

*Brown v. Grinder*
    2019 U.S. Dist. LEXIS 10236 (E.D. Cal. Jan. 22, 2019) ........................................... 26

*Bryan v. MacPherson*
    630 F.3d 805, 830 (9th Cir. 2009) ...................................... 17, 23, 30, 44, 45

*Burns v. City of Concord*
    2017 U.S. Dist. LEXIS 195389 (N.D. Cal. Nov. 28, 2017) ....................................... 19

*B.R.S. v. City of Palm Springs*
    2015 U.S. Dist. LEXIS 200956 (C.D. Cal. Jan. 26, 2015) .................................. 22, 28

*Bynum v. City of N. Las Vegas*
    2020 U.S. Dist. LEXIS 158134 (D. Nev. Aug. 31, 2020) .................................. 20, 21

*Caruso v. Solorio*
    2020 U.S. Dist. LEXIS 245841 (E.D. Cal. Dec 30, 2020) ......................................... 36

*Chang v. City of Pacifica*
    2018 U.S. Dist. LEXIS 234689 (N.D. Cal. Mar. 30, 2018) ....................................... 33

*Changamu v. Lamb*
    2025 U.S. Dist. LEXIS 24845 (D. Az. Feb. 11, 2025) .............................................. 13

*Clark v. County of L.A.*
    2021 U.S. Dist. LEXIS 253305 (C.D. Cal. Dec. 13, 2021) ....................................... 12

*Cook v. Kinzua Pine Mills Co*
    207 Or. 34 (1956) ...................................................................................................... 51

*Deskins v. City of Bremerton*
    2009 U.S. Dist. LEXIS 37703 (W.D. Wash. May 1, 2009) ....................................... 22

*Deorle v. Rutherford*
    272 F.3d 1272 (9th Cir. 2001) .........................................................................*passim`*

*Diamond v. City of Sandy*

2025 U.S. Dist. LEXIS 51435 (D. Or. Mar. 20, 2025) ............................................. 25

*Dold v. Snohomish Cnty.*
   649 F. Supp. 3d 1084 (W.D. Wash. 2022) ................................................. 35

*Dominguez v. Cnty. of Los* Angeles
   2024 U.S. Dist. LEXIS 145998 (C.D. Cal. Aug. 15, 2024) ...................................... 48

*Drummond v. City of Anaheim*
   343 F.3d 1052 (9th Cir. 2003) ........................................................ *passim*

*Estate of Aguirre v. Cnty. of Riverside*
   29 F.4th 624 (9th Cir. 2022) ................................................................ 12

*Estate of Sanchez v. Cnty. of Stanislaus*
   2023 U.S. Dist. LEXIS 203673 (E.D. Cal. Nov. 14, 2023)................. 28, 29, 35, 38, 47

*Est. of Soakai v. Abdelaziz*
   137 F.4th 969 (9th Cir. 2025) .................................................................. 43

*Francisco v. City of Redmond*
   2021 U.S. Dist. LEXIS 191287 (D. Or. July 15, 2021)...................................... 12, 21

*French v. City of Cortez*
   361 F. Supp. 3d 1011 (D. Col. 2019)........................................................ 22

*Friedman v. Live Nation Merchandise,* Inc.
   833 F.3d 1180, 1189 (9th Cir. 2016)........................................................ 36

*Furnace v. Sullivan*
   705 F.3d 1021 (9th Cir. 2013) .............................................................. 27

*Glenn v. Wash. Cnty.*
   673 F.3d 864 (9th Cir. 2011) .............................................................. 30

*Gonzalez v. City of Alameda*
   2023 U.S. Dist. LEXIS 169602 (Sept. 22, 2023)........................................ 29

*Gordon v. County of Orange*
   6 F4th 961 (9th Cir. 2021)................................................................ 43

*Graham v. Connor*
   490 U.S. 386 (1989) ................................................................ *passim*

*Green v. City & Cnty. of S.F.*
   751 F.3d 1039, 1050 (9th Cir. 2014)........................................................ 40

*Greer v. City of Hayward*
229 F. Supp. 3d 1091, 1105 (N.D. Cal. 2017) ............................................................. 29

*Gregory v. Cnty. of Maui*
523 F.3d 1103 (9th Cir. 2009) ..................................................................................... 49

*Grobstein v. Portland*
2021 U.S. Dist. LEXIS 69098 (D. Or. Feb. 16, 2021) ................................................ 27

*Henderson v. City of Torrance*
2020 U.S. Dist. LEXIS 247103 (C.D. Cal. Dec. 14, 2020) ........................................ 25

*Holloway v. Orange Cnty.*
538 F. Supp. 3d 973, 977 (C.D. Cal. 2021) ................................................................ 20

*Holloway v. Orange Cnty.*
2024 U.S. Dist. LEXIS 79046, *5 (C.D. Cal. Mar. 18, 2024) .................................... 20

*Hyde v. City of Wilcox*
23 F.4th 863 (9th Cir. 2022) ........................................................................................ 21

*Hyer v. City & Cnty. of Honolulu*
118 F.4th 1044 (9th Cir. 2024) .................................................................................... 42

*Ingram v. Kubik*
30 F4th 1241 (11th Cir. 2022) ..................................................................................... 27

*Ioane v. Hodges*
939 F.3d 945 (9th Cir. 2018) ....................................................................................... 43

*Isayeva v. Sacramento Sheriff's Dep't*
872 F.3d 938 (9th Cir. 2017) ....................................................................................... 21

*Johnson v. Duffy*
588 F.2d 740, 743 (9th Cir. 1978) ............................................................................... 35

*Jones v. Williams*
297 F.3d 930, 937 (9th Cir. 2002) ............................................................................... 35

*Joseph v. Bartlett*
981 F.3d 319 (5th Cir. 2020) ....................................................................................... 27

*Khang v. Ruiz*
2015 U.S. Dist. LEXIS 200837 (C.D. Cal. Apr. 17, 2015) ........................................ 35

*K.J.P. v. Cty. of San Diego*
  2019 U.S. Dist. LEXIS 63657 (S.D. Cal. Apr. 12, 2019).............................................28

*Krueger v. Phillips*
  2025 U.S. App. LEXIS 21515, *54 (10th Cir. 2025)................................22, 23, 40, 42

*Lam v. City of Los Banos*
  976 F.3d 986 (9th Cir. 2020) ..............................................................................22

*Larry v. Helzer*
  2006 U.S. Dist. LEXIS 37906 (D. Or. May 17, 2006)..............................................23

*Lawhon v. Mayes*
  2021 U.S. App. LEXIS 33823 (4th Cir. 2021) ...................................................38, 40

*LeBlanc v. City of Los Angeles*
  2006 U.S. Dist. LEXIS 96768 (C.D. Cal. Aug. 16, 2006) ........................................38

*Livingston v. Kehagias*
  803 Fed. Appx. 673 (4th Cir. 2020) ....................................................................13

*Lomeli v. Cnty. of L.A.*
  2012 U.S. Dist. LEXIS 28016 (C.D. Cal. Mar. 1, 2012) ..........................................20

*Maresca v. Bernalillo Cnty.*
  804 F.3d 1301 (10th Cir. 2015) ..........................................................................32

*Martin v. City of Broadview Heights*
  712 F.3d 951 (6th Cir. 2013) ..............................................................................30

*Mattos v. Agarano*
  661 F.3d 433 (9th Cir. 2011) ........................................................................ *passim*

*Mbegbu v. City of Phoenix*
  2017 U.S. Dist. LEXIS 172368 (D. Az. Oct. 18, 2017)......................................32, 36

*Meyers v. Balt. County*
  713 F.3d 723 (4th Cir. 2013)...............................................................................21

*Miller v. Roycroft*
  2024 U.S. Dist. LEXIS 60324 (D. Mass. Mar. 31, 2024) .................................. *passim*

*Miller v. Jackson*
  2025 U.S. App. LEXIS 23404 (1st Cir. 2025) ........................................................17

*Myers v. City of Charleston*

2021 U.S. Dist. LEXIS 45010 (S.D.W.V. Mar. 10, 2021) ................................... 39, 42

*Nehad v. Browder*
929 F.3d 1125 (9th Cir. 2019) ...................................................................29, 31, 34

*Nunis v. City of Chula Vista*
676 F. Supp. 3d 867 (S.D. Cal. 2023) ................................................................ 15, 31

*Ouza v. City of Dearborn Heights*
969 F.3d 265 (6th Cir. 2020) ..................................................................................... 44

*Payne v. City of Eugene*
760 F. Supp. 3d 1157 (D. Or. 2024).................................................................. *passim*

*Perea v. Baca*
817 F.3d 1198, 1203 (10th Cir. 2016)......................................................................... 27

*Perkins v. City of Anaheim*
2021 U.S. Dist. LEXIS 166024 (C.D. Cal. Apr. 26, 2021) ........................................ 19

*Perkins v. Edgar*
2022 U.S. App. LEXIS 29926 (9th Cir. Oct. 25, 2022)....................................... 38, 50

*Pirolozzi v. Stanbro*
2008 U.S. Dist. LEXIS 36054 (N.D. Ohio May 1, 2008) ......................................... 27

*Price v. City of Sutherlin*
945 F.Supp.2d 1147, 1157 (D. Or. 2013).................................................................... 51

*Price v. Roseburg Police Dep't*
2017 U.S. Dist. LEXIS 159966 (D. Or. June 21, 2017)............................................ 44

*Quinto-Collins v. City of Antioch*
718 F. Supp. 3d 1033 (N.D. Cal. 2024).................................................................... 42

*Ramsey v. City of Santa Ana*
2023 U.S. Dist. LEXIS 46873, *23 (C.D. Cal. Mar. 17, 2023) ........................... 14, 29

*Rascon v. Brookins*
2018 U.S. Dist. LEXIS 20908 (D. Az. Feb. 8, 2018)......................................... 18, 26

*Rice v. Morehouse*
989 F.3d 1112, 1122 (9th Cir. 2021)................................................................. 24, 35

*Sandoval v. City*
2023 U.S. Dist. LEXIS 347 (N.D. Cal. Jan. 3, 2023) ............................................... 37

*Santos v. Gates*
287 F.3d 846 (9th Cir. 2002) .................................................................................. 28

*Scott v. Smith*
109 F.4th 1215 (9th Cir. 2024) ...............................................................30, 36, 37, 38

*Seidner v. DeVries*
39 F.4th 591 (9th Cir. 2022) ................................................................................... 36

*Smalls v. Binner*
2016 U.S. Dist. LEXIS 28564 (W.D.Va. Mar. 7, 2016) ............................................ 27

*Stephenson v. California*
761 F. Supp. 3d 1242 (C.D. Cal. 2025)...........................................................39, 41, 42

*Timpa v. Dillard*
20 F.4th 1020 (5th Cir. 2021) ................................................................................. 38

*Tucker v. Las Vegas Metro. Police Dep't*
470 Fed.Appx. 627 (9th Cir. 2012) .......................................................................... 50

*Tuggle v. City of Tulare*
2023 U.S. Dist. LEXIS 112523 (E.D. Cal. June 29, 2023) ........................................ 31

*Tuuamalemalo v. Greene*
946 F.3d 471, 477 (9th Cir. 2019) ........................................................................... 14

*Tyvoll v. City of Portland*
2023 U.S. Dist. LEXIS 155938 (D. Or. May 23, 2023)............................................. 47

*Verela v. State*
405 So. 3d 515 (Fl. 2025)........................................................................................ 18

*V.W. v. Nichelini*
2017 U.S. Dist. LEXIS 15835 (E.D. Cal. Feb. 2, 2017) ........................................... 34

*Walton v. Gomez*
745 F.3d 405 (10th Cir. 2014).................................................................................. 27

*Weigel v. Broad*
544 F.3d 1143 (10th Cir. 2008) .......................................................................... 40, 41

*Wells v. City of Las Vegas*
2024 U.S. Dist. LEXIS 82731 (D. Nev. May 7, 2024)............................................... 40

*Wilkinson v. Lewis*
289 F. Supp. 3d 371, 379 (N.D.N.Y. 2018)................................................................ 36

*Wilkinson v. Torres*
610 F.3d 546 (9th Cir. 2010) ..................................................................................... 12

*Williamson v. City of National City*
23 F.4th 1146 (9th Cir. 2022) .......................................................................12, 34, 39

*Williams v. Jackson*
2014 U.S. Dist. LEXIS 179713 (D. Or. Dec. 3, 2014)............................................... 51

*Wise v. City of Portland*
483 F.Supp. 3d 956 (D. Or. 2020)............................................................................. 47

*Wright v. Beck*
981 F.3d 719 (9th Cir. 2020) ..................................................................................... 43

*Wright v. Cockrell*
2001 U.S. Dist. LEXIS 21931 (N.D. Tex. Sept. 4, 2001) .......................................... 18

*Winkler v. City of Phoenix*
849 Fed. Appx. 664 (9th Cir. 2021) .................................................................... 31, 34

*Young v. Cnty. of Los Angeles*
655 F.3d 1156 (9th Cir. 2011) ................................................................................... 24

*Zelaya v. Las Vegas Metro. Police Dep't*
682 F. App'x 565 (9th Cir. 2017)............................................................................... 50

ARGUMENT

I.    SUMMARY JUDGMENT STANDARD IN EXCESSIVE FORCE CASES

"The reasonableness standard nearly always requires a jury to sift through disputed factual contentions, so summary judgment in an excessive-force case should be granted sparingly." *Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) (cleaned up). The pertinent question is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The objective inquiry into reasonableness is "highly fact specific." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010).

II.    EXCESSIVE FORCE CLAIM: DRIVE-STUN TO MARSHALL'S UPPER BACK WHILE FOUR OFFICERS RESTRAINED HIM FACE DOWN IN THE PRONE POSITION

   A.    *Graham* Factors

       1.    Type and Amount of Force:

Teets drive-stunned Marshall in the back for 4.9 seconds. Ex.78(Quad Vid. 10:20)*;* Ex.35 (Leonesio Rprt., p. 11); Ex.18, 19(Colasurdo Dep. 45:11-46:5).[1] Teets' "drive-stun" was "far from a trivial application of force," particularly since Marshall became unresponsive 2 ½ minutes later. *Francisco v. City of Redmond*, 2021 U.S. Dist. LEXIS 191287, *13-14 (D. Or. July 15, 2021). In assessing the reasonableness of Teets' drive-stun, this Court must consider "the magnitude of the electric shock at issue and the extreme pain." *Clark v. Cnty. of L.A.*, 2021 U.S. Dist. LEXIS 253305, *17 (C.D. Cal. Dec. 13, 2021) (quoting *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011)). Marshall's "actual harm experienced" informs the classification of the type and amount of force used. *Williamson v. City of National City*, 23 F.4th 1146, 1151-52 (9th Cir. 2022). "Taser use is

---

[1] All exhibits cited in this brief are authentic and properly admitted under the Declarations of Jonathan R. Russell, Crispin Rosenkranz, and Sara Marshall, filed concurrently herewith Plaintiffs' Compendium of Exhibits.

severe and injurious regardless of the mode which the taser is set." *Armstrong v. Vill. Of Pinehurst*, 810 F.3d 892, 911 (4th Cir. 2016).

The quantum of force from Teets' drive stun was especially great because it was used on an individual in mental crisis and excited delirium. Teets' role as officer-in-charge (OIC) and his Crisis Intervention Training (CIT) are significant. His training identified excited delirium as a medical emergency with a high death risk and warned excessive force could worsen a subject's condition. Ex.73(P0324, 0328); Ex.30(Soto Rprt., p. 2). Teets claims he applied the drive-stun to Marshall's upper back because it was a "large muscle group" that would cause Marshall to lose strength and release his arm. This contradicts Lexipol which instructs officers in excited delirium encounters to do "*minimize* large muscle group movements to reduce lactic acid buildup" to prevent cardiac arrest. Ex.10(McGrew PMK Dep. 23:14-24:2).

██████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

███████████████████████ The body-worn-camera (BWC) shows Marshall had a strong response to Teets' "Taser deployed in drive-stun mode" and "cause[d] extreme [] pain []." *Changamu v. Lamb*, 2025 U.S. Dist. LEXIS 24845, *29 (D. Az. Feb. 11, 2025); Ex.78(Quad Vid. 10:23-11:05). Thus, while a drive-stun might ordinarily be considered an intermediate level of force, Teets knew its use on Marshall substantially increased the risk of grave harm.

In analyzing Teets' drive-stun, the Court must further consider the cumulative effect of all force used *before* the drive-stun. *Livingston v. Kehagias*, 803 Fed. Appx. 673, 686 (4th Cir. 2020) ("cumulative force deployed against Livingston was under the circumstances constitutionally excessive.") The officers had already used significant force by the time of the drive-stun. Ex.78(Quad Vid. 08:19-10:20); Ex.28(Bercovici Rprt., pp. 44-47). During the collective restraint,

Marshall lay prone under several officers' weight; sustained head trauma;[2] and had been shocked by Teets' first tasing.[3]

McGann conceded that at the time of the drive-stun, the officers had "too much weight on him," and Marshall could not free his arm trapped beneath him. Ex.39(FG1238). The BWC confirms this: Teets ordered McGann and Dorick to "Get his ass!" Ex.78(Quad Vid. 8:32). During the dogpile, Teets remarked, "Someone's on me," while Marshall was trapped under multiple officers' weight. *Id.* at 8:40; Ex.37(FG2627). With Marshall restrained, Teets pressed his knee into Marshall's upper back while Dorick applied additional pressure. Ex.78(Quad Vid. 9:10). Dorick ordered Marshall to "stop kicking" even as the officers increased weight, prompting Marshall to groan and cry out repeatedly, "Help! Help! Help! Help! Help!" and call out for a "Doctor!" *Id.* at 9:33-9:49.[4]

"[T]he Ninth Circuit had held that a person need not be in fully body restraints or even handcuffs to be considered restrained." *Ramsey v. City of Santa Ana*, 2023 U.S. Dist. LEXIS 46873, *23 (C.D. Cal. Mar. 17, 2023) (citing *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019)). Restrained by the officers, Marshall's fingers twitched. Ex.78(Quad Vid. 10:08). Teets threatened to Tase him. *Id.* at 10:14. A bewildered Marshall asked, "I'm gonna what?" (10:18). After the restraint, Teets drive-stunned Marshall while leaning his full weight into him with his knee on Marshall's neck and his left arm pressing down—evoking a strong reaction from Marshall. Marshall managed to say, "Hallelujah," just as Teets drove both knees into Marshall's neck and

---

[2] Senior medic Sergio Vigil said Marshall had "significant head trauma." Ex.71(FG2520). McGann saw Marshall bleeding from his head and believed Marshall's "head got pushed into the concrete." Ex.39(FG1244). Teets told medics that he punched Marshall in the jaw and Marshall may have hit his head on the wall. Ex.78(Quad Vid. 30:50-31:10.)

[3] During Teets' initial Taser deployment, evidence suggests Marshall did not suffer neuromuscular incapacitation (NMI). Nevertheless, Teets had reason to believe Marshall was experiencing the same Taser exposure Teets felt—particularly since a probe was embedded in Marshall's arm. Ex.37(FG2625); Ex.35(Leonesio Rprt., pp. 9–10); Ex.37(FG2625–2626).

[4] *See also* Ex.79(P202811334 Radio Traffic WCSO1Merged and Redacted (x12) at 0:02:29).

buttocks with full body weight, drawing a reaction from Marshall that it felt like a "chokehold." (10:23-43).[5]

With both hands cuffed, and feeling the onset effects of the drive-stun and restraint, Marshall kicked his legs while gasping for air. (10:43-10:58). Teets, McGann, and Dorick continued to press Marshall down, and Teets again drove both his knees into Marshall's upper back and buttocks. (10:59)[6] McGann, who had been restraining Marshall by hand, left to retrieve a hobble, and was replaced by the 285-pound Shafer. (11:07-11:33).[7] Shafer set his massive weight on Marshall causing Marshall to yell out again, "Help! Help! Help!" to which Teets responded, "Shut the fuck up." (11:35).

### 2.   Severity of Alleged Crimes Were Minor

The officers were responding to a "welfare check"—not a crime in progress. Ex.28(Bercovici Rprt., p. 42); Ex.7(LaMonica Dep. 98:12-20); see e.g., *Nunis v. City of Chula Vista*, 676 F. Supp. 3d 867, 880-81 (S.D. Cal. 2023). It is doubtful Marshall was even capable of forming specific intent while suffering excited delirium. Ex.22(Soto Dep. 41:8-42:24; 54:1-11; 59:9-19; 63:25-64:2)—symptoms the officers instantly recognized. Ex.3(McGann Dep. 64:14-21); Ex.2 (Dorick Dep. 41:6-16; 58:18-22); Ex.37(FG2619-20; FG2613); Ex.4(Shafer Dep. 19:12-20:23.) Assuming *arguendo* Marshall's reactive donkey-kicking and flagpole bangs to the church door established probable cause for arrest, these offenses were not serious enough to justify using potentially deadly force.

---

[5] The video evidence disputes Teets' contention that his "right knee *may* have been *touching* Marshall's *body*" and that his "left knee was *resting* on Marshall's buttocks" during the drive-stun.

[6] The video evidence disputes Teets' contention that immediately after Marshall was handcuffed, Teets put his right knee *near* Marshall upper back and shoulder and that he was only pressing down with enough force to steady himself or diminish Marshall' ability to kick.

[7] The officers' approximate weights were: Teets, **205 pounds**; Dorick, **200 pounds**; McGann, **160 pounds**; and Shafer**, 285 pounds**. Ex.1(Teets Dep. 10:18-19); Ex.4(Shafer Dep. 64:7–65:7). Shafer described Teets as "a strong guy." *Id*. (64:12–16).

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ The officers had no evidence Marshall had stolen the flagpole; and therefore, no probable cause of theft. *See* Decl. of S. Marshall, ¶5. Under ORS 164.345, the crime of criminal mischief (even in the third degree) requires proving that the accused had the "intent to cause substantial inconvenience to the owner or another person." Marshall could not have committed an assault on a police officer if he did not know Teets was a police officer (an element of ORS 163.208). Marshall never acknowledged he was conversing with police officers, and officers never identified themselves as police officers. A jury could find Marshall's punch was a split-second, instinctive act of self-defense; something Teets should have recognized before he later drive-stunned Marshall. *See* discussion *infra*.[8]

### 3. No immediate safety threat

The "most important *Graham* factor" is whether the individual posed an immediate threat to the safety of the officers or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011).

### a. Level of Marshall's Threat Before the Takedown

The 9-1-1 caller reported a welfare check and identified a shirtless guy "walking up and down…[the S]treet with a flagpole…right in the middle of the road." Ex.80(P202811334 Phone call 1 10-07-20 23.49.37 (SC 262 PHN) at 0:14-50). The caller further relayed there was "no traffic," but that a single car came down the road and was "able to go around" Marshall before Marshall began "sprinting back and forth across the street." *Id*. at 01:02-03:01. The caller confirmed Marshall was carrying only the flagpole. *Id*. at 03:09. Dispatch relayed this information to the officers. Ex.79(P202811334 Radio Traffic WCSO1Merged and Redacted (x12) at 0:09-

---

[8] Teets acknowledged his counter-punch to Marshall was a split-second reaction. Ex.37(FG2638). Plaintiffs should be afforded the same benefit.

0:30). There were no reports Marshall was combative or aggressive. See e.g., *Miller v. Roycroft, supra,* at *28.

Similarly, Marshall did not pose a danger to any church congregants at midnight during the COVID pandemic. See e.g., *Bryan v. MacPherson*, 630 F.3d 805, 827 (9th Cir. 2010) ("no indication that there were pedestrians nearby or traffic on the street at the time of the incident."); see also *Berger v. Spokane Cnty.*, 2017 U.S. Dist. LEXIS 20227, *20 (E.D. Wash. Feb. 13, 2017) (no "*immediate* risk of harm to the deputies or the public" as mentally ill subject was "not wearing a shirt and was visibly unarmed, removed himself from a crowded area to a vacant parking lot.") Marshall paced in the empty church courtyard holding his flagpole.

Marshall was merely acting erratically; and "[e]rratic or unpredictable behavior might require an officer to be alert and prepared for different possible scenarios," but that "does not necessitate assuming the worst. Sometimes an individual's behavior is a manifestation of their mental health condition but is not dangerous." *Miller v. Roycroft,* 2024 U.S. Dist. LEXIS 60324, *31 (D. Mass. Mar. 31, 2024).[9]

Officers issued mixed commands—some told Marshall to put the pole down, while Teets commended him to keep it raised.[10] The flagpole did not indicate Marshall was armed or violent.

---

[9] The 2019 knee-on-back excessive force prone restraint in *Miller v. Roycroft* was affirmed by the First Circuit in *Miller v. Jackson*, 2025 U.S. App. LEXIS 23404 (1st Cir. 2025) (published). The *Miller* Court denied the officer qualified immunity because pre-existing law clearly established that "exerting significant, continued forced on a person's back while that person is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Id.* at *10. *Miller* noted that a person did not need to be handcuffed to be subdued or restrained as a legal matter. *Id.* at *11. However, *Miller* did grant the officer qualified immunity for the defendant officer's punch to the decedent before the decedent was subdued and handcuffed and while the decedent had the **officer's** arm trapped underneath him. That portion of the *Miller* opinion (Phase I) is irrelevant to Marshall's case since none of the FGPD officers' arms were trapped underneath Marshall when Teets drive-stunned him.

[10] When Officer McGann arrived at the church, McGann told Marshall to "set the pole down." Ex.78(Quad Vid. 0:07). Marshall responded three times, "I can't." *Id.* at 0:08-13. Teets commended Marshall's efforts and obvious respect for the American flag. *Id.* at 04:52 ("Yep. Don't let it hit the ground. We don't want to do that. Gotta keep the flag off the ground."); *id.* at

He held the lightweight, collapsible aluminum flagpole, taken from his home, in both hands and was carefully focused on not letting it touch the ground. Decl. of S. Marshall, ¶5.

He did not use the flagpole as an offensive weapon, but only to keep the officers from encroaching his safe space. *See* Ex.30(Soto Rprt., pp. 3-4); Ex.22(Soto Dep. 52:14-23); Ex.31(Whitely Rprt., pp. 1-5); Ex.23(Whitely Dep. 48:20-49:10); Ex.28(Bercovici Rprt., pp. 39-42).[11] Any perceived safety threat was created only after the officers failed to follow proper-de-escalation trainings. Ex.28(Bercovici Rprt., p. 39); Ex.31(Whitely Rprt., pp. 1-5). The officers should have perceived Marshall's maneuvers as "defensive resistance." *Rascon v. Brookins*, 2018 U.S. Dist. LEXIS 20908, *39-40 (D. Az. Feb. 8, 2018) (reasonable officer would have perceived subject's attempt to break free from officers' restraint was "defensive resistance.") Marshall was unarmed and suffering an immediate medical emergency. Marshall never threatened the officers before the officers surrounded him and closed in on him. Ex.39(FG1234). The greatest risk of danger to Marshall was encountering impatient and improperly trained police officers. "Under those circumstances, a fact finder could reasonably conclude that [Officer Teets'] fear was not well-founded or reasonable." *Miller v. Roycroft*, supra, 2024 U.S. Dist. LEXIS 60324, *31.

Teets argues that Marshall's defensive punch changed the threat level. Teets was bull-rushing Marshall with his Taser pointed at Marshall's chest less than 2 feet away when Marshall instinctively punched in self-defense. Ex.78(Quad Vid. 8:13). Regardless of the punch, any

---

05:52 ("Yep. Get it off the ground. Good job."); *see also* 4 U.S.C.S. § 8(b) ("The flag should never touch anything beneath it, such as the ground…")

[11] Defendants mischaracterize Marshall's flagpole jabbing moves as "stabbing" or "charg[ing] at the officers with the flagpole as a spear." (ECF 88; Teets Decl. ¶12). Twice, Marshall gestured defensively with his flagpole. He did not attempt to "stab" Teets with his flat, collapsible flagpole. Ex.63(FG261). See *Wright v. Cockrell*, 2001 U.S. Dist. LEXIS 21931, *19 (N.D. Tex. Sept. 4, 2001) ("WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 1145 (9th Ed. 1985) defines 'stab' as to wound or pierce by the thrust of a **pointed** weapon"). The Oxford English Dictionary defines 'stab' as 'to wound (often to kill) with a thrust of a pointed weapon (chiefly, with a short weapon, as a dagger.'" *Verela v. State*, 405 So. 3d 515, 520 (Fl. 2025); see also *Verela v. State*, 964 S.W. 2d 32, 37 (Tex. 1997) (same). For sake of brevity, Plaintiffs refer to Marshall's defensive gestures as "jab."

immediate threat to the officers dissipated after Marshall laid helplessly restrained in a prone position by the pressing weight of 3-4 officers. See e.g., *Burns v. City of Concord*, 2017 U.S. Dist. LEXIS 195389, *36-37 (N.D. Cal. Nov. 28, 2017) (when officer deployed canine, plaintiff no longer posed a threat). Even assuming *arguendo* that Marshall was the "first aggressor does not change the [] analysis." *Perkins v. City of Anaheim*, 2021 U.S. Dist. LEXIS 166024, *27 (C.D. Cal. Apr. 26, 2021). "[P]ainful, injurious, serious inflictions of force, like the use of a taser, do not become reasonable simply because officers have authorization to arrest a subject who is unrestrained." *Armstrong*, supra, at 895.

> *b.   Level of Marshall's Threat <u>at Time of Drive-Stun</u> Deployment*

At the moment of the drive-stun, Marshall was pinned to the ground by four burly officers, partially handcuffed, unarmed, and physically incapable of freeing his trapped arm. McGann testified ***Marshall's left arm was stuck under his body due to his <u>own</u> weight and the officers' restraint.*** Ex.3(McGann Dep. 55:9-14). Dorick testified that "weight from [Marshall's] own body was lifted off the ground in order to obtain [his] arm." Ex.2(Dorick Dep. 80:7-13). In his interview with Major Crimes Division (MCD), McGann stated that at the time Teets drive-stunned Marshall, the officers had "too much weight on him," and Marshall could not get his arm out from underneath. Ex.39(FG1238).

With the flagpole no longer in his possession (and the loose Taser in Teets' hands), Marshall had nothing that could be used as a weapon.[12] The lighting where Marshall was standing in full

---

[12] Plaintiffs dispute that Marshall reached out with his left hand and scooped the Taser under his body. Officer statements to Major Crimes the following day are consistent with Plaintiffs' interpretation of the evidence that Marshall had his hand on the Taser *after* Teets shot Marshall with the Taser in probe mode the first time.

<u>Officer McGann</u>, who was positioned on the opposite side of Marshall from Teets stated, that he heard "at one point" someone say, "he's got my Taser," and then McGann saw "at one point" a hand wrestling over a Taser. Ex.39(FG1237). It was "at that point," McGann tried controlling Marshall's hand. (*Id.*) McGann does not say whether he saw Marshall's hand on the Taser before or after the Taser pop.

view of the officers for several minutes was bright. It was clear the shirtless Marshall was not carrying a weapon in his waistband or in his pocketless Mickey Mouse pajamas. *See* Decl. of S. Marshall, ¶2; See e.g., *Lomeli v. Cnty. of L.A.*, 2012 U.S. Dist. LEXIS 28016, *14 (C.D. Cal. Mar. 1, 2012) ("He voluntarily removed his shirt, exposing no weapon tucked in his waistband."); *Berger*, supra, at *20 (mentally ill subject "was not wearing a shirt and was visibly unarmed"). "An officer has no reasonable suspicion to believe a suspect is armed in the absence of suspicious bulges, any report that the suspect had a weapon, or suspicion of a crime likely to involve the use of weapons, even if the suspect passively resists the officer's order to be searched." *Clark*, supra, 2021 U.S. Dist. LEXIS 253305, *20. Bolstering this point, no officers searched Marshall after he was handcuffed. Ex.78(Quad Vid. 10:51-end).

Teets' reliance on *Holloway v. Orange Cnty.* is distinguishable because in *Holloway* the suspect told the deputy he had "*camping knives* in the campsite and a *pocketknife on his person*." 538 F. Supp. 3d 973, 977 (C.D. Cal. 2021); 2024 U.S. Dist. LEXIS 79046, *5 (C.D. Cal. Mar. 18, 2024). Holloway had been threatening and rummaging through the RV of a person who called in a life-threatening emergency call, and a "little girl was screaming." *Id*. at *5. Holloway was not shirtless, not in excited delirium, nor was the drive-stun fatal.

*Bynum v. City of N. Las Vegas*, 2020 U.S. Dist. LEXIS 158134 (D. Nev. Aug. 31, 2020) is distinguishable because Bynum hid his arms to resist handcuffing. *Id*. at *2-3. Here, Marshall did not. He was punched and suffered severe head trauma from being slammed into concrete, before

---

Officer Dorick said he saw Marshall with the taser in his hand *after* Dorick heard a taser pop and the distinct sound of a taser cycle. Ex.38(FG1205). That is when Dorick wrestled it from Marshall's hands. Dorick said nothing about whose hands the Taser was in *when discharged*.

The City's 30(b)(6) on the interpretation of the Taser download testified that there was a period of just one second between the time that Teets' Taser was taken off the safety; and when the trigger was pulled. Ex.72(FG2717); Exs.18,19(Colasurdo Dep. 33:5-13; 41:13-17). There is no evidence that Mr. Marshall had any prior experience using Tasers. (S. Marshall Decl., ¶4). Rather, evidence suggests Marshall did not have any prior experience using Tasers. On the other hand, evidence shows OIC Teets was very familiar with Tasers and had used them in the course of his duties as a police officer. Exs.16,17(Gordon Dep. 27:6–28:3).

being tased. Unlike *Bynum*, no officer suspected Marshall had a weapon—who was shirtless—and no pat-down occurred after he was handcuffed. *Cf.* at *4.

*Ciampi* is also inapposite because it pre-dates *Mattos' en banc* decision clarifying that a drive-stun can be intermediate force or greater. *See* discussion in *Francisco*, supra, 2021 U.S. Dist. LEXIS 191287, *13-14.

Finally, *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938 (9th Cir. 2017), is easily distinguished. Marshall was not "tossing" officers; was smaller than those restraining him; and never threatened them. *Id.* at 943, 949. Instead, he pleaded, "Don't shoot," and cried for "help" and a "doctor." Ex.78(Quad Vid. 1:18; 9:33-9:49).

Teets claims he believed Marshall was trying to bite his arm during the struggle for the Taser. ████████████████████████████████████████████████████████ no BWC footage shows Marshall attempting to bite him; and no officer reported Marshall trying to bite Teets. In his MCD interview, Teets admitted he did not know whether his "assumption" was correct—only that Marshall's mouth was open and he was unsure whether Marshall was "trying to yell," "doing weird stuff," or "trying to bite [him]." Ex.37(FG2628-29).

The Court must assess whether use of the drive-stun was reasonable, "keeping in mind the magnitude of the electric shock at issue and the extreme pain that [the plaintiff] experienced." *Mattos*, 661 F.3d at 443. The law also recognizes that "the need for more force wane[s] as circumstances change[.]" *Hyde v. City of Wilcox*, 23 F.4th 863, 871 (9th Cir. 2022). When evaluating whether a person posed an immediate threat, courts "focus on the immediate threat of harm," that is, "[courts] consider the danger a suspect poses at the time force is applied." *Andrews v. City of Henderson*, 35 F.4th 710, 716 (9th Cir. 2022). "Force justified at the beginning of an encounter is not justified even seconds after if the justification for the initial force has been eliminated." *Meyers v. Balt. County*, 713 F.3d 723, 733 (4th Cir. 2013). "The reasonableness of [Teets'] actions depends both on whether he was 'in danger at the precise moment that he used force and on whether his own reckless or deliberate conduct during the seizure unreasonably

created the need to use such force.'" *French v. City of Cortez*, 361 F. Supp. 3d 1011, 1033 (D. Col. 2019).

For example, in *Mattos*, the plaintiff was pulled over for speeding in a school zone and refused to sign the citation. Before the officer deployed the Taser drive-stun, another officer had already removed the keys from the plaintiff's ignition. *Id*. at 444. At that point, the plaintiff "no longer posed even a *potential* threat to the officers' or others' safety, much less an immediate threat." *Id*. In *French v. City of Cortez*, 361 F. Supp. 3d 1011 (D. Col. 2019), an officer deployed his Taser in drive-stun, while his fellow officer was "on top of [the subject] and had him positioned face down beneath him." *Id*. at 1034. However, the immediate threat to the officer at the time of the drive stun was "minimal," even though the subject had *knives* in his hands moments earlier, because "at least three officers were surrounding" the subject "and assisting to control his limbs." *Id*. In *Krueger v. Phillips*, the decedent "ceased to fight back, lay exhausted on the ground, and begged for help." Nonetheless, two deputies "held him down and tased him at least one additional time in drive-stun." 2025 U.S. App. LEXIS 21515, *54 (10th Cir. 2025). The *Krueger* court held the jury could find the decedent was "effectively subdued—held down by the Deputies, physically exhausted, and no longer fighting back—when the Deputies held him down and drive-stunned him." *Id*.

As in *Krueger*, "[a] reasonable jury could find that once Mr. [Marshall] was physically subdued, even though he was not complying with the commands to produce his hands, he was no longer resisting…because he was physically unable to move his hands out from under his torso while the [officers] put their weight on top of him." *Id*. at *55. Before the drive-stun, Teets had adequate time to "reevaluate" and realize Marshall posed no threat. *Lam v. City of Los Banos*, 976 F.3d 986, 1000 (9th Cir. 2020). Four officers were restraining Marshall in a pinned-down ~~prone~~ position. *Deskins v. City of Bremerton,* 2009 U.S. Dist. LEXIS 37703, *29 (W.D. Wash. May 1, 2009) ("The second tase occurred after Mr. Deskins was lying on the ground surrounded by officers.") After Marshall was pinned to the ground, he posed minimal, if any, threat of violence. "There is a triable issue as to the severity of the threat [Marshall] posed, given that four [officers]…restrained him after he was tackled by [Teets]." *B.R.S. v. City of Palm Springs*, 2015

U.S. Dist. LEXIS 200956, *14, 21-23 (C.D. Cal. Jan. 26, 2015) (denying qualified immunity for Taser shots to prone, restrained, unhandcuffed plaintiff.) "Continued use of force after an individual has been subdued is a violation of the Fourth Amendment, including using tasers set to stun mode." *Krueger*, supra, at *60.

### 4. Level of Resistance

"Resistance is not 'a binary state, with resistance being either completely passive or active. Rather, it runs the gamut from the purely passive protestor who simply refuses to stand, to the individual who is physically assaulting the officer." *Bryan*, supra, 630 F.3d at 830. Plaintiffs dispute Marshall's level of resistance to Teets which require credibility determination and video interpretations. The jury must determine the level of resistance posed by Marshall's movements; the resistance the officers reasonably perceived; and mitigating factors (such as Marshall's excited delirium and the officers' actions that instigated the use of force).

### a. Upon Officers' Arrival

Marshall was not actively resisting or evading arrest when the officers arrived at the church. There was no probable cause of any crime. Officers never told Marshall he was under arrest or involuntary custody. The most the officers could have done was take Marshall home, medical facility, or sobering facility. *See* ORS § 430.399; *Larry v. Helzer*, 2006 U.S. Dist. LEXIS 37906, *21-22 (D. Or. May 17, 2006) (denying summary judgment to officers who seized plaintiff under ORS § 430.399 because of fact issues as to degree of force.)

The officers instantly recognized Marshall was acting erratically and exhibiting symptoms of a medical emergency ("excited delirium") per department policy and training. Ex.78(Quad Vid. 2:12-2:25; ███████████████████████████████████████ FGPD policy warned that subjects displaying excited delirium symptoms "should be considered medical emergencies," with an "increased risk of sudden death." Medical assistance should be requested as soon as practicable. Ex.75(FG3781).

The evidence contradicts the officers' claim they did not recognize Marshall's excited delirium symptoms. McGann confirmed it was an excited delirium situation when Marshall forced the

broken flagpole light through the church mail slot. Ex.39(FG1236). Dorick recognized the condition before Teets deployed the drive-stun. Ex.38(FG1214). The City's 30(b)(6) witness, Captain Maslen, testified that "the minute you watch the video it's like, yeah, this isn't normal." Ex.13(Maslen Dep. 161:18–164:5). There is "sufficient evidence to question whether the [officers'] failure to notice the cues that [Marshall] was in the midst of some sort of psychotic break" was reasonable. *Berger*, supra, at *22; Ex.39(FG1236).

Teets' attempt to de-escalate was inconsistent with his excited delirium CIT. Ex.73(P0328-331; Ex.22(Soto Dep. 41:12-42:24; 47:22-48:11; 53:20-54:24; 55:9-56:5; 57:12-58:6; 59:24-60:13); Ex.23(Whitely Dep. 31:7-32:13). Even if Marshall could not be considered clinically "delirious," his mere "[e]xpressing disagreement with an officer's order and not immediately complying qualifies as only minimal resistance." *Brown v. Diaz*, 2020 U.S. Dist. LEXIS 148067, *19 (E.D. Cal. Aug. 17, 2020); *Young v. Cnty. of Los Angeles*, 655 F.3d 1156, 1165 (9th Cir. 2011) (arrestee's repeated refusal to reenter vehicle was not active resistance). As OIC, Teets had "a duty to independently evaluate the situation." *Rice v. Morehouse*, 989 F.3d 1112, 1122 (9th Cir. 2021). Rather than follow his Crisis Intervention Training (CIT) and promptly call EMTs, Teets chose expediency over Marshall's Fourth Amendment rights. Ex.73(P0323); Ex.77(FG7012); Ex.22(Soto Dep. 47:22-48:11; 57:20-58:6; 41:12-42:24; 55:9-58:6).

### b. Marshall Defensively Jabbed his Flagpole in Officer Dorick's Direction as the Officers Encroached

The Washington County Mental Health Response Team (MHRT) expert opined that efforts to engage Marshall verbally "were defeated by the aggressive closing of distance." *See* Ex.28(Whitely Rpt. p. 2); Ex.23(Whitely Dep. 31:7–32:13); Ex.28(Bercovici Rpt. p. 40). As Dorick advanced into Marshall's confined space, Marshall made a brief jabbing motion toward Dorick with the flagpole, but did not come close to contact. Ex.13(Maslen Dep. 156:9–16). McGann admitted the jab "wasn't almost aggressively." Ex.2(FG1236).

Marshall was not an imminent risk of harm to the officers or himself, and the officers were not justified in closing in on him. Ex.23(Whitely Dep. 54:1-18); Ex.22(Soto Dep. 43:12-45:3). Instead,

they should have done what Lexipol policymakers advise: "Give the subject space…[P]ut some distance between the officers and the subject to reduce the risk of injury or violence and give additional time for backup to arrive." Ex.28(Bercovici Rprt., p. 56, n. 39). They should not have confronted Marshall. Ex.73(P0328).

The officers could have safely created distance and waited for EMTs to arrive. Ex.22(Soto Dep. 47:22-48:11); Ex.23(Whitely Dep. 29:1-32:13); Ex.28(Whitely Rprt., p. 5). As Teets spoke with Marshall, Dorick moved from behind a column. Marshall, perceiving Dorick as a threat, shifted his pole toward Dorick. Ex.78(Quad Vid. 07:06). A reasonable jury could find Marshall was trying to protect himself—not evade arrest or cause harm. *Henderson v. City of Torrance*, 2020 U.S. Dist. LEXIS 247103, *21 (C.D. Cal. Dec. 14, 2020) ("Ross fled from police for his safety, rather to evade arrest or to harm himself or others") (cleaned up). A jury could reasonably find Marshall's brief jab was a defensive reaction, signaling a desire to be left alone in his perceived safe space at the church door. *Diamond v. City of Sandy*, 2025 U.S. Dist. LEXIS 51435, *38 (D. Or. Mar. 20, 2025) (plaintiff's statement that he might act "*if the officers used force again*" not a direct threat.)

### c.  Kicking and Banging the Church Glass Door was Reactive, Not Resistive

After Marshall's first defensive jab, Dorick aimed his Taser at him, and Teets put on leather gloves used for fighting, and the officers shouted commands. Ex.78(Quad Vid. 7:18); Ex.28(Whitely Rprt., pp. 3-4). A reasonable jury could find the forceful commands provoked Marshall to hit the flagpole against the glass door. Ex.78(Quad Vid. 7:24-8:12); Ex.30(Soto Rprt. pp. 3-4); Ex.22(Soto Dep. 50:6-51:22; 53:20-54:24); Ex.23(Whitely Dep. 45:15-46:5, 53:7-24); Ex.28(Whitely Rprt., p. 6). Marshall's response to the officers' encroachment, Taser deployment, and verbal commands was consistent with delirium. Ex.28(Whitely Rprt., pp. 1-5); Ex.23(Whitely Dep. 31:12-33:23; 45:15-46:5; 49:11-50:5). Teets' CIT instructed him to "not confront the individual or try to communicate in a forceful manner as that may confuse and agitate them

further." Ex.73(P0328); Soto Rprt., pp. 3-4; Ex.22(Soto Dep. 53:20-54:24); Ex.28(Bercovici Rprt., p. 56).

### d.    Marshall's Punch was Instinctive, Not Resistive

Teets bullrushed Marshall while pointing his Taser at Marshall's chest. *See* Ex.28(Bercovici Rprt., p. 10); Ex.29(Bercovici Rbtl., pp. 12-13); Ex.78(Quad Vid. 8:13). In a single second, Marshall turned to face his aggressor and released his right hand from the flagpole to defend himself. Ex.78(Quad Vid. 8:13). Marshall's defensive punch was a natural, instinctive reaction given his compromised mental state. Ex.28(Bercovici Rprt., pp. 41, 47); Ex.29(Bercovici Rbtl., pp. 3, 4, 7, 11); Ex.23(Whitely Dep. 47:25-48:10); Ex.7(LaMonica Dep. 123:7-124:5). See e.g., *Brown v. Grinder*, 2019 U.S. Dist. LEXIS 10236, *27-28 (E.D. Cal. Jan. 22, 2019) ("Brown's moving his elbows was a reaction to the officers' blows."); *Brown v. Diaz*, 2020 U.S. Dist. LEXIS 148067, *16 (E.D. Cal. Aug. 14, 2020) (same as to plaintiff's 'lunge' after being tasered). While punching an officer constitutes resistance, context matters. The degree of resistance is militated by Teets' bullrush with a Taser pointed at Marshall during a mental health crisis. Ex.78(Quad Vid. 8:16); Ex.13(Maslen Dep. 110:24-111:10). Marshall's defensive response warranted a lesser degree of force. *Rascon*, supra, 2018 U.S. Dist. LEXIS 20908, *39-40 (reasonable officer would have perceived "defensive resistance.")

### e.    Marshall was Not Capable of Actively Resisting or Attempting to Evade when he was Drive-Stunned

What followed was a massive accumulation of force: a punch to Marshall's jaw; a takedown smashing his head on the cement wall and smothering it into the concrete;[13] a Taser probe shot into his arm; and the restrained weight of several bulky officers. Under this pressure, the 4.9-second drive-stun shock was sufficient to be lethal. Ex.33(Hiserodt Rprt. pp. 2-3); Ex.26(Vilke Dep. 45:4-49:19).

---

[13] Senior medic Sergio Vigil found Marshall suffered "significant head trauma." Ex.71(FG2520); Ex.78(Quad Vid. 13:37).

The drive-stun was unnecessary. "[T]he degree of force used by the police is permissible only when a strong government interest *compels* the employment of such force." *Drummond*, at 1057. "[T]he force which is applied must be balanced against the *need* for that force." *Id*.; *Grobstein v. Portland*, 2021 U.S. Dist. LEXIS 69098, *24 (D. Or. Feb. 16, 2021) (genuine issues of material fact regarding "need" to use degree of force.); *Joseph v. Bartlett*, 981 F.3d 319, 324 (5th Cir. 2020) (same); *Perea v. Baca*, 817 F.3d 1198, 1203 (10th Cir. 2016) (same).

Teets was permitted to use only the degree of force necessary. *Pirolozzi v. Stanbro,* 2008 U.S. Dist. LEXIS 36054, *20 (N.D. Ohio May 1, 2008) (denying qualified immunity to drive stun on excited delirium individual.) "Resistance, or the reasonable perception of resistance, does not entitle police officers to use *any* amount of force to restrain a suspect." *Barnard v. Theobald*, 721 F.3d 1069, 1076 (9th Cir. 2013). Teets' drive-stun was disproportionate to the goal of getting Marshall handcuffed and into a recovery position. *Smalls v. Binner*, 2016 U.S. Dist. LEXIS 28564, *46 (W.D.Va. Mar. 7, 2016) (drive stun "excessive because Decedent's compromised situation posed little, if any, threat of violence or risk of flight. The force was disproportionate to the objective of moving or securing Decedent.") A reasonable jury could find it retaliatory. Ex.78(Quad Vid. 0:08:32) ("Get his ass!"); *id*. at 11:34 ("Shut the fuck up!"; *id*. at 0:12:26 ("Fucker punched me…")[14] Under the "framework to mental health seizures[,"] "force used by an officer is reasonably only if it is reasonably proportionate to the need for that force…" *Ingram v. Kubik*, 30 F.4th 1241 (11th Cir. 2022); *Walton v. Gomez*, 745 F.3d 405, 424 (10th Cir. 2014) (drive stun case in which "[a] reasonable jury could conclude that a lesser degree of force would have exacted compliance and that this use of force was disproportionate to the need.") Summary judgment is properly denied where parties' versions of the facts differ as to the degree of threat. *Furnace v. Sullivan*, 705 F.3d 1021, 1029 (9th Cir. 2013) ("disputed fact whether [plaintiff] posed a threat to the officers, such that they were justified in" using amount of force.)

---

[14] Detective LaMonica opined that Teets was "pissed off" and acted angrily in this heat-of-the-moment use of force. Ex.7(LaMonica Dep. 127:6-25).

Drive-stuns on delirious subjects should be last-resort. Ex.23(Whitely Dep. 72:5-73:9). There is more than adequate summary judgment evidence to create a fact issue as to whether the officers needed to drive-stun Marshall to overcome his alleged resistance. There is a genuine factual dispute whether Marshall refused to give up his arm; or whether he *could* have given it up, even if he wanted. Ex.3(McGann Dep. 55:9-14; Ex.39(FG1238). As police practice expert, Adam Bercovici opined, "Marshall had significant weight on his back with his arm underneath. In addition, [he] was likely experiencing the dangerous medical effects [from the] compressed restraint in his compromised state." Ex.29(Bercovici Rbtl., p. 16). "Even where some force is justified, the amount actually used may be excessive." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002).

Courts recognize that "[w]hen a person falls, they put their arms out to brace their fall, which subsequently puts their arms underneath their body, restricting their arm movement." *Miller v. Roycroft*, supra, 2024 U.S. Dist. LEXIS 60324, *34. Based on Marshall's "chest being pressed to the ground and [the officers'] body weight on his back, [Marshall] would not have been able to free his arms in that moment even if he wanted to." *Id.* Marshall's "resistance: could easily be "predicated on his attempting to breathe rather than his resisting the officers' attempts to handcuff him." *Id.* Courts have recognized that an officer kneeling on an individuals' back can make it difficult to breathe. Marshall suffered cardiac arrest shortly after the drive-stun. In the minute before the drive-stun, Marshall was twitching and gasping for air, and crying for "help" and a "doctor." Ex.78(Quad Vid. 9:36-10:22). His body was already in a state of hypoxia and experiencing "air hunger." Ex.33(Hiserodt Rprt., p. 1). See *Sanchez v. Cnty. of Stanislaus*, 2023 U.S. Dist. LEXIS 203673, *56 (E.D. Cal. Nov. 14, 2023) ("Plaintiff have also submitted an expert report concluding that Mr. Sanchez was…experiencing 'air hunger.'") Marshall's "resistance" was likely an attempt to get out from under the suffocating force of the large weight on his back. See *B.R.S.*, supra, 2015 U.S. Dist. LEXIS 200956, at *18; *K.J.P. v. Cty. of San Diego*, 2019 U.S. Dist. LEXIS 63657, *22 (S.D. Cal. Apr. 12, 2019) (fact issue as to whether decedent "no longer actively resist[ed], but instead was struggling due to an inability to breathe.") This Court previously

recognized "struggles of a prone suspect may be due to oxygen deficiency, rather than a desire to disobey officers' commands." *Payne v. City of Eugene*, 760 F. Supp. 3d 1157, 1169 (D. Or. 2024). Experts have opined that a person with impaired breathing could be expected to move around to find a better position to breathe normally. See e.g., *Gonzalez v. City of Alameda*, 2023 U.S. Dist. LEXIS 169602, *53 (N.D. Cal. Sept. 22, 2023); *Ramsey*, supra, 2023 U.S. Dist. LEXIS 46873, *22. Marshall's "resistance" was consistent with his natural reaction of fighting for breath while restrained face down in a prone position with officers on top of him, and not intentional. See *id*.; *Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1105 (N.D. Cal. 2017).

### B.  Additional Factors:

"Other factors, in addition to the three *Graham* factors, may be pertinent in deciding whether a use of force was reasonable under the totality of the circumstances." *Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019).

   1.  Emotionally Distraught/Mental Health Crisis (*Deorle v. Rutherford*)

"[I]ncreasing the use of force may, in some circumstances at least, exacerbate the situation" when police approach "an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest." *Deorle v. Rutherford*, 272 F.3d 1272, 1283-84 (9th Cir. 2001). Courts consider whether "it is or should be apparent to the officers that the individual [] is emotionally disturbed." *Sanchez*, supra, 2023 U.S. Dist. LEXIS 203673, *42 (quoting *Deorle*, at 1283). "The government's interest in using force against an 'emotionally disturbed individual,' even one who is acting out, is less than its interest in using force against someone 'who has committed a serious crime against others.'" *Id*. "Intoxication and mental illness are not mutually exclusive conditions, and they often appear in tandem." *Sanchez*, supra, at *43.

Marshall was suffering a mental health crisis and showed classic signs of excited delirium. Taser manufacturer (AXON) cautioned against Taser usage on individuals showing medical crisis signs (Ex.29-Bercovici Rbtl., p. 16.; FG78, 34, 174)—and explicitly warned that tasing mentally ill persons can increase cardiac and metabolic risks and death. (FG35, 36, 42).

FGPD officers were trained to treat delirious individuals as immediate medical emergencies. Ex.36(FG2493); Ex.8(McGrew Dep. 83:5-20, 88:3-11); Exs.9, 10(McGrew PMK 16:21-17:1); Ex.23(Whitely Dep. 34:17-35:9); Ex.29(Bercovici Rbtl. p. 5). ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████.[15]

"The government has an important interest in providing assistance to a person in need of psychiatric care; [] the use of force justified by that interest differs in degree and kind from force against someone who committed a crime or poses a community threat." *Bryan*, 630 F.3d at 829. Teets "ignored [Marshall's] diminished mental state and used excessive force to control him." *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013). His drive-stun was particularly dangerous given Marshall's prone restraint and precarious medical condition. Ex.29(Bercovici Rbtl., p. 16).

2. Availability of Less Intrusive Alternatives

The existence of "clear, reasonable, less intrusive alternatives" weighs against the reasonableness of Teets' force. *Glenn v. Wash. Cnty.*, 673 F.3d 864, 876 (9th Cir. 2011). Teets was required to consider less intrusive methods, including promptly calling EMS and waiting for medical personnel to arrive and assist with taking Marshall into protective custody under ORS § 430.399. See also *Scott v. Smith*, 109 F.4th 1215, 1225 (9th Cir. 2024) (officers could have "waited for EMS to execute a 'soft restraint.'") "The circumstances were not so exigent that [Teets] had to

---

[15] Additionally, in 2019, Teets violated FGPD policy as the subject of a citizen complaint related to a person experiencing a manic episode, during which Teets cursed the complainant with: "Fuck you." Teets admitted his frustration affected his actions, despite warning from a fellow officer. Ex.58(FG3524–29).

act immediately, rather than wait for [EMS] to arrive and to develop a tactical plan." *Miller v. Roycroft*, 2024 U.S. Dist. LEXIS 60324, \*29 (citing *Hopkins v. Bonvicino*, 573 F.3d 752, 765 (9th Cir. 2009)). Officers could have monitored Marshall's erratic behavior while medics staged. Ex.23(Whitely Dep. 51:8-21; 31:7-33:23); Ex.22(Soto Dep. 47:22-50:4; 57:20-58:10). Lexipol policies and Teets' CIT instructed officers to "request EMS response immediately (before the subject is even approached)." Ex.28(Bercovici Rprt., p. 56, n. 39). Officer-in-Charge (OIC) Teets received comparable CIT. Ex.22(Soto Dep. 47:22-50:4; 57:20-58:9).

Although McGann eventually requested medics, the request came less than a minute before Marshall was bullrushed, tackled, and piled on. Ex.78(Quad Vid. 7:29–8:15). The timing and manner of the request fell short of accepted best practices. Ex.29(Bercovici Rbtl., p. 7).

### 3.  OIC Teets Created the Dangerous Situation

The Court must evaluate Teets' deviation from AXON and Dr. Soto's excited delirium training within "the totality of the circumstances." *Tuggle v. City of Tulare*, 2023 U.S. Dist. LEXIS 112523, \*16 (E.D. Cal. June 29, 2023). A key factor in excessive force is whether the officer was "responding to a preexisting situation" or "created the very emergency" he then used force to resolve. *Winkler v. City of Phoenix*, 849 Fed. Appx. 664, 666 (9th Cir. 2021).

Teets "unnecessarily creat[ed his] own sense of urgency," and considering the totality of the circumstances, his "poor judgment or lack of preparedness caused him [] to act unreasonably, 'with undue haste.'" *Nehad*, supra at 1135. As Officer-in-Charge, Teets needlessly provoked the situation by encroaching on Marshall's space without waiting for medics after initial interaction agitated Marshall. Ex.23(Whitely Dep. 32:10-13; 33:18-23; 49:11-51:21); Ex.22(Soto Dep. 19:4-16; 47:22-48:11; 57:20-58:6); see *Nunis*, supra, 676 F. Supp. 3d at 880 (officer insistence on handcuffing created an avoidable chain of events.)

#### a.  Failure to Promptly Summon EMT Personnel

Teets' response fell short of accepted standards for handling a medical emergency. Ex.29(Bercovici Rbtl., p. 3). Teets had CIT, including Dr. Soto's presentation on delirium key

signs and serious risks. Ex.68(FG7305); Ex.22(Soto Dep. 34:11-35:22; 90:5-13; 92:4-9); Ex.73(P0321-0331). ████████████████████████████████████████████████████ ████████████████████████████████████████████ Post-incident interviews confirmed officers' awareness of excited delirium and its dangers. Ex.38(FG1214); Ex.7(LaMonica Dep. 105:2-9).

"The reasonableness of an officer's actions must be assessed in light of the officer's training." *Maresca v. Bernalillo Cnty.*, 804 F.3d 1301, 1311 (10th Cir. 2015). FGPD's Taser expert and Rule 30(b)(6) witness testified that Teets was trained on the Taser-related medical risks, especially for excited delirium subjects. Exs.16, 17(Gordon Dep. 7:1–10). The City contends Teets was "well-versed" and had "considerable experience." *Id.* at 27:6–28:3. Teets was trained that individuals in crisis are medically vulnerable and at heightened risk of arrest-related death, and that Taser use can exacerbate respiratory, metabolic, and cardiac risks. *Id.* at 7:1-10; 48:25–50:1. Teets was also instructed to avoid Taser use on medically compromised subjects with excited delirium symptoms. *Id.* at 58:2-13; 69:22-72:23.

Teets' CIT and AXON training specifically warned of the risks from this type of force. He knew Marshall was at elevated risk for cardiac arrest given Marshall's delirium symptoms, prior Taser exposure, and prolonged restraint by multiple officers. *Mbegbu v. City of Phoenix*, 2017 U.S. Dist. LEXIS 172368, *11 (D. Az. Oct. 18, 2017) ("Weber was aware Mbegbu already had been tased.") As OIC that night, Teets simply failed to apply his AXON and 40-hour CIT training, thereby creating an avoidable situation. ████████████████████████ ███████████████████████████████████████████████████████████ ██████████████████████████████████████████

---

████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████

b. *Officers' Provocative Encroachment Triggers Marshall's Defensive Jab*

During the encounter, encroaching officers forced Marshall into a defensive posture. Ex.78(Quad Vid. 3:21, 5:11, 5:49). Lexipol advises officers to create "distance between officers and the subject" and "be sensitive" because the person is "likely not in control of their actions." Ex.29(Bercovici Rbtl., pp. 7-8). Dr. Soto's CIT similarly instructed: "Do not confront the individual or try to communicate in a forceful manner as that may confuse and agitate them further." Ex.73(P0328).

Despite the warning to be sensitive, Teets confronted Marshall about drug use (Ex.78-Quad Vid. 4:49; 6:00). This, along with Dorick's closing-in approach, triggered a fight-or-flight reaction. Ex.28(Whitely Rprt., p. 5). Officers should have realized Marshall's mental impairment. Ex.13(Maslen Dep. 161:18–164:5); Ex.28(McGann Dep. 63:18-64:21; Teets Dep. 31:25-32:3). Officers' contradictory commands about the flagpole, Taser pointing and threats of Tasing, further intensified Marshall's response, prompting him to hit the glass door. Ex.78(Quad Vid. 7:24). The AXON manual warns that aggression toward breaking glass is a sign of medical crisis, and advises calling for backup before engagement, if practicable. Ex.53(FG78); Ex.64(FG7106). CIT emphasizes that individuals in crisis can be easily triggered by commands or an officer's approach. Ex.23(Whitely Dep. 48:20-49:10). Advancing on Marshall predictably provoked a defensive reaction and escalated the situation, violating modern policing standards. Ex.28(Bercovici Rprt., pp. 41, 47); Ex.29(Bercovici Rbtl., pp. 3, 4, 7, 11); Ex.23(Whitely Dep. 47:25-48:10).

Marshall's flagpole jabs posed minimal safety concerns. Experts characterize them as *defensive* responses to officers' aggressive approach with Tasers drawn. Ex.28(Bercovici Rprt., pp. 39, 41, 47); Ex.29(Bercovici Rbtl., pp. 3, 4, 7, 11); Ex.28(Whitely Rprt., pp. 1–5); Ex.23(Whitely Dep. 48:4–10). The officers' "increasingly aggressive measures…intensified his paranoia." *Chang v. City of Pacifica*, 2018 U.S. Dist. LEXIS 234689, *34 (N.D. Cal. Mar. 30, 2018). Only after officers closed distance did Marshall exhibit fight-or-flight behavior, kicking and striking the door. Ex.28(Whitely Rprt., pp. 5-6); Ex.23(Whitely Dep. 45:15-49:10); Ex.22(Soto Dep. 50:6-51:22; 53:20-54:24); Ex.38(FG1197). MHRT Whitely confirmed Teets'

and Dorick's aggressiveness could have easily escalated Marshall's response. Ex.23(Whitely Dep. 47:10-49:10).

"[A] central issue is whether [FGPD officers] were reasonable in initiating the violent encounter with [Marshall]. Not merely whether the use of Tasers was reasonable after the officers initiated the physical confrontation." *V.W. v. Nichelini*, 2017 U.S. Dist. LEXIS 15835, *19 (E.D. Cal. Feb. 2, 2017). The officers' foreseeably created the perceived need for force. *Winkler* 849 Fed. Appx. at 666. As OIC, Teets' mishandling foreseeably "set in motion a series of events that ended tragically." *Miller* v. *Roycroft*, supra, 2024 U.S. Dist. LEXIS 60324, at *30. "Once [Teets deviated from his CIT], a chaotic and confusing scene unfolded, generating equally confusing and chaotic evidence." *Bonivert v. City of Clarkston*, 883 F.3d 865, 880 (9th Cir. 2018).

> c. *Foreseeable Chain of Events: Bullrush Leads to Marshall's Protective Punch Leads to Dogpile; Leads to Marshall's Squirming Under Heavy Weight; Leads to Deadly Drive Stun*

The situation escalated because officers failed to de-escalate. Marshall, visibly in crisis, needed space and time. Ex.29(Bercovici Rbtl., pp. 2, 6, 10). Instead, officers violated MHRT protocols by engaging too quickly without waiting for medical support. Ex.28(Whitely Rprt. pp. 1-5); Ex.23(Whitely Dep. 32:2-13; 33:18-23; 48:20-51:21); Ex.30(Soto Rprt. pp. 3-4); Ex.22(Soto Dep. 18:25-19:16; 47:18-48:11; 52:14-23; 57:20-58:6); Ex.28(Bercovici Rprt., pp. 39, 42). Given Marshall's impaired capacity, it was predictable he would react defensively when Teets charged him with his Taser drawn. The de-escalation failures provoked an otherwise manageable situation resulting in unnecessary force and Marshall's death. See *Nehad*, 1135; *Miller v. Roycroft*, supra.

4. Teets' Drive Stun Contributed to Marshall's Death

"[T]he risk of harm and the actual harm experienced" is an additional relevant factor. *Williamson*, supra, 23 F.4th at 1151-52. Marshall lost consciousness shortly after Teets' drive-stun, never regained it, and remained in a vegetative state until life support was withdrawn. Decl. of S. Marshall, ¶3. The "effect" of the drive-stun is central to assessing reasonableness. *Sanchez*, supra, 2023 U.S. Dist. LEXIS 203673, *38 (citing *Rice v. Morehouse*, supra, 989 F.3d at 1121).

Under § 1983, a person is liable if they affirmatively act, participate in another's acts, or omit legally required acts causing the deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Liability also arises from "setting in motion a series of acts … reasonably likely to cause" a constitutional injury, or being an "integral participant" in unlawful acts. *Peck v Montoya*, 51 F.4th 877, 889 (9th Cir. 2022). Defendant officers concurrently caused Marshall's death. *Jones v. Williams*, 297 F.3d 930, 937, n.6 (9th Cir. 2002). "An injury can have multiple but-for causes and multiple proximate causes." *Dold v. Snohomish Cnty.*, 649 F. Supp. 3d 1084, 1097 (W.D. Wash. 2022). The "interaction as a whole (or in aggregate) led to Mr. [Marshall's] death." *Id*. See e.g., *Khang v. Ruiz*, 2015 U.S. Dist. LEXIS 200837, *30 (C.D. Cal. Apr. 17, 2015) ("Plaintiffs…need not prove a sole cause of death to recover. Whether or not a taser…or an officer on top of Decedent's back *alone* caused Decedent's death does not matter; the jury could find that several of Defendant Officers' actions were improper and *collectively* caused Decedent's death.")

Dr. Ponea testified that Marshall arrived at the ICU in "very critical condition" with severe acidosis and multi-organ failure. Ex.21(Ponea Dep. 17:5–18). She rejected methamphetamine as the primary cause of Marshall's death. (*Id*. at 23:8-15; 43:15–44:2). Instead, she identified the cause as a prolonged cardiac arrest possibly contributed by the Taser. (*Id*. at 25:10-26:6). After reviewing the BWC, the medical examiner, Dr. Nelson, amended his findings to note that the "large amount of force to restrain" and "exertion most certainly contributed to [Marshall's] death." Ex.32(Nelson Rprt., p. 2.) Plaintiffs' pathologist testified that the drive-stun contributed to Marshall's death. Ex.33(Hiserodt Rprt., pp. 1-3); Ex.24(Hiserodt Dep. 77:19-79:25; 83:13-84:1; 92:6-93:5; 93:21-96:8; 98:5-99:18). *Khang*, supra, 2015 U.S. Dist. LEXIS 200837, *30 ("Whether or not a taser, or a chokehold, or an officer on top of Decedent's back *alone* caused Decedent's death does not matter; the jury could find that several of Defendant Officers' actions were improper and *collectively* caused Decedent's death. **Mr. Hiserodt's** opinions are relevant to the jury's

decision…") (italics in original; emphasis added).[17] Even Defendants' medical expert agreed that Marshall was a classic eggshell, and *any* physical exertion could have contributed to his death. Ex.26(Vilke Dep. 45:4-49:19).

"The eggshell skull doctrine; *i.e.* the defendant takes his victim as he finds him, is a recognized theory in section 1983 cases." *Caruso v. Solorio*, 2020 U.S. Dist. LEXIS 245841, *82 (E.D. Cal. Dec 30, 2020). Thus, the fact Marshall suffered from underlying vulnerabilities does not absolve the officers of liability for the fatal consequences of their excessive force. There is "no legal authority requiring expert testimony on causation in a § 1983 action. To the contrary, circumstantial and testimonial evidence are indistinguishable insofar as the jury factfinding function is concerned, and circumstantial evidence can be used to prove any fact." *Mbegbu*, supra, 2017 U.S. Dist. LEXIS 172368, *24 (restraint-related death, citing *Friedman v. Live Nation Merchandise*, Inc. 833 F.3d 1180, 1189 (9th Cir. 2016); Ninth Cir. Civ. Jury Instr. 2.13 (2017)).

"[A]ttempting to decide excessive force cases at summary judgment requires courts to 'slosh our way through the factbound morass of 'reasonableness,' with predictably messy results." *Bonivert*, supra, 883 F.3d at 880 (denying qualified immunity to officer's drive-stun deployment that occurred following a "chaotic and confusing scene[], generating equally confusing and chaotic evidence.") "Because the reasonableness standard 'nearly always requires a jury to sift through disputed factual contentions…summary judgment…in excessive force cases should be granted sparingly. *Scott*, 109 F.4th at 1222-23. "It is the province of the jury to decide what import to give circumstances that 'can be viewed in various ways.'" *Seidner v. De Vries*, 39 F.4th 591, 601 (9th Cir. 2022).[18]

---

[17] Plaintiffs' cardiologist opined that the contemporaneous weight force decreased Marshall's ventilation and cardiac output. Ex.34(Steinberg Rbtl., p. 5); Ex.25(Steinberg Dep. 30:5-31:9; 34:18-35:22; 41:22-42:13; 47:25-48:24; 50:17-51:2; 53:14-24; 56:21-58:24; 62:4-22; 64:23-65:12).

[18] BWC footage, while capturing much of Teets' conduct, is not dispositive. "The mere existence of a videotape in the record depicting some or all of the events in dispute will not always be dispositive at the summary judgment stage." *Wilkinson v. Lewis*, 289 F. Supp. 3d 371, 379

### III.    EXCESSIVE FORCE: PRONE RESTRAINT BODY COMPRESSION

Defendant officers applied significant restraint and body compression to Marshall before and after handcuffing, contributing to his death. Ex.34(Steinberg Rbtl., pp. 5-12); Ex.32(Nelson Rprt., p. 2); Ex.33(Hiserodt Rprt., pp. 1-2). Although Teets acknowledged the need to move Marshall to his side (recovery position), he failed to immediately do so. Ex.78(Quad Vid. 11:15-18); Ex.8(McGrew Dep. 223:13-18); Ex.55(FG6969). Experts stress that after high-risk takedowns, a prone, restrained person must be immediately rolled to their side. Ex.29(Bercovici Rbtl. pp. 17, 21); Ex.34(Steinberg Rbtl. pp. 5-12).

Even after he was fully handcuffed, Teets, Dorick, and Shafer continued pressing on Marshall's head, neck, back, and shoulders until he became unresponsive. Ex.78(Quad Vid. 10:52). Teets kept his knee on Marshall's neck, briefly lifted it, then pressed into Marshall's upper back again his knee and fists. (*Id*. at 11:00). Even after Teets removed his knee, all three officers maintained pressure. *Id*. at 12:03.

Officer Shafer, weighing 285 pounds, pressed on Marshall's hips and back, and Dorick applied knee pressure. Ex.78(Quad Vid. 12:46); Ex.4(Shafer Dep. 65:3-7). Marshall was held prone for 5 minutes and 32 seconds, with continuous pressure—including at times on his neck. For 2 minutes and 41 seconds after being handcuffed, officers collectively maintained significant weight on Marshall's back, in violation of accepted law enforcement standards. Ex.28(Bercovici Rprt., p. 38). Marshall was unconscious when the officers finally rolled him over. Ex.78(Quad Vid. 13:33).

#### A. *Graham* Factors

##### 1. <u>Type and Amount of Force was Deadly</u>

"To classify the force used, we consider the specific circumstances of the case." *Scott*, 109 F.4th at 1223. "[B]odyweight compression" on a subject's "back and neck during and short after handcuffing" is "severe, deadly force." *Id*.  FGPD officers believed Marshall suffered excited

---

(N.D.N.Y. 2018). Interpretation of the videos is "appropriately reserved for the triers of fact." *Id.; Sandoval v. City*, 2023 U.S. Dist. LEXIS 347, *4 (N.D. Cal. Jan. 3, 2023).

delirium. Ex.38(FG1214); Ex.39(FG1236); Ex.40(FG1279). "At risk suspects are extremely vulnerable to sudden death following [a] struggle due to the added effects of their pre-existing conditions." *LeBlanc v. City of Los Angeles,* 2006 U.S. Dist. LEXIS 96768, *38 (C.D. Cal. Aug. 16, 2006) (quoting LAPD 1999 training bulletin); Ex.75(FG3781) (FGPD policy recognizing deadly effects). Teets knew he had already drive-stunned Marshall; punched him; shot a Taser probe into him; and compressed him into the prone position under several officers' weight. By the time Marshall was handcuffed, the officers knew (or should have known) they needed to handle him with extreme care and immediately put him in the recovery position. Ex.25(FG3781); Ex.52(FG35, 36, 42); Exs.16, 17(Gordon Dep. 48:25-50:1); Ex.73(P0324, 0328); Exs. 14,15(Martino Dep. 103:2-24).

The risk of restraint-related medical dangers in these circumstances was known to Teets from the 40-hour CIT course provided "to help people experiencing mental health problems." *Miller v. Roycroft*, supra, at *34; *Lawhon v. Mayes*, 2021 U.S. App. LEXIS 33823, fn. 2 (4th Cir. 2021) ("training materials instruct officers to 'get the subject off his/her stomach as soon after handcuffing as circumstances allow.'") An "objectively reasonable officer with [Teets'] training would have concluded that [Marshall] was struggling to breathe, not resisting arrest." *Timpa v. Dillard*, 20 F.4th 1020, 1031 (5th Cir. 2021). Nonetheless, Teets continued compressing Marshall's torso post-handcuffing, ignoring his pleas and ordering him to "Shut the fuck up!" Ex.78(Quad Vid. 11:34). "Ninth Circuit courts have repeatedly found that the use of body weight to restrain a handcuffed, prone, and agitated individual is severe, and may even be considered deadly force because of its substantial risk of death or serious bodily injury." *Payne*, supra, 760 F. Supp. 3d at 1168; *Perkins v. Edgar*, 2022 U.S. App. LEXIS 29926, *3 (9th Cir. 2022) ("reasonable officers would have been aware that applying force against a restrained detainee who is potentially in medical distress violated the rule established in *Drummond* and its progeny").

Teets used deadly force. "The question is not how much of [Teets'] bodyweight [he] placed on Mr. [Marshall], but rather the amount of force" Teets and his officers "leveraged into keeping [Marshall's] body on the ground." *Sanchez*, supra, 2023 U.S. Dist. LEXIS 203673, *55. In *Payne*

*v. City of Eugene*, 760 F. Supp. 3d 1157 (D. Or. 2024), deputies restrained a prone detainee, holding legs, arms, and head. *Id.* at 1168. Within a minute and a half, the detainee lost consciousness after expressing he "cannot breathe." *Id.* at 1163-68. Considering the "actual harm experienced" (*Williamson*, supra, at 1151-52), Officers Dorick and Shafer's force was also **deadly**. See *Stephenson v. California*, 761 F. Supp. 3d 1242, 1263 (C.D. Cal. 2025) ("It is undisputed that McKee knowingly restrained Stephenson's *legs* while Norem placed weight on Stephenson's back with his knee. Accordingly, a reasonable jury could find that McKee used *deadly force*." (emphasis added)); *Briseno v. City of Tuscon*, 2025 U.S. Dist. LEXIS 38678, *55 (D. Az. Mar. 3, 2025) ("bodyweight compression on a prone individual can be considered severe or even deadly force.")

### 2. Severity of Marshall's Crimes was Minimal

In *Payne*, the Court found the severity of Mr. Payne's offenses—missing a child support hearing and resisting arrest—was minimal, as both were misdemeanors unlikely to result in significant detention. *Id.* at 1169. Likewise, Marshall's offense consisted of kicking and banging on the church door, a petty offense. Although Marshall instinctively punched Teets (after being bullrushed with a drawn Taser)—the severity of that offense was mitigated by Marshall's mental condition and the foreseeability of his conduct given his mental state fueled by the chaos of this arrest.

### 3. Marshall was Incapable of Presenting an Immediate Threat While Handcuffed

The BWC shows officers kneeling on Marshall post-handcuffing, without conducting any search or safety check—clear evidence that Marshall no longer posed a threat once handcuffed. *Myers v. City of Charleston*, 2021 U.S. Dist. LEXIS 45010, *39 (S.D.W.V. Mar. 10, 2021) ("during the time Adam is placed and left in a prone position, Ouma and Miller did not frisk Adam for weapon; search the home for any other suspects or potential dangers; or roll Adam to his side, per Department policy.") At that point, McGann confirmed the officers "had that situation more than handled." Ex.39(FG1240).

Even if Marshall "continued to struggle and kick…once he was handcuffed, prone, and he had the weight of an officer on him, he no longer posed an immediate threat to the safety of the officers,

and any resistance to arrest was outweighed by the fact that he could not attempt to evade arrest by flight." *Krueger v. Phillips*, 2025 U.S. App. LEXIS 21515, *67 (10th Cir. 2025) (published). He posed, at most, a minimal threat to the four officers. *Green v. City & Cnty. of S.F.*, 751 F.3d 1039, 1050 (9th Cir. 2014) ("Green was also considerably outnumbered, which counts against a finding that she posed a threat to the multiple officers at the scene."); *Drummond*, 343 F.3d at 1057-58 (an individual on their stomach with arms cuffed behind their back poses "only a minimal threat to anyone's safety.") As in *Payne*, BWC shows none of the FGPD officers "feared for [their]…safety" after Marshall was handcuffed. *Payne*, at 1170.

The need for force diminished once the four officers had Marshall restrained in prone. "The calculus changed" again after Marshall was "handcuffed and lying on the ground." *Blanchard v. Cnty. of Los Angeles*, 2022 U.S. Dist. LEXIS 181640, *31 (C.D. Cal. Aug. 25, 2022). "[E]ven after it was readily apparent for a significant period of time that [Marshall] was fully restrained and posed no danger, the officers continued to use pressure on a vulnerable person's upper torso while he was lying on his stomach. A reasonable officer would know these actions present a substantial and totally unnecessary risk of death to the person." *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008). "[O]nce outnumbered and handcuffed, [Marshall] could not have posed any risk to the safety of the officers or others." *Lawhon*, supra, 2021 U.S. App. LEXIS 33823, *5.

"A jury could find that [Marshall] was no longer a threat once he was handcuffed and that it was unreasonable for Officer [Teets] to kneel on [Marshall], rather than the ground next to him, to 'catch his breath.'" *Wells v. City of Las Vegas*, 2024 U.S. Dist. LEXIS 82731, *24 (D. Nev. May 7, 2024)

### 4.  Marshall's Lack of Resistance

"Several courts have cautioned against misinterpreting movement of limbs as active resistance when it may be more indicative of an individual's struggle to breathe." *Payne,* at 1169. By the time Teets was kneeling on the handcuffed Marshall, Marshall had been tackled; struck against a brick wall (Ex.13-Maslen Dep. 156:23-157:20); punched by Teets, subjected to severe pressure from three officers (including on his back and neck) and drive-stunned for 4.9 seconds—all while

struggling under the officers' collective weight. Marshall's limb movements after all this violence could be more indicative of a struggle to breathe, rather than actively resisting, thereby creating a factual question for the jury. *Payne,* at 1169-70.

In *Payne*, video evidence showed Payne was 'thrashing around, his whole body was not in control," and he was "kicking his legs, though not directly at any [officer]." *Payne* at 1170. By contrast, Teets admitted that once Marshall was handcuffed, Marshall was "still tense," but he was "not actively trying to pull or yank or thrash or anything like that." Ex.37(FG2635).

   5.   Marshall was in the Midst of a Mental Health Crisis

██████████████████████████████████████████

██████████████████████████ See *Payne*, supra, at 1170 (unintelligible grunts and screams could indicate a fragile and agitated mental state).

   6.   A Less Intrusive Alternative was to Put Marshall in the Recovery Position
        Immediately After he was Handcuffed

After Marshall was handcuffed, Teets continued applying pressure to his torso and neck. Ex.78(Quad Vid. 10:51-13:13); An obviously less intrusive alternative would have been to immediately move Marshall into the recovery position. See e.g., *Payne*, at 1170 ("…less intrusive alternatives were available—the most obvious being to not place any pressure on Mr. Payne's torso.") "There is well-known police guidance recommending that officers get a subject off his stomach as soon as he is handcuffed because of the risk of suffocation." *Stephenson,* supra*, 761 F. Supp. 3d at 1274. "[P]utting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force." *Payne*, supra, at 1171. The risk of "breathing problems created by pressure on the back and placement in a prone position," are "especially [apparent] when an individual is in a state of excited delirium." *Weigel*, supra, 544 F.3d at 1154.

This risk should have been familiar to Teets because he took the 40-hour CIT course "that provided training to help people experiencing mental health problems." *Miller v. Roycroft*, supra, 2024 U.S. Dist. LEXIS 60324, at *34. Despite this training, Teets and his officers "exerted more

force than was reasonable" by dropping their weight on Marshall "and kneeling on his neck, especially after he was restrained." *Blanchard*, supra, 2022 U.S. Dist. LEXIS 181640, *36. Their "prone restraint was contrary to national standards of care in policing." *Alves v. Riverside Cnty.,* 2023 U.S. Dist. LEXIS 109189, *48 (C.D. Cal. May 19, 2023). The officers should have put Marshall "in the recovery position sooner after he was restrained." *Alves*, supra, at *50. Instead, Marshall was "kept in the prone position while handcuffed" and subsequently died. *Myers*, 2021 U.S. Dist. LEXIS 45010, at *44.

 "Viewing the facts in the light most favorable to Plaintiff," FGPD's "moderate interest did not justify the severe force of pressure on Mr. [Marshall's] back [and neck]." *Payne*, at 1170. Marshall was handcuffed, unarmed, agitated, shrieking, and unintelligible. See *id.* He was "suffering a paranoid episode, and a jury could determine that the amount of force … exceeded the need presented under the circumstances." *Quinto-Collins v. City of Antioch,* 718 F. Supp. 3d 1033, 1052 (N.D. Cal. 2024) (QI denied to December 2020 prone restraint). OIC Teets was "on notice that, when [Marshall] was in handcuffs and laid prone on the ground, additional force, as…been applied here, was unlawful." *Id*. at 1053; see also *Stephenson*, supra, 761 F. Supp. 3d at 1274; *Krueger v. Phillips*, 2025 U.S. App. LEXIS 21515, *66-67 (10th Cir. 2025) (published).

## IV. NO QUALIFIED IMMUNITY BECAUSE THE LAW WAS CLEARLY ESTABLISHED IN OCTOBER 2020 REGARDING <u>DRIVE STUN</u> ON RESTRAINED PERSON SUFFERING FROM EXCITED DELIRIUM

 "To be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022). "A 'case directly on point' [] is not required" for a right to be clearly established. *Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1067 (9th Cir. 2024) (analyzing qualified immunity to Fourth Amendment excessive force claim). Courts "first to binding precedent. 'If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end.'" *Ballentine*, supra, at 64.  "[I]n the absence of binding precedent, we look to whatever decisional law is available to ascertain whether the law is clearly

established." *Wright v. Beck*, 981 F.3d 719, 736 (9th Cir. 2020). A plaintiff "need not identify a prior identical action to conclude that [a] right is clearly established." Thus, "[t]he question is not whether an earlier case mirrors the specific facts here. Rather, the relevant question is whether 'the state of the law at the time gives officials fair warning that their conduct is unconstitutional.'" *Ballentine*, 28 F.4th at 66.

### A. Intersectionality

The Ninth Circuit "routinely rel[ies] on the intersection of multiple cases when holding that a constitutional right has been clearly established." *Soakai v. Abdelazis,* 137 F.4th 969, 985 (9th Cir. 2025); *Ioane v. Hodges*, 939 F.3d 945, 956-57 (9th Cir. 2018) (holdings from *four* prior cases put the unlawful officer's conduct beyond debate); *Gordon v. County of Orange*, 6 F4th 961, 971 (9th Cir. 2021) (*three* cases); *Ballou v. McElvain*, 29 F.4th 413, 426-27 (9th Cir. 2022) (*two* cases). The Ninth Circuit drive-stun and medical distress cases are similar enough that "every reasonable official would have understood that what he is doing" is unlawful. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

#### 1. Drive-Stun Clearly Established Precedent: *Mattos / Bonivert*

The Ninth Circuit has made clear that using a Taser drive-stun on a person who *actively resists arrest* but poses *no immediate threat* constitutes excessive force. *Bonivert v. City of Clarkston*, 883 F.3d 865, 880 (9th Cir. 2018) (citing *Mattos v. Agarano,* 661 F.3d 433, 445–46 (9th Cir. 2011) (en banc)). *Mattos* distilled the salient Fourth Amendment facts: The plaintiff, seven months pregnant, refused to sign a traffic ticket and resisted by refusing to exit her car and clutching the steering wheel. Officers twisted her arm and drive-stunned her three times before handcuffing her inflicting extreme pain and a rapid heartbeat. *Id*. at 436-38; 445-46.

*Mattos* established clear contours for Taser drive stun cases*:* "[U]se of a taser in drive-stun mode on a person who 'actively resisted arrest,' but posed no 'immediate threat to the safety of the officers or others,' constitute[s] excessive force." *Bonivert,* supra, 883 F.3d at 880 (citing *Mattos* at 661 F.3d at 445-46.) Those exact same contours governed the *Bonivert* drive stun case, where officers responding to a physical domestic call after midnight were aware the suspect "had

been drinking that evening" and "had a problem with authority." *Bonivert*, at 869-80, 880. The officer drive-stunned Bonivert after he had been tackled. Bonivert was arrested for assaulting an officer, resisting arrest, and domestic violence assault. *Id*. at 871.

Applying *Mattos* and *Bonivert's* Taser drive-stun contours to our facts, OIC Teets' drive-stun was excessive under clearly established law—even assuming Marshall was resisting—because Marshall posed no immediate threat to officers or others at the time of the fatal deployment. Teets asks this Court to draw Marshall's right more narrowly than the Ninth Circuit's has permitted. But "just as a court can generalize too much, it can generalize too little. If it defeats the qualified immunity analysis to define the right too broadly…it defeats the purpose of 1983 to define the right too narrowly." *Ouza v. City of Dearborn Heights*, 969 F.3d 265, 280 (6th Cir. 2020).

2.   Mental Health Clearly Established Precedent: *Deorle v. Rutherford* /

*Bryan v. MacPherson*

Marshall's constitutional rights were even more clearly established because of his excited delirium and the intersection of rights defined in *Deorle* and *Bryan*. "Taser-specific case law is not necessary to resolve whether the right at issue was clearly established." *Price v. Roseburg Police Dep't*, 2017 U.S. Dist. LEXIS 159966, *13 (D. Or. June 21, 2017). "[W]here it is or should be apparent to the officers that the individual involved is emotionally disturbed…must be considered in determining, under *Graham*, the reasonableness of the force employed." *Deorle*, 272 F.3d at 1283. "Every police officer should know…that it is objectively unreasonable to [use significant, non-lethal force on] an unarmed man who: has committed no serious offense, is mentally or emotionally disturbed, has been given no warning of the imminent use of such a significant degree of force, poses no risk of flight, and presents no objectively reasonable threat." *Id.* at 1280-85; *Bryan*, 630 F.3d at 832 (rejecting use of intermediate force in a "tense, but static, situation" involving a nonthreatening, emotionally distraught individual.)

When an officer believes a subject is "mentally disturbed" the officer should make "greater effort to take control of the situation through less intrusive means." *Bryan*, supra, 630 F.3d at 829. As the <u>Deorle</u> Court explained, "problems posed by, and thus the tactics to be employed

against, an unarmed, emotionally distraught individual who is creating a disturbance or resisting arrest are ordinarily different from those involved in law enforcement efforts to subdue an armed and dangerous criminal who has recently committed a serious offense." *Deorle*, 272 F.3d at 1282-83.-

> "The same reasoning applies to intermediate levels of force. A **mentally ill individual is in need of a doctor**, not a jail cell, and in the usual case—where such an individual is neither a threat to himself nor to anyone else—the government's interest in deploying force to detain him is not as substantial as its interest in deploying that force to apprehend a dangerous criminal. Moreover, the purpose of detaining a mentally ill individual is not to punish him, but to help him. The government has an important interest in providing assistance to a person in need of psychiatric care; thus, the **use of force that may be justified by that interest necessarily differs both in degree and in kind from the use of force that would be justified against a person who has committed a crime or who poses a threat to the community**. After all, "increasing the use of force may, in some circumstances at least, exacerbate the situation," whereas a 'waiting period [could] diffuse a potentially violent situation and prevent [harm].'" *Deorle*, 272 F.3d at 1283, n.21.

Marshall's clearly established constitutional right to be free from Teets' drive stun arises at the intersection of (i) the *Mattos-Bonivert* drive-stun cases involving resistance without an immediate threat; and (ii) the *Deorle-Bryan* line prohibiting significant force against mentally disturbed, unarmed individuals. As of October 2020, it was clearly established that deploying a drive-stun Taser on Marshall under these medical and psychological circumstances constituted unreasonable and excessive force.

V.    **NO QUALIFIED IMMUNITY BECAUSE THE LAW WAS CLEARLY ESTABLISHED IN OCTOBER 2020 THAT <u>CONTINUOUS FORCEFUL PRONE RESTRAINT OF A HANDCUFFED PERSON</u> SUFFERING EXCITED DELIRIUM CONSTITUTES EXCESSIVE FORCE**

A. **This Court's Qualified Immunity Analysis in *Payne v. City of Eugene***

This Court has already addressed the clarity of the law in a closely analogous prone-restraint death that *predated* both the October 2020 Marshall incident and George Floyd's May 2020 death. See *Payne v. City of Eugene*, 760 F. Supp. 3d 1157 (D. Or. 2024).

In *Payne*, officers responded to a 911 call for a man experiencing a mental health crisis and on methamphetamine. They arrested Payne on an unpaid child support warrant. *Payne*, supra, at 1163. After a violent struggle, Payne was arrested and transported to jail without medical clearance. Once there, seven to eight deputies applied varying degrees of pressure to Payne's "arms, legs, head, and back." *Id*. **90 seconds** after being removed from the vehicle, Payne lost consciousness. *Id*.. Payne died two days later from anoxic encephalopathy. *Id*. at 1164.

In *Payne*, this Court recognized the *Drummond* line of cases had put officers "on notice that their disputed actions—applying pressure to the back of a handcuffed, prone, agitated individual who was struggling to breathe—were unlawful." *Payne*, at 1171. The Court further held that cases "distinguishable from *Drummond*" still put officers "on notice that applying pressure to the back of a prone, handcuffed individuals who was struggling to breathe was constitutionally excessive." *Id*. The most salient *Drummond* facts were that the decedent was "unarmed, handcuffed, agitated, and on his stomach, with the weight of multiple officers applied to his body." *Id*.

Unlike *Payne*, Marshall was restrained in prone for **4 minutes and 25 seconds** before the officers got off his back. Ex.78(Quad Vid. 9:10-13:35). Approximately **2 minutes and 44 seconds** of that time was after Marshall was handcuffed. (10:51-13:35). See also *Alves v. Riverside Cnty*., 2021 U.S. Dist. LEXIS 169354, *8 (C.D. Cal. Aug. 5, 2021) (1 minute 18 seconds after handcuffing). The circumstances were similar enough for Teets to know "not to place pressure on [Mr. Marshall's] back [and/or] neck during those moments." *Payne*, at 1171.

Marshall's case is more egregious than *Payne*. Like *Payne*, Marshall was unarmed, handcuffed, agitated, and prone beneath the weight of multiple officers—but unlike *Payne*, some of that weight was on his *neck*. See *Payne*, at 1171 (noting that "Mr. Payne …did *not* have weight applied directly to his neck."); see also *Briseno*, supra, 2025 U.S. Dist. LEXIS 38678, *55 (denying qualified immunity to March 2020 prone restraint death in which "a jury could find that Defendants' use of force, particularly their body weight on Alvarado's neck and back, was deadly force.")

Moreover, Teets knew—based on his CIT with Dr. Soto and the nationwide outcry following the George Floyd incident just months earlier—that using a knee-on-neck technique could constitute deadly force.[19] See *Drummond*, supra, at 1061-62 (denying qualified immunity in part because "local newspaper publicity less than two months before the incident publicize[d] cases of compressional asphyxia" and because "officers received training from their *own police department* explaining specifically that 'when or more officers are kneeling on a subject's back or neck to restrain him, compression asphyxia can result.'") (italics in original). ███████████████

████████████████████████████████████████████████

███████████

Teets' continued "pressure on Mr. [Marshall's] back beyond the minimal force warranted… evidence[s] the violation of a clearly established right made clear in *Drummond* and elsewhere." Quoting *Payne*, at 1172. "Ninth Circuit case law, [] has recognized that pressing an individual face first into the ground is "capable of causing death or serious injury" and that "prone and handcuffed individuals in an agitated state have suffocated under the weight of restraining officers." *Sanchez*, supra, 2023 U.S. Dist. LEXIS 203673, *56-57 (analyzing 2018 in-custody death and quoting *Drummond.*)

### B. *Drummond v. City of Anaheim*, 343 F.3d 1052 (9th Cir. 2003)

In *Drummond*, officers responded to a call that Drummond might harm himself by running into traffic. *Drummond*, 343 F.3d at 1054. When the officers arrived, Drummond was "hallucinating and in an agitated state." *Id*. The officers "knock[ed] Drummond to the ground," and "cuffed his arms behind his back as [Drummond] lay on his stomach." *Id*. "Although Drummond offered no resistance," officers placed their weight on his back using their knees, with one officer placing a

---

[19] "Following the death of George Floyd during a confrontation with the Minneapolis, Minnesota Police in May 2020, large scale protests erupted around the country throughout the summer including in Portland, Oregon." *Tyvoll v. City of Portland*, 2023 U.S. Dist. LEXIS 155938, *1 (D. Or. May 23, 2023); *Wise v. City of Portland*, 483 F. Supp. 3d 956, 961 (D. Or. 2020) ("George Floyd's tragic killing on May 25, 2020 sparked national and international protests...In Portland, these protests have continued for almost one hundred days.")

knee on his neck. *Id.* Drummond "repeatedly told the officers that he could not breathe and that they were choking him." *Id*. Approximately 20 minutes after being taken to the ground, Drummond lost consciousness and suffered irreversible brain damage from oxygen deprivation. *Id*. at 1055.

The Ninth Circuit held that the officer's use of force "was severe and, under the circumstances, capable of causing death or serious injury." *Id*. at 1056. The Court noted that while Drummond was "being taken into custody to prevent injury to himself[,]" he "did not resist the arresting officers" once he was on the ground, prone and handcuffed. *Id*. at 1059. The court concluded that while "some force was surely justified in restraining Drummond so that he would not injure himself or the arresting officers[,]" "after he was handcuffed and lying on the ground, the force that the officers then applied was clearly constitutionally excessive when compared to the minimal amount that was warranted." *Id*. These rules have been consistently followed in the Ninth Cricuit, and was the law in October 2020.[20]

Like *Drummond*, Marshall was hallucinating and in an agitated state when Teets put his weight on Marshall's back and neck with his knee. Although Marshall went limp approximately 5 minutes after the takedown (Ex.78-Quad Vid. 8:16-13:14)—as opposed to *Drummond's* 20 minutes— Marshall was handcuffed and facedown when Teets continued with the prone restraint. This Court in *Payne* noted that the qualified immunity question is not whether the facts of this case are "more egregious" than *Drummond*; but whether "the circumstances [] are similar enough" that the officers "knew or should have known not to place pressure on Mr. [Marshall's] back during those moments." *Payne*, at 1171.

---

[20] "For years, *Drummond* has provided law enforcement personnel with notice that, notwithstanding slight factual variations, it is constitutionally excessive to place body weight force on the back or neck of a prone and unarmed individual who cannot meaningfully resist." *Dominguez v. Cnty. of Los* Angeles, 2024 U.S. Dist. LEXIS 145998, *39-40 (C.D. Cal. Aug. 15, 2024) (collecting Ninth Circuit decisions); *Scott*, supra, 109 F.4th at 1226 ("Long before Scott's death [in 2019], we clearly established that it is unconstitutional to use bodyweight force on the back and neck of a prone and unarmed individual.")

### C. *Gregory* and *A.B.* are Distinguishable Because Teets Used Prone Restraint After Marshall Was Handcuffed

In denying the defendants qualified immunity, this Court in *Payne* relied on several unpublished decisions that "fell within [*Drummond's*] orbit" to deny qualified immunity. *Payne*, supra, at 1171. As in *Payne*, those pre-incident Ninth Circuit decisions guide this Court's qualified immunity inquiry. Before analyzing those cases, it is helpful to first distinguish the cases Teets relies on to argue that *Drummond's* prone-restraint law was not clearly established in October 2020.

#### 1.  Teets' Cited Ninth Circuit Cases are Distinguishable

Teets argues that the law is not clear because of *Gregory v. Cnty. of Maui*, 523 F.3d 1103 (9th Cir. 2009) and *A.B. v. Cnty. of San Diego*, 2022 U.S. App. LEXIS 9534 (9th Cir. 2022). Both cases are distinguishable because, unlike here, the officers ceased using force *once the subjects were handcuffed*—or never completed handcuffing at all. In *Gregory*, the Ninth Circuit found the officers' prone restraint was not excessive because "the officers in [that] case ceased using force once Gregory was handcuffed." *Id*. at 1109. The Ninth Circuit underscored this important distinction that same year in *Arce v. Blackwell*, 294 Fed. Appx. 259, 262 (9th Cir. 2008): "Significantly, unlike in *Drummond*…the police officers in *Gregory* 'ceased using force once Gregory was handcuffed,' even through Gregory continued to resist throughout the encounter."

Similarly, *A.B. v. Cty. of San Diego* involved force largely applied *before* restraint was achieved. There, deputies responded to a man acting strangely at a busy store, where he repeatedly placed his hands into bulging pockets. 2020 U.S. Dist. LEXIS 182507, *3-4 (S.D. Cal. Oct. 1, 2020). A struggle followed, and the man was tackled, Tased, and punched. However, he was never fully handcuffed—only "partly secured." *Id*. at *8.

In this case, officers collectively maintained significant weight on Marshall's back for more than two and a half minutes after he was handcuffed. Ex.28(Bercovici Rprt., p. 38).

#### 2.  *Payne's* Ninth Circuit Cases are Analogous

Marshall's case aligns with the Ninth Circuit decisions relied on in *Payne*. In *Perkins v. Edgar*, 2022 U.S. App. LEXIS 29926 (9th Cir. Oct. 25, 2022), officers responded to a reported assault where Perkins punched an officer and **bit off his finger** before breaking free. *Perkins v. City of Anaheim*, 2021 U.S. Dist. LEXIS 166024, *9 (C.D. Cal. Apr. 26, 2021). The Ninth Circuit upheld the district court's ruling that the officer violated *Drummond* by applying pressure to Perkins's back instead of placing him in the recovery position. *Id.* at *11. The court emphasized that the absence of verbal pleas for air was not dispositive because Perkins's "body language and other facts surrounding the incident—including that [he] was bleeding and handcuffed, had labored breathing, and had been mostly unresponsive to the Officers' questions—should have put the Officers on notice that he was having trouble breathing." *Perkins*, supra, 2022 U.S. App. LEXIS 29926, *4.

In *Zelaya v. Las Vegas Metropolitan Police Dep't,* 682 F. App'x 565, 566 (9th Cir. 2017), four officers took a man down; handcuffed him; and then three officers continued to pin him with their bodies for at least 90 seconds after the man was subdued. The Ninth Circuit held that this continued prone restraint violated *Drummond's* prohibition against maintaining bodyweight pressure on a prone, handcuffed individual's neck and torso" *Id.*

In *Abston v. City of Merced*, 506 Fed. Appx. 650 (9th Cir. 2013), the Ninth Circuit found a *Drummond* violation when the decedent, under the influence of methamphetamine, drove the wrong way on a highway and struggled with officers while exhibiting erratic behavior. *Id.* at 651. After officers tased him, they applied pressure to his back while he was face-down, handcuffed, and ankle-shackled for one minute and seven seconds. *Id.* at 652.

Finally, in *Tucker v. Las Vegas Metro. Police Dep't*, 470 Fed. Appx. 627 (9th Cir. 2012), officers responded to a man under the influence who had destroyed property and was bleeding amid broken glass. They found him lying on a bed, drenched in sweat. *Tucker v. Las Vegas Metro. Police Dep't,* 2009 U.S. Dist. LEXIS 416327, *3 (D. Nev. Sept. 15, 2009). After he kicked one officer, the officer struck him with a baton and administered a drive-stun before handcuffing him. *Id.* at *3-4. Although restrained, the man continued to kick, prompting two officers to straddle his

lower back—one applying knee pressure to keep him down. The man stated he could not breathe. *Id*. at \*4. The Ninth Circuit held this conduct violated clearly established law under *Drummond*, despite the continued resistance after handcuffing. *Tucker*, supra, 470 Fed. Appx. at 629.

## V. PLAINTIFFS' STATE LAW CLAIMS: ASSAULT & BATTERY

Assault is the "intentional attempt to do violence to the person of another, coupled with present ability to carry the intention into effect." *Cook v. Kinzua Pine Mills Co*., 207 Or. 34, 48-49 (1956). Under Oregon law, a law enforcement officer is authorized to use force reasonably necessary under the circumstances to fulfill his lawful professional duties. See *Ballard v. City of Albany*, 221 Or.App. 630, 640-41 (2008). As such, "the success of a plaintiff's . . . battery claim[ ] is contingent upon whether the use of force was excessive under the Fourth Amendment." *Price v. City of Sutherlin*, 945 F.Supp.2d 1147, 1157 (D. Or. 2013) (citing *Ballard*, 221 Or.App. at 640-41).

Here, the parties present conflicting accounts of their physical altercation. Factual questions remain whether OIC Teets' use of force was reasonable under the circumstances. Accordingly, summary judgment is not appropriate. See e.g., *Williams v. Jackson*, 2014 U.S. Dist. LEXIS 179713 (D. Or. Dec. 3, 2014).

CONCLUSION

Plaintiffs respectfully request this Court deny Defendant Teets summary judgment.

Dated this 5th day of November 2025.

/S/ Jonathan (Jonny) Russell
Jonathan Russell OSB #220641
Clark Law & Associates LLC
6501 SW Macadam Ave. Suite E
Portland, OR   97239
(503) 238-1010
(503) 238-1212 (facsimile)
jonny@clarklawportland.com
*Of Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This brief contains **40 pages**, including headings, footnotes, and quotations, but excluding the caption, table of contents, table of cases and authorities, signature block, exhibits, and any certificates of counsel.

/s/ Jonathan Russell

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that I served the attached **PLAINTIFFS' RESPONSE TO DEFENDANT STEVEN TEETS' MOTION FOR SUMMARY JUDGMENT** on:

Lauren Nweze
E-mail:LNweze@wshblaw.com
Wood Smith Henning & Berman LLP
12755 SW 69th Avenue, Suite 100
Portland, OR 97223
*Of Attorneys for Defendants City of Forest Grove, Kole McGann, and Matthew Dorick*

Aaron Hisel, OSB No  161265
Capitol Legal Services
901 Capitol St NE
Salem, OR 97301
503-480-7250
Fax: 503-779-2716
Email: aaron@capitol.legal

*Of Attorneys for Defendant Steven Teets*

☐  By hand delivering to said attorney(s) a true copy thereof.

X   By emailing to said attorney(s) at their above listed email address(es) a true copy thereof.

☐  By mailing to said attorney(s) a full and correct copy therefor, contained in a sealed envelope, with postage paid, addressed to said attorney(s) as stated above and deposited in the United States Post Office at Salem, Oregon.

Dated this 9th day of November 2025.

Clark Law and Associates, LLC

<u>/s/ Jonathan Russell</u>
Jonathan Russell OSB #220641
6501 SW Macadam Avenue, Suite E
Portland, OR 97239
*Of Attorneys for Plaintiffs*